1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3               MARSHALL DIVISION

4  SIMPLEAIR, INC.             )(

5                       )(    CIVIL DOCKET NO.

6                       )(    2:13-CV-587-JRG

7  VS.                   )(    MARSHALL, TEXAS

8                       )(

9  GOOGLE, INC., ET AL      )(    MARCH 7, 2014

10                     )(    8:00 A.M.

11               PRE-TRIAL HEARING

12      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13         UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFFS: (See sign-in sheets docketed in
                    minutes of this hearing.)

17

18  FOR THE DEFENDANTS: (See sign-in sheets docketed in
                    minutes of this hearing.)

19

20  COURT REPORTER:     MS. SHELLY HOLMES, CSR
                    Official Reporter

21                    United States District Court
                    Eastern District of Texas

22                    Marshall Division
                    100 E. Houston Street

23                    Marshall, Texas  75670
                    (903) 923-7464

24

25  (Proceedings recorded by mechanical stenography, transcript
produced on a CAT system.)

1                          I N D E X

2

3    March 7, 2014

4                                              Page

5          Appearances                          1

6          Hearing                              3

7          Court Reporter's Certificate       118

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              COURT SECURITY OFFICER:  All rise.

2              THE COURT:  Be seated, please.

3              All right.  We're here for a pre-trial in regard to

4     SimpleAir versus Google.  This is Civil Action 2:13-CV-587.

5              Let me call for announcements on the record.  What

6     says the Plaintiff?

7              MS. DERIEUX:  Elizabeth DeRieux on behalf of

8     Plaintiff, SimpleAir.  With me today, Greg Dovel, Jeff

9     Eichmann, Simon Franzini, and we're ready to proceed.

10             THE COURT:  All right.  And what says the Defendant?

11             MS. AINSWORTH:  Good morning, Your Honor.  Jennifer

12    Ainsworth on behalf of Google, along with Mitch Stockwell, Russ

13    Korn, and Mr. Ken Makish from Google.  We're ready, Your Honor.

14             THE COURT:  Thank you.

15             All right.  As everyone should know, this case is set

16    to go to trial before a jury in this Court on the 17th of

17    March.  Prior to jury selection, which will take place first

18    thing on the morning of Monday, the 17th, the Clerk's Office

19    will play the patent video for the prospective jurors.

20             During the voir dire process, each side will be

21    allowed 30 minutes per side to examine the panel.  As I think

22    you're all aware of from our last trial, you're entitled to use

23    up to three minutes of your voir dire time to give the jury a

24    high level overview of the disputes in this case.  You are not

25    to argue your case.  And if I sense that you have become
```

1  argumentative, I will call you on it in front of the panel, so

2  don't do it.

3        The remainder of your time is to be used specifically

4  for making inquiries of the panel members with regard to

5  selecting a fair and impartial jury.

6        There is a jury -- juror questionnaire in this case,

7  and I'll refer you to the Clerk for access to the answered

8  questionnaires.  The Court's practice is that by or before the

9  end of the day on the day of jury selection, those

10  questionnaires must be returned to the Clerk and you are not

11  entitled to retain any of the information, any of the hard

12  copy, electronic form, or any other form.  So everything you

13  get from the Clerk comes back to the Clerk after the jury is

14  selected as far as the questionnaires are concerned.

15        Each side will be given four peremptory challenges,

16  and the Court will seat eight jurors.  And we'll proceed to

17  begin the trial after the jury's selected on the 17th.  Each

18  side will be afforded four hours per side to put on your

19  evidence.  That's not including openings or closings.

20        With regard to openings, given the focused nature of

21  this dispute, each side will be allowed 15 minutes for opening

22  statements.  Each side will be allowed 20 minutes for closing

23  statements.

24        As before, it will be my practice to be available in

25  chambers by 7:30 each morning during the trial.  If there are

housekeeping matters or late arising disputes, that time is available to counsel to consult with the Court about those issues and obtain direction.

If there are to be witnesses who testify by video deposition and there are disputes regarding those designations or counter designations, I need to see them the day before the videoclip is to be played. And we'll do that on a rolling basis going forward.

After we've concluded the evidence, I'll entertain motions under Rule 50(a), and I'll hold an informal charge conference followed by a formal charge conference, as before.

I remind you of the Court's directive not to refer to individuals by first name only, and I instruct you to advise your witnesses to do the same. If your witnesses refer to individuals by first name only, I'll consider you haven't carried out my directive in preparing those witnesses. Both first and last name are fine, both -- or last name with Mr. or Ms., Dr., whatever the proper title is, is fine, but first names only are not.

With regard to any sensitive or confidential matters that would come out during the trial, the Court is open to request to seal the courtroom. I see Ms. Smith in the back, and I assume she's here for Microsoft.

MS. SMITH: I am, Your Honor.

THE COURT: My request would be that counsel meet and

1  confer and coordinate these requests.  I'd like to -- I'd like

2  to accommodate the necessity of protecting any confidential

3  information while at the same time minimizing the interference

4  or disruptions with the trial process and also minimizing any

5  interference with the concept of trial being an open and public

6  undertaking.  So I'll expect everybody to talk about it and

7  decide how to best group or coordinate that so that we at least

8  minimize the disruptive effect of sealing, but I am open to

9  that.  And I'd like as much notice about that as possible so

10 that I can plan for it as the trial progresses.

11        MS. SMITH:  Thank you, Your Honor.  I have one -- one

12 point of clarification, as well.  Is it going to be the

13 protocol as well in this case that you will not be sealing the

14 courtroom for opening and closing argument?

15        THE COURT:  I'm sorry?

16        MS. SMITH:  As far as opening and closing argument

17 when confidential Microsoft attorney -- outside attorneys eyes

18 only information is disclosed in opening and closing, is there

19 any remedy -- any -- any ability to request a closed courtroom

20 for either of those stages of trial?

21        THE COURT:  You know, that's certainly not evidence.

22 I'd be hard pressed to seal the courtroom during opening and

23 closing unless somebody can convince me there's a compelling

24 reason to do it.  That's different than when sworn testimony is

25 being presented, but by definition, that's just attorney

1    argument.

2          MS. SMITH:  Thank you for that clarification, Your

3    Honor.

4          MS. AINSWORTH:  Your Honor --

5          THE COURT:  Ms. Ainsworth.

6          MS. AINSWORTH:  Thank you, Your Honor.  Just to make

7    sure that this does go more smoothly this next time, since we

8    are not trying the infringement portion of the case, we don't

9    anticipate that we'll have source code issues, so part of the

10   sensitive information shouldn't be an issue.  However, because

11   it's the damages case, we do anticipate that a lot of these --

12   a lot of the license issues and the financial issues are going

13   to be front and center probably within the first minute of the

14   Plaintiff's opening, as -- as we saw during the last trial.

15         And I want to extend to the Court our apologies that

16   our motion for redaction turned out to be as difficult as it

17   did, and we want to make sure that that doesn't happen this

18   time.

19         THE COURT:  I think you understand that unless it

20   falls under Rule 5, I'm probably not going to redact the

21   transcript, so we're going to need to address it with sealing

22   rather than redactions.

23         MS. AINSWORTH:  Okay.  Thank you, Your Honor.  And I

24   think the parties probably didn't grasp that fully last time.

25         And if I might ask one other thing with regard -- and

1    I hesitate to do so because I know the Court has ruled on the

2    motion for redaction, but would there be a possibility --

3    possibility of if the parties could jointly request 10 or less

4    items to seal from the prior transcript, would the Court

5    entertain that?

6              THE COURT:  Well, the problem is post my order on your

7    request for redactions, the transcript's already been ordered

8    and is out.  So to use an old expression, the horse is out of

9    the barn at this point, Ms. Ainsworth.  So it makes that

10   request more or less moot.

11             MS. AINSWORTH:  Thank you, Your Honor.

12             THE COURT:  So going forward, don't assume you're

13   going to get carte blanche on redactions to the extent it

14   becomes necessary.  And necessary is the standard, not just

15   preferable.  But to the extent it becomes necessary, the Court

16   will seal the courtroom.  I just want to do it in a way that

17   disrupts this trial as little as possible.

18             MS. AINSWORTH:  Thank you, Your Honor.

19             THE COURT:  And you do raise a very good point, and I

20   want to emphasize, and that is we are just trying the damages

21   issue.  We are not going to retry the infringement or the

22   validity issues.  And the Court's opinion is there's no need to

23   go back into those.  They are a given, and I intend to instruct

24   the jury that those are established.  And I'll consider

25   anything outside of application to the damages issue

irrelevant.  I do -- I do not want this trial to become an
unintended revisiting of the infringement or the validity
issues.  Those are resolved.  I want it to be focused on the
damages issue, which is the only issue the jury is going to be
asked to answer at the end of the day.

And I have some concern that without clear
understanding by everybody before it starts, it might well
lapse into those other areas and I want everybody to be aware
of the Court's feelings about it before we get started.

MS. AINSWORTH:  Thank you, Your Honor.  I think there
probably will be some specific issues that we'll need to
address with Your Honor today to make sure we know where those
lines are.

THE COURT:  And I'm happy to give direction on that.
But I will do so with an overall understanding that this is a
damages trial, and it's not anything else.

MS. AINSWORTH:  Thank you, Your Honor.

THE COURT:  All right.  I'm going to direct the
parties to meet and confer and file by 5:00 o'clock on Monday,
the 10th, a joint proposed set of jury instructions and verdict
form.

Also, as before, I intend to afford the jury the
benefit of a juror notebook, and I'm going to direct the
parties to jointly prepare and furnish to the Court 10 copies
no later than the Friday before Monday, the 17th.  I don't have

1  a calendar up here.  I think that's the 14th.  Whatever it is,

2  the Friday before.

3        Those juror notebooks should contain a copy of the

4  patents-in-suit, just purely for context.  I see no need to

5  include the claim construction chart, as before.  But there

6  should be individual pages for witnesses with the photograph

7  and the name superimposed at the top, as before.  No titles, no

8  designations or characterizations, just simply the name and the

9  photograph, as well as the legal pad to fit in the notebooks.

10        Also, as before, I remind counsel that the Court's

11  view with regard to expert testimony is that it is both

12  confined and defined by the reports of the experts, and the

13  Court has a very dim view of attempts to go outside of the

14  written report.  And I would urge you not to cross that line.

15  And if there's any doubt, stay on the other side of it.

16        Any questions about those instructions?

17        All right.  Let's move next to the actual pre-trial

18  motions in dispute that need to be taken up.  The first one I

19  have is Google's motion for a continuance and their motion to

20  stay pending appeal.  If Google feels compelled to offer some

21  argument on this, I'll allow you a very brief period of time.

22  If not, I'll give you a ruling.

23        MR. STOCKWELL:  Your Honor, just briefly on the motion

24  for continuance.  I assume the Court is going to deny that

25  based on the earlier comments, but we do have associated with

1  that a motion to substitute a witness because we're not going

2  to be able to get Ms. Ghosh here.  We're not going to get

3  Mr. Nerieri here, and we would like to substitute a -- a

4  witness that we have disclosed to the Plaintiff in their stead,

5  Your Honor.

6         THE COURT:  That disclosure has been made because at

7  the time this was filed, I don't recall that the disclosure had

8  been made.

9         MR. STOCKWELL:  It has been made, Your Honor.  It's

10 Constine -- and I'm sorry -- Minaguchi.

11        THE COURT:  Well, the Court is going to deny the

12 motion for continuance and the motion to stay pending appeal.

13        With regard to the substitute -- substitution of

14 witnesses, my inclination is to allow it, but to afford the

15 Plaintiffs an opportunity to depose these people during this

16 coming week.  I think it's inherently unfair to bring somebody

17 new that is going to testify that the Plaintiffs have not had

18 an opportunity to depose.  If we can -- if we can set a method

19 by which the Plaintiffs will not be seeing them for the first

20 time when they get on the witness stand, then I'm probably

21 going to allow you to substitute.

22        MR. STOCKWELL:  Okay.  We understand that, Your Honor,

23 and we certainly aren't opposed to that.

24        THE COURT:  What's the Plaintiff's position on the

25 substitution issue?

1          MR. DOVEL:  Your Honor, the witness they've identified

2     was never identified in any previous disclosures, so we have no

3     discovery on them, so it would be absolute critical that we

4     take a deposition.  But with that deposition and there's just

5     one witness, we can -- we can do it.

6          THE COURT:  All right.  Well, I'm -- I'm going to

7     allow the substitution, conditioned upon a mutually agreed upon

8     time and place for a deposition to be conducted by the

9     Plaintiff during this coming week.

10         MR. STOCKWELL:  Thank you, Your Honor.  Just one

11    clarification.  We -- we are also bringing Mr. Gold, but he was

12    a disclosed may call witness on our list the last time, and

13    they've already deposed him.  We don't view him as a substitute

14    witness because he was already disclosed and had been deposed

15    in the case.  So it would be Mr. Gold and the substitute

16    witness.

17         THE COURT:  Well, my ruling is witnesses who have not

18    been previously disclosed are deposed, so --

19         MR. STOCKWELL:  Yes, sir.

20         THE COURT:  -- that shouldn't apply to him.

21         All right.  Let's next take up Google's motion to

22    present the testimony of Mr. Eastburn by deposition.  I'll hear

23    from the Defendant on this.

24         MR. KORN:  Thank you, Your Honor.

25         As set forth in the -- the papers and in the motion

1   for continuance, Mr. Eastburn underwent hip surgery on February

2   3rd.  And if you recall from the -- the first trial, he was

3   walking with a cane, which isn't his normal mode of -- mode of

4   transportation.  He actually needed surgery before the trial,

5   but wanted to push that off so that the trial could happen in

6   January.  The surgery was scheduled on February 3rd.  He had

7   that surgery successfully, but has been instructed by his

8   doctor not to travel by air for 90 days.  Therefore,

9   Mr. Eastburn is unavailable to -- to testify live at trial.

10          And with that, we request the opportunity to take a

11  trial deposition of Mr. Eastburn so that it can be played

12  before the jury in the damages trial.

13          Now, Mr. Eastburn's testimony is relevant to

14  Georgia-Pacific Factor 9, which is any incremental benefit that

15  Plaintiff alleges to be in the patent above be prior art.  He

16  testified to that in his -- in the -- in the original trial.

17  It's also in his expert report where he lays out the -- the

18  state of the art prior to January of 1996, which was the

19  earliest priority date of the '914 patent.

20          So the substance of his testimony will be short.  It

21  will be limited to the state of the art by identifying some of

22  the -- the art that was in existence prior to the '914 patent.

23  It will not be a claim-by-claim invalidity analysis or any

24  opinion that the claims are, in fact, invalid.  It's just a

25  summary of the art in existence prior to the filing of the '914

1  patent, which, again, Your Honor, is relevant to

2  Georgia-Pacific Factor No. 9.

3       THE COURT:  All right.  What's the Plaintiff's

4  response?

5       MR. EICHMANN:  Your Honor, we don't challenge

6  Mr. Eastburn's medical condition or inability to come here at

7  trial, but we fully challenge any relevance of his proposed

8  testimony.  Mr. Eastburn submitted an invalidity report in this

9  case, and they are now trying to repurpose it and say that it's

10 relevant to the issue of damages.  There are factors that they

11 can point to, very broad factors, under Georgia-Pacific that

12 talk about what was in existence before and what the

13 incremental value might be.  But their damages expert doesn't

14 address that factor with respect to any of the prior art or any

15 of the opinions of Mr. Eastburn.

16      In addition, there is nothing in Mr. Eastburn's

17 existing report that meets the description that they just

18 proffered of what his testimony would be.  They say he's not

19 going to provide a detailed analysis of the claims and how they

20 apply to the prior art.  That's fine.

21      So what they do intend, Your Honor, is to have him

22 come in and offer conclusory testimony saying, here's all this

23 prior art technology that existed, and this is really only just

24 a small improvement.  There is nothing like that in his report.

25 To the contrary, he asserts in his report anticipation

1    arguments that take the position that there is nothing new

2    about the patent whatsoever.  He does not provide any analysis

3    of any proposed incremental value of the patent over the prior

4    art.  And for them to now try to re-characterize his testimony

5    and present that is outside the scope of his report, it is not

6    relevant to the issues of damages, and it is furthermore highly

7    prejudicial in the sense that it's confusing to the jury,

8    especially in such a limited short time frame trial.

9            THE COURT:  Let me ask you this, counsel.  Do you

10   recall from the prior trial whether or not Dr. Ugone referred

11   to and relied upon in his testimony -- Mr. Eastman's (sic) --

12   Eastburn's reports or opinion?

13           MR. EICHMANN:  I don't recall that, but I'll tell you,

14   Your Honor, in opposing -- so we brought an in limine that's

15   related to this, as well.

16           THE COURT:  Right.

17           MR. EICHMANN:  I went back through his report --

18   Dr. Ugone's report.  There's not a single cite to any piece of

19   prior art or to Mr. Eastburn.  I didn't go do a further check

20   to see if they snuck something in at trial that wasn't in the

21   report.  I don't recall that having happened.  But to the

22   extent that they try to do that again with Dr. Ugone, then he'd

23   be outside of his report relying upon Mr. Eastburn.

24           THE COURT:  Well, if Dr. Ugone's report never referred

25   to Mr. Eastburn or his opinions or his report, I don't see how

1   Mr. Eastburn's relevant to come in at this point as a witness,

2   either live or by trial testimony.  So unless -- Mr. Korn, if

3   you've got something else, I'll hear from you, but if those are

4   the facts, then this is going to be denied.  Do you have

5   anything else to add that would change that?

6          MR. KORN:  Just -- just very briefly, Your Honor.

7   Aside from what may or may -- or may not be in Mr. Ugone's

8   report, I believe that the -- the jury has a right to

9   understand what was in existence prior to the '914 patent when

10  in their mind they're trying to value whatever incremental

11  benefit that that patent might bring, especially in light of

12  such a large damages number that Plaintiff is seeking.

13         In Mr. Eastburn's report, he did not specifically call

14  out a Georgia-Pacific factor, nor did he need to because he was

15  preventing -- presenting his -- one of ordinary skill in the

16  art as an expert would understand was the state of the art.

17         THE COURT:  Well, given that Dr. Ugone is your damages

18  expert and given that his report does not rely on

19  Mr. Eastburn's report or opinions, to allow Mr. Eastburn to

20  testify at this trial seems to me to be improper.  And

21  Dr. Ugone in his testimony certainly is going to be confined to

22  the parameters of his report.  And if Mr. Eastburn's not

23  incorporated into that or his opinions aren't, I think it would

24  be improper to allow him to testify.

25         So I'm going to deny Google's motion to present the

1  testimony of Mr. Eastburn by trial deposition.

2        MR. KORN:  Yes, Your Honor.

3        THE COURT:  All right.  Next is Google's renewed

4  motion to exclude the testimony of Dr. Srinivasan.

5        And, counsel, I view this as a fairly clear rehash of

6  the Daubert motion that we heard before.  If there's something

7  new, let's talk about it.  If it's not --

8        MR. STOCKWELL:  I believe that's correct as to both

9  this and Mr. Mills.  We did update the papers to include

10  references to the trial transcripts, Your Honor.

11        THE COURT:  Well, given that representation and given

12  the Court's careful consideration of this at the earlier trial,

13  I'm going to maintain a consistent ruling and I'm going to deny

14  the motion to exclude the testimony of Dr. Srinivasan.

15        MR. STOCKWELL:  Understood, Your Honor.

16        THE COURT:  Same question with regard to the pending

17  motion to exclude the testimony of Robert Mills.  Is it

18  substantively different than taken up before?

19        MR. STOCKWELL:  No, Your Honor.  We -- as I said, we

20  did update that to include references to deposition

21  transcripts --

22        THE COURT:  All right.

23        MR. STOCKWELL:  -- and the trial transcripts, yes.

24        THE COURT:  Then it'll likewise, consistent with the

25  prior ruling, be denied.

1        Let's next move to the Plaintiff's motions in limine.

2        Let me ask if there have been any late agreements

3   between counsel that the Court needs to be noticed of -- made

4   aware of?  If not, we'll take up the disputed motions in limine

5   in succession.

6        MR. EICHMANN:  No agreements, Your Honor.

7        THE COURT:  All right.  Then the first one appears to

8   be no argument or evidence regarding the lack of pre-filing

9   notice or willfulness.  And these are the Plaintiff's motions

10  in limine, so I assume these are objections by the Defendants.

11  Let me hear from the Defendants on this.

12        MR. STOCKWELL:  So, Your Honor, this is Plaintiff's

13  Motion in Limine No. 1.  Do you want me to just address this

14  motion, Your Honor, or all of the motions?

15        THE COURT:  Let's take them one at a time.

16        MR. STOCKWELL:  Okay.  Thank you, Your Honor.

17        So the -- this first argument that Plaintiff makes is

18  that, look, there is no relevance to whether or not Plaintiff

19  put Google on notice of the patent-in-suit before filing a

20  lawsuit.

21        I think our position is it responds to their point

22  that Google would not have implemented the -- what we contend

23  to be our non-infringing alternative, moving the server

24  overseas earlier.

25        And, Your Honor, there has been a stipulation in the

1    pre-trial order that willfulness is not in this case.  So I

2    agree that notice is not relevant from that perspective.  But

3    there is a dispute between the parties over the availability of

4    that non-infringing alternative.

5          Now, their position is the non-infringing alternative

6    was not available, number one, they say because, well, they

7    have this second '279 patent.  But in the first trial, they

8    also took the position that the non-infringing alternative was

9    not available for various other reasons ranging from Google

10   didn't respect their patents in the sense that after the

11   lawsuit was filed, Google actually expanded the infringing

12   activity to -- Google had privacy concerns over implementing

13   the non-infringing alternative and moving the server.

14         The fact that they did not put Google on notice before

15   filing the lawsuit explains why to the lay jury we did not

16   actually implement the non-infringing alternative.

17         There's a further point here, Your Honor.  To lay

18   juries, the fact that the Court is going to instruct the jury

19   that Google has been found to infringe -- I mean, lay juries

20   often believe that infringement is the same as copying.  The

21   lack of notice here, Your Honor, helps show that Google did not

22   act willfully.  It did not copy.  It may be have found to have

23   been an infringer, but, in fact, Google independently developed

24   its service.  And there are two Georgia-Pacific factors that

25   are going to be highly relevant in the retrial.

1          The extent to which the -- the infringer used the

2     invention and any evidence probative of that use and the

3     portion of the profit for the invention versus elements --

4     risks that Google took or features that Google added.

5          The fact that Google independently developed the C2DM

6     processes without notice of the patent -- without knowledge of

7     the patent confirms that Google did not copy the patent, so it

8     did not make extensive use of the patent.  And it shows that

9     Google's independent develop -- development led to additional

10    features.  So we contend that that evidence remains relevant to

11    the damages retrial.

12         THE COURT:  Let me ask you this, counsel.  Given that

13    the infringement finding is based upon allegations of direct

14    infringement and direct infringement is a strict liability

15    situation, why would notice be relevant?

16         MR. STOCKWELL:  I'm -- I'm --

17         THE COURT:  You don't have to prove intent for

18    direct --

19         MR. STOCKWELL:  Correct, Your Honor.  I'm not -- I'm

20    not contending that.  I mean, we -- we have a finding of

21    infringement.  Notice is not relevant from that standpoint.

22    Notice is relevant for showing that Google actually

23    independently developed the -- and -- and, frankly, Your Honor,

24    that's not even disputed.  Google independently developed the

25    service without knowledge of the patent.  And in doing so, it

1    added its own features and benefits.

2         THE COURT:  Let me -- let me -- let me stop you there.

3    I think we may be concerned about apples versus oranges.

4         I think that Google's entitled to show it

5    independently developed its service.  I don't think that runs

6    afoul of this motion in limine.  The motion in limine asked to

7    preclude, without leave of Court granted in advance,

8    information before the jury about pre-filing notice and

9    willfulness.  Those aren't whether or not Google independently

10   developed its services.

11        So my inclination is to grant Plaintiff's Motion in

12   Limine 1, but make it clear that doesn't preclude Google from

13   showing that it independently developed its services.

14        MR. STOCKWELL:  Okay.  But -- so, Your Honor, the

15   easiest way to show that, and I'm just trying to be very

16   practical here, is, you know, asking a witness, did you develop

17   the service without knowledge of the patent?  Yes.  Did anyone

18   send you a notice or a letter about the patent before you

19   developed the service?  No.  I mean, that -- that is evidence

20   of independent development.  I mean, I -- I don't see how --

21        THE COURT:  Well, first of all -- first of all, the

22   jury's going to be clearly instructed that -- on the issue of

23   copying and that there's not a finding of copying here.  And I

24   think -- I think there are various ways that you can establish

25   that your client independently developed its service without

1  going into whether there was a demand letter sent in advance or

2  not.  And given the direct infringement nature of the

3  underlying liability finding, my inclination is and my ruling

4  is that I'm going to grant Plaintiff's Motion in Limine 1 with

5  the clarification I've given.

6      MR. STOCKWELL:  And -- and, Your Honor, I think it's

7  very helpful that the Court will instruct the jury that a

8  finding of infringement is not the same as copying.  There's

9  been no allegation or evidence that Google copied the patent.

10  And -- and we would ask the Court to give exactly that

11  instruction.

12      THE COURT:  Well, I'm sure my instruction may not be

13  exactly the way you would say it, Mr. Stockwell, but --

14      MR. STOCKWELL:  And I understand that, Your Honor, but

15  I would like to propose some language on that when we -- when

16  we tender our -- our charges.

17      THE COURT:  And certainly you'll have that

18  opportunity.

19      MR. STOCKWELL:  Yes.  Thank you, Your Honor.

20      THE COURT:  Let's move to Motion in Limine No. 2.

21  Argument or evidence about SimpleAir's other lawsuits about

22  Google.

23      MR. STOCKWELL:  So, Your Honor, this is directly

24  relevant to the damages issues in this case.  And if you recall

25  back to the first trial --

1          THE COURT:  The '279 patent?

2          MR. STOCKWELL:  Well, and -- and the -- the fact that,

3    number one, it's relevant on the '279 patent.  I mean, you

4    know, if -- if you grant our motion and keep the '279 patent

5    out, you'll be reversing for us what you did in the first

6    trial.  It certainly makes that second case less relevant, but

7    it's also relevant, Your Honor, because the licenses they rely

8    on, the Microsoft, the Apple, the RIM licenses, the licenses we

9    rely on, Facebook, Yahoo, are portfolio licenses that involve

10   all of their patents.

11         So the -- the -- the evidence that we have submitted,

12   Your Honor, in the first trial was to show that, look, you're

13   asking for whatever the demand is, 150 million to 180 million

14   for one single patent, the licenses that you receive were a

15   maximum of -- I don't want to mention this in open Court,

16   again, but what -- the numbers are in the record before for

17   Microsoft and Apple and RIM, those numbers were for multiple

18   patents.  And the fact that SimpleAir has sued us on those

19   multiple patents and is seeking damages on those additional

20   patents is highly relevant to the jury's comparison of the

21   only -- of the most relevant evidence of damages, the license

22   agreements that are portfolio license agreements to the

23   hypothetical negotiation under consideration, which is only

24   covering the '914 patent.

25         So this evidence -- I -- I don't -- I don't see how

1  this can't be relevant.  It's highly relevant, and it's not

2  prejudicial to them.  There's -- the -- the Court has already

3  said, we're not going to get into notice issues.  It's a strict

4  liability issue.  You're going to instruct the jury on that.  I

5  don't understand why this is even prejudicial.  It's part of

6  their case to argue that the '279 patent keeps us from

7  implementing an alternative non-infringing substitute.

8          THE COURT:  Well, it seems to me and -- and comment on

9  this observation.  It seems to me that the Defendant can show,

10 without mentioning other litigation, that the settlement

11 agreements cover more than the '914 patent without going beyond

12 that and talking about other lawsuits.

13         MR. STOCKWELL:  Well, of course, Your Honor, except

14 that the jury is left with the impression that the only thing

15 that they're seeking in this case is -- is that they're valuing

16 the '914 patent at $180 million or 160 million, whatever their

17 final number is, and they're trying to say that's -- that's all

18 we're asking for.  They're trying to suggest that's all we're

19 asking for.  They've got these other patents.  They're going to

20 be asking for more money, so the comparison between the --

21 you're asking the jury to compare 180 million for one patent to

22 between 5 and 30 million for portfolio licenses, okay?

23         The comparison is -- is even more out of whack when

24 you consider the fact that they're seeking additional damages

25 for the two other patents that they've asserted against us.  So

1   it's not -- our argument to the jury is -- is they're not just

2   looking -- they're just not out of whack because they're

3   seeking six times their maximum license fee just for the '914

4   patent, they're going to be seeking far more than six times

5   their maximum licensing fee when you add in the damages that

6   they're seeking for these other patents through their other

7   lawsuits.

8           THE COURT:  All right.

9           MR. STOCKWELL:  I mean, that -- that is an apt

10  comparison for the jury to make in this case.

11          THE COURT:  All right.  Let me hear from the -- from

12  the Plaintiff on this motion in limine and your basis for it,

13  taking into account what Defense counsel's argued.

14          MR. EICHMANN:  Your Honor, you had it exactly right

15  when you pointed out that the issue of a license for a single

16  patent versus a portfolio is something that can be discussed

17  and addressed by the experts without pointing to the existence

18  of other lawsuits.  And, in fact, that's what both experts

19  address in their expert reports, which were filed -- served

20  rather before these other cases were even filed.  That's one of

21  the arguments that Dr. Ugone already makes.  These guys

22  licensed the whole portfolio for X million dollars.  You're

23  seeking Y million dollars for just this one patent.  There's

24  nothing that precludes them from making that analysis or

25  arguing about apportionment.

1        What they are seeking to do, Your Honor, the way they

2   want to get this in evidence is to do the same thing they did

3   with Mr. Payne's cross-examination and in their closing

4   argument.  They want to suggest to this jury, first, that we're

5   seeking too much money, that we're simply reading, which is

6   something that's not tethered to any actual damages analysis.

7   But more than that, they want to suggest to the jury, you know

8   what, don't award too much damages here because there's another

9   jury coming after you on another lawsuit, and they're going to

10  award more damages, as well.

11       They want the jury to reduce the amount of damages

12  they award in this case because they have in their mind the

13  suggestion that there's these other cases, and there's more

14  money coming down the pipeline.  That's extremely prejudicial.

15  This case is not about those other cases.

16       If they want to talk about and we need to talk about

17  the '279 patent, we can do that.  Both sides have expert

18  reports that address that patent.  But even there, it's not

19  necessary to even go into the fact that there's a lawsuit on

20  that patent.  What's necessary there is to explain our

21  positions that they would not find it to be acceptable to move

22  these servers overseas knowing they would simply just run into

23  further allegations of infringement on that other patent.

24       So we believe it is entirely irrelevant, Your Honor,

25  and absolutely is prejudicial and confusing.

          THE COURT:  All right.  Well, I'm going to try to be
as consistent as possible, and this was substantially argued in
the prior trial.  I'm going to grant the motion in limine with
one exception, and that is if the Defendants open the door by
talking about this alternative of moving their servers
offshore, then the Plaintiff will be able to go into the fact
that there is a lawsuit pending about the '279 patent and
establish that that has been filed.  But except for that narrow
exception, which is going to be triggered by the door being
opened, I don't see that the other lawsuits are relevant and I
don't see that it precludes the kind of comparative argument
that the Defendants indicated they want to make.  So I'm going
to grant -- with that one exception, I'm going to grant Motion
in Limine 2.

          And next, let's go to Motion in Limine 3.  Any
arguments regarding non-infringement or invalidity?

          MR. STOCKWELL:  Can I -- can I seek clarification,
Your Honor, on your last ruling?

          THE COURT:  All right.

          MR. STOCKWELL:  So -- just so -- just so we're clear,
the way I understand your ruling is if we get into the
non-infringing alternatives, which we do intend to do, you're
going to allow Plaintiff to address that by saying there's a
lawsuit on the '279 patent and we're then able to make the
comparisons that I just argued with respect to the portfolio

1    license versus the multiple patents that they've -- you know,

2    they're looking for money on the '914 patent, and they're

3    looking for money on the '279?

4            THE COURT:  I think that's my ruling.

5            MR. STOCKWELL:  Okay.  Thank you, Your Honor.

6            THE COURT:  All right.  What -- what's the Defendants'

7    reason to object to the motion in limine about going into

8    non-infringement or invalidity?

9            MR. STOCKWELL:  Your Honor, just to be clear, we -- we

10   don't object to that.  We are not going into non-infringement,

11   and we're not going into invalidity.

12           With respect to the validity part, I believe that Your

13   Honor has just addressed that with respect to Mr. Eastburn's

14   point that, you know, we -- we are not going to elicit

15   testimony from Mr. Eastburn.

16           Your Honor, I do think it is entirely fair, and -- and

17   I did this on cross-examination with Mr. Payne and Mr. Knox --

18   for us to inquire of Mr. Payne and Dr. Knox what are the key

19   features of this invention over the prior art?  That is

20   directly relevant to the Georgia-Pacific factors.  We certainly

21   intend to get into that.  They don't even challenge that.  They

22   just say, we don't want to see evidence of invalidity.  We're

23   not going to get into that.  But I certainly am allow -- I

24   should be allowed to cross examine those witnesses on those

25   issues.

1          THE COURT:  All right.  What's the Plaintiff's

2     response?

3          MR. EICHMANN:  First, Your Honor, Mr. Payne is not an

4     expert.  He's not a designated expert.  And if they're going to

5     intend to present a cross like last time where they're going

6     into all these things and asking him to compare the patented

7     invention versus the prior art and what's the key to the

8     invention, that's not proper for their cross-examination of

9     Mr. Payne.

10          Furthermore, more broadly, whether they do that with

11     Mr. Payne or with Dr. Knox, just because -- they can't now

12     switch the argument and say, okay, we're not going to talk

13     about prior art through Mr. Eastburn or Dr. Ugone because their

14     reports are limited, but we as counsel are now going to make

15     these arguments about invalidity and incremental benefits of

16     the invention over the prior art in our closings and our cross.

17     That's not permitted either, Your Honor.  That's not relevant.

18     That's not disclosed in their expert reports, which is the

19     place it should be, or any other interrogatory responses.  And

20     it's confusing and prejudicial to be making that argument.

21          The jury's not, by the way, going to be asked to make

22     any factual -- factual finding of, well, what's the key element

23     of the invention, or how is your invention different from the

24     prior art?  That's not something that they're asked to provide.

25     And to the extent that there's relevance to some broad

1  Georgia-Pacific factors, that's the subject of Dr. Ugone and

2  Mr. Mills' testimony.  That's why they're designated to apply

3  those factors.  Those factors are not to be applied by

4  cross-examination questions posed to non-expert witnesses or

5  posed outside the scope of what they have disclosed in this

6  case.

7          MR. STOCKWELL:  Your Honor, can I respond briefly to

8  that?

9          THE COURT:  All right.  Briefly.

10         MR. STOCKWELL:  Your Honor, it is -- Georgia Pacific

11 Factor 9 very clearly says that -- that you should consider the

12 contribution of the invention over the prior art.  That's what

13 the -- that's the whole point of the damages is to -- is to

14 evaluate that.  It is perfectly proper for me to ask Mr. Payne

15 did you invent push notification because that's -- I mean, that

16 may be their story now.  He admitted he didn't invent push

17 notification.  He invented a particular improvement over the

18 prior art.

19         Mr. -- Dr. Knox testified that that particular

20 improvement, the key feature of it was that last step.

21 Georgia-Pacific says, look at the contribution over the prior

22 art and evaluate the damages of that.  It's perfectly proper

23 for me to elicit that testimony and make that argument in

24 closing.  I don't need to have an expert to say that.  That's

25 in the law.  It's -- it's a fact that I can elicit from their

1 witnesses on examine -- on cross-examination and then make my

2 closing argument on it. I'm not going beyond anybody's expert

3 report. I'm just making my argument on that.

4 THE COURT: Well, let's -- let's leave it this way.

5 I'm going to grant the motion in limine, and I'm going to grant

6 it primarily because that affords the Court the ability to be a

7 gatekeeper during the course of the trial. And if at some

8 point you believe you should approach and seek leave to go into

9 something that relates to non-infringement or invalidity, then

10 you have the option of doing that. But that way we don't have

11 just an open door where everybody can do what they want to do.

12 You're going to have to clear it with me first before you go

13 into it.

14 MR. STOCKWELL: And -- and that's fine, Your Honor.

15 There -- there is one issue we didn't discuss, the

16 non-infringement point, and that revolves, again, around the

17 '279 patent because Dr. Williams put in a counter to their

18 reliance on the '279 patent. Part of what he said as to the

19 grounds for non-infringement was that moving the servers would

20 put the system in use outside the United States which is

21 grounds for not infringing a system patent. That argument

22 relates to non-infringement of the '279 patent, not the '914

23 patent that we have been found to infringe.

24 So we -- I -- I don't think there's -- their motion in

25 limine even gets to that issue on the '279 patent. And -- and

1   I'm -- you know, we -- we do wish to get into that with

2   Dr. Williams, and I'm inquiring whether I need to approach when

3   we do that, Your Honor.

4        THE COURT:  Well, the motion in limine as propounded

5   by the Plaintiff relates to the '914 patent, so the ruling is

6   going to be limited to the '914 patent.

7        MR. STOCKWELL:  Thank you, Your Honor.

8        MR. EICHMANN:  Your Honor, may I have a brief moment

9   on that issue?

10       THE COURT:  All right.

11       MR. EICHMANN:  We believe that in addressing the

12  non -- the non-infringing alternative of the foreign servers

13  and whether the '279 patent would be infringed by that, that

14  they can go into the issue that Mr. Stockwell identified

15  about where is the system put into use.  That's in Williams'

16  report -- Dr. Williams' report, and that's okay.  But also in

17  that report, he reiterates the same technical arguments that he

18  makes for the '914, saying, for example, well, the -- the '279

19  also calls for a central broadcast server that does X, Y, and Z

20  and for the same reasons our servers don't do that for the

21  '914, it's not -- we don't do it for the '279.

22       The law of the case, Your Honor, is that all of those

23  common elements and limitations of the '914 that are also found

24  in the '279, those -- those are found to infringe.  So they

25  can't come up, for example, and say, we don't have an

1  information gateway, and we don't have a transmission gateway,

2  all those sort of things.  The law of the case is, yes, they

3  do.  But with respect to the elements of their response on the

4  9 -- '279 patent where they say, well, it's a system claim and

5  you have to put the system in here under the law, that part's

6  okay, just not a rehash of their '914 arguments.

7          THE COURT:  Well, as -- as my ruling was in the prior

8  trial, to the extent the lawsuit about the '279 comes in at

9  all, it's to the extent that it exists.  It's not a development

10  of the allegations or a dispute about the various contentions

11  in that lawsuit.

12          And as I said early on this morning, I intend this

13  trial to be about damages in this case as to the '914 patent.

14  And we're not going to turn this into an infringement trial,

15  whether it's on the '914 or the '279.  And I think everybody

16  understands that.  And if I find that people are intentionally

17  ignoring that directive, I'll act accordingly.  But the '279

18  only comes in if the door's opened by Google, and it comes in

19  to the extent to show there is that pending separate lawsuit.

20  That's where it starts, and that's where it stops.

21          And other than that, this case is going to be about

22  damages that are due with regard to the infringement of the

23  '914.  It should be a very simple straightforward case, and I'm

24  going to be bothered if I see people trying to turn it into

25  something else.

1        MR. EICHMANN:  Your Honor, it may sound like I'm

2   arguing against your ruling, I'm not.

3        THE COURT:  No, no --

4        MR. EICHMANN:  I'm trying to -- I'm trying --

5        THE COURT:  I just -- my statement's for everybody's

6   benefit in the room, not directed solely to you, Mr. Eichmann.

7   It's directed to everybody.

8        MR. EICHMANN:  I just want the Court to understand

9   that we have in this case -- what happened is this, they have

10  raised this non-infringing alternative.  Dr. Knox testifies,

11  says, hey, that doesn't help.  They just get into hot water on

12  this other patent, and he has an -- an analysis of that.  They

13  respond and say, well, we don't infringe that patent, as well,

14  and I have two categories of responses.  They say, we don't

15  infringe the '279 for the same reason as the '914.  We're

16  saying they can't bring that up again in this case under the

17  law of the case.  And they separately say that --

18        THE COURT:  Well, let me see if I can be more

19  specific.

20        MR. EICHMANN:  Sure.

21        THE COURT:  Is if -- if there's something that relates

22  to infringement that's a common issue between the '279 and the

23  '914, the fact that it might be in the '279 is not going to

24  open the door to it because it's part of the '914, and I've

25  ruled that no infringement evidence on the '914 comes in.

1          MR. EICHMANN:  That helps.  Thank you.

2          THE COURT:  Okay.  All right.  Next motion in limine

3    from the Plaintiff is argument or evidence about differences

4    between the preferred embodiment or commercial embodiment in

5    the Google services.  Defendants object, and I'll hear the

6    basis for their objection.

7          MR. STOCKWELL:  So, Your Honor, and this -- I actually

8    want to focus the Court on the language here of the

9    Georgia-Pacific factor because I think, again, this is sort of

10   right in the breadbasket of what Georgia-Pacific was talking

11   about.  It's in Page 10 of our brief.

12         Factor 10, the nature of the patented invention, the

13   character of the commercial embodiment of it as owned and

14   produced by the licensor, and the benefits to those who have

15   used the invention.  So as part of their proffer of -- of what

16   they're going to do at trial, they describe the testimony of

17   Mr. Payne and Dr. Knox and said, well, yes, we are going to

18   talk about the invention.  We're going to talk about the

19   AirMedia Live embodiment.  So they are going to talk about

20   the -- the patentee's use of the commercial embodiment, the

21   nature and character of that, okay?

22         Then you look at Factor 13, the portion of the

23   realizable profit that should be credited to the invention as

24   distinguished from any non-patented elements, manufacturing

25   processes, business risks, or significant features or

1   improvements added by the -- by the infringer.  And Factor 9

2   is -- is similar.

3         So Factor 10 instructs the jury to look at the

4   character of the commercial embodiment of the patent-in-suit as

5   practiced by the patentee, and Factor 13 says, okay, look at

6   what the infringer did.  Did they add something?  Did they add

7   improvements to that?  Your Honor, it's calling for the very

8   comparison that they say should be excluded.  Unless we get

9   into this in terms of, well, did you talk about this in your

10  expert reports?  Absolutely, absolutely.  It was addressed by

11  Dr. Williams.  He -- he testified extensively in the first

12  trial about what -- well, Google has Android.  Android was

13  developed around a free and open source concept.  We elicited

14  testimony about how the -- the way they practice their

15  commercial embodiment was they tried to charge for it.  That

16  didn't work.  That is part of the valuation that we did and

17  that the experts relied on and proffered to the jury in the

18  first trial, and we wish to do the same thing again.  And

19  Georgia-Pacific calls for exactly that.

20        THE COURT:  Plaintiff's response?

21        MR. EICHMANN:  First, Your Honor, this is one we

22  brought last time and that the Court granted.  It's hard to

23  imagine how evidence distinguishing the preferred or commercial

24  embodiments of AirMedia to the accused Google services, now the

25  infringing Google services, was not relevant or was too

confusing or prejudicial in the past case, but now suddenly is

relevant in this case, which is a -- a subset of the prior case

on damages.

In addition, Your Honor, with respect to those

Georgia-Pacific factors, that is about whether there are

additional achievements -- or rather contributions that they

have made to the infringing service, as compared to what is in

the patent, the infringing that the -- the technology that they

have infringed. That does not require a confusing comparison

about what AirMedia Live did in 1996 before the patents -- the

'914 patent was even filed for, much less granted, comparing

that with what Google was doing in 2010 forward.

This is not the type of analysis that's in their

expert reports. And to the extent it's in there, we moved

successfully to preclude them from putting on this confusing

evidence last time. It should be the same ruling this time,

Your Honor.

MR. STOCKWELL: Can I -- can I respond to that

briefly, Your Honor?

THE COURT: You may.

MR. STOCKWELL: Your Honor, the basis for that ruling

and actually what -- what I believe the Court did is it was the

same gatekeeper function that you were exercising. The reason

they argued against this the first time around is they said,

look, the law requires for infringement, you compare the claims

to the accused instrumentality.  We don't want them comparing

the commercial embodiments or the preferred embodiments to the

accused instrumentality.  That's going to be confusing and

prejudicial under the law of infringement.

And -- and we said, wait a minute, that --- that

evidence is still going to be relevant on the -- on the damages

front, so we're still going to be getting into that sort of

comparison, and there's going to be evidence of their

commercial embodiment, and there's going to be evidence of our

commercial embodiment.

Now, in this case, where it's only restricted to

damages and we no longer have that infringement issue in play

because you're instructing the jury that you've already found

infringement, that type of comparison is directly relevant to

damages and is directly relevant to the Georgia-Pacific

factors.

THE COURT:  All right.  To ensure that the Court

adequately performs its gatekeeping function, I'm going to

grant Motion in Limine 4, although I'm going to give this

clarification to the parties.

When the issue of invalidity is a live issue before

the jury, direct comparison between the commercial embodiment

and the accused services is not proper.  I fully understand

under the Georgia-Pacific factors that discussion of the

commercial embodiment is permitted and a discussion of what

1  Google does is fully permitted.  What -- what I view this

2  motion in limine as precluding and what I intend it to preclude

3  by this ruling is a direct element or claim-by-claim,

4  element-by-element comparison between the prior commercial

5  embodiment and the Google services.  It doesn't mean you can't

6  talk about the Google services.  It doesn't mean you can't talk

7  about their embodiment, but you can't hold them up side-by-side

8  and bullet point-by-bullet point go through a direct comparison

9  of the two.  That's not proper, and that would be excluded by

10  this motion in limine.  I'm not trying to preclude a full and

11  adequate application of the Georgia-Pacific factors.  But

12  it's -- it's clear that a direct comparison is not proper here,

13  even under a damages analysis.  That doesn't preclude a

14  discussion of the embodiments or the accused services on their

15  own.  So No. 4 is granted.

16      Next is No. 5, no argument about Google's patent

17  exhaustion or license defenses.

18      MR. STOCKWELL:  Your Honor, I think we don't -- again,

19  we don't -- we did not oppose this as phrased.  We did point

20  out that we certainly are going to address the Facebook and

21  Yahoo licenses.  Those are what Dr. Ugone relied on in his

22  damages testimony.  They filed a Daubert challenge in that.

23  The Court denied it.  So certainly this is a damages trial.

24  It's not a liability trial.  We're not putting on exhaustion

25  and license defenses.  Those -- you've already ruled on that.

1   So I don't -- I don't think there's any dispute on this one.

2          THE COURT:  Plaintiff?

3          MR. EICHMANN:  Well, we thought, Your Honor, that you

4   already ruled on that before the last trial, too, and yet we

5   still saw all this evidence coming in that attempted to put up

6   these data points all over the place and then make inferences

7   about how they apply.  So it's not just about them expressly

8   arguing that there's a license for the Facebook or Yahoo

9   traffic, for example, or that those rights are exhausted.

10         It's about them making these arguments and inferences

11  about connecting what Facebook does with the Google service,

12  how many notifications it sends -- same thing for Yahoo or the

13  others -- and arguing or suggesting that in some way the jury

14  should consider that link between Facebook and their accused

15  services or Yahoo and their accused services in determining the

16  damages in this case.  That is a separate issue that is

17  improper under the Court's prior rulings from Dr. Ugone's

18  comparison of the Facebook license agreement and the Yahoo

19  license agreement where he says, okay, these guys over here

20  paid X million dollars.  We over here should pay Y million

21  dollars.

22         We don't think that opinion is proper.  We tried to

23  exclude it.  We lost on that.  That's fine.  That can come in

24  under the Court's ruling, but it's that link between Facebook

25  and Yahoo, sending messages through the Google services that we

1  don't think they should be able to argue or make because it's

2  just a back door attempt at their license and exhaustion

3  defenses.

4      THE COURT:  Well, here's my ruling.  I'm going to

5  grant this motion in limine, and I want it understood that any

6  argument by the Defendant that the damages in this case should

7  be reduced because a certain number of Google messaging

8  services are used by Facebook or Yahoo is improper and is

9  within the scope of this motion in limine.

10     MR. STOCKWELL:  And -- and I understand that, Your

11  Honor.  I -- I certainly don't understand -- I mean, I -- I

12  don't want there to be any confusion over this ruling at trial

13  because Dr. Ugone, in adjusting the Facebook license, which was

14  perfectly proper in the first trial, was not objected to at the

15  first trial and -- and the Court found in the Daubert motion

16  was fine, he -- he looked at the number of messages Facebook

17  sent and he valued the Facebook license relative to the Google

18  situation by adjusting for the number of messages Google sent

19  in addition to that and comparing those.

20     Now, that was not any effort to suggest that those

21  Facebook messages were somehow licenses.  He was simply

22  adjusting the -- the Facebook payment to the greater Google

23  volume of messages.  I don't understand this motion to be

24  challenging what we did in the first trial on that point.  We

25  certainly intend to go into that again.

1          THE COURT:  I -- I -- I think that's fine.  But to --

2     to go beyond that and say the damages should be reduced because

3     of this, I think you understand where the problem is.

4          MR. STOCKWELL:  I understand that, Your Honor, yes.

5          THE COURT:  Okay.  I understand we have an agreement

6     that there's not going to be any argument or discussion about

7     attorney's compensation.  That motion in limine is granted.

8          Next is Motion -- Plaintiff's Motion in Limine 7, no

9     argument or evidence about Verus being a foreign company or

10    being a Bermuda company.

11         MR. STOCKWELL:  Your Honor, just -- we tried to

12    accommodate this by explaining to the Plaintiff that we don't

13    intend to argue that, but there's -- there's a -- there's a

14    document that's going to be in evidence.  It's already been

15    admitted.  It's the Verus/SimpleAir purchase agreement, and it

16    recites that Verus is a Bermuda -- or is whatever company it

17    is.  And we said, look, that's going to be in evidence.  We're

18    not going to jump up and start arguing, oh, they're a -- you

19    know, they're a foreigner.

20         So our -- our opposition is only limited to the

21    extent -- you know, we won't have to go back through and redact

22    all those documents.  We're not -- we're not intending to argue

23    that, though.

24         THE COURT:  Well, I'm going to grant the motion.  That

25    doesn't exclude the exhibit, but it does preclude you from

1   using that exhibit to highlight that particular fact out of the

2   document.

3          MR. STOCKWELL:  Correct.  I understand that, Your

4   Honor.

5          THE COURT:  Okay.

6          MR. STOCKWELL:  I would view that as argument.

7          THE COURT:  So would I.

8          All right.  No. 8, evidence or argument by Google that

9   its accused instrumentalities practice the claims of any -- of

10  Google's own patents or patents to third parties.  What's the

11  issue here, counsel?

12         Let me hear from the Plaintiff first.  This is your

13  motion in limine.

14         MR. FRANZINI:  Thank you, Your Honor.

15         We're not seeking to preclude Google from presenting

16  the battery life improvements that its own employees

17  implemented, but just because -- in order to do so, they don't

18  need to put up a patent or the patent of third parties and

19  suggest that Google itself practices the claims of those

20  patent -- those patents.  Nor to put up the evidence that we

21  need an expert report.  They don't have an expert report

22  comparing Google's patents or any third-party's patents to

23  Google's accused services.

24         And in addition to that, it's irrelevant to the issue

25  of damages and carries a risk of confusing or misleading the

1  jury.

2          THE COURT:  All right.  What else?

3          MR. FRANZINI:  Yes, I mean, that's -- that's the

4  essence of the motion.

5          THE COURT:  What's the Defendants' position?

6          MR. STOCKWELL:  Your Honor, the -- the Court earlier

7  ruled that you were going to exercise your gatekeeper function

8  because you were concern -- the argument then was we don't want

9  Google pointing to the fact that it's practicing its own or

10  third-party patents as in saying, therefore, we don't infringe

11  SimpleAir's patent.  So you said, I'm going to grant in part --

12  I do think Google can get into their own battery life patents.

13  It's highly relevant to damages.

14          Remember, their theory is that the key advantage of

15  their patent is battery life improvement.  We say there's

16  nothing in your patents about battery life.  Mr. Nerieri added

17  that feature, got his own patents that do discuss battery life.

18  That was directly put in in response to damages.

19          The Court in the first trial said, I'm going to allow

20  that, and I'm going to keep a, you know, watch on that to make

21  sure you don't cross over in arguing, well, you're practicing

22  your own patent and, therefore, you infringe.  The reason the

23  Court allowed it was because it was so relevant to damages.

24  It's the same situation here, Your Honor.  It's highly relevant

25  to damages.  We no longer even have the concern that somehow

1  the jury's going to infer that, well, because we practice our

2  own patents, we don't infringe.  There's -- you're going to

3  instruct them that there's infringement.

4       So this motion, in our view, should be denied.  I

5  mean, it's the same evidence that we saw in the first trial

6  relevant to damages.

7       THE COURT:  Well, consistent with my ruling in the

8  prior trial, I'm going to make it clear that the Defendant is

9  entitled to show that the battery life improvements are

10 attributable to what they've done.  But by the same token, that

11 needs to be a discussion of battery life, not waving patents in

12 front of the jury for some other purpose.  So I'm going to

13 grant it, but I want it clear that the Defendant has no

14 restrictions on showing the battery life improvements are of

15 its own doing.  But I don't see how flashing a set of patents

16 in front of the jury furthers that.

17      MR. STOCKWELL:  Your Honor, how -- that was exactly

18 why we -- you allowed the evidence in the first trial, the

19 evidence of the patents in front of the jury because it proved

20 that we were the ones that came up with the battery life

21 improvement.  And we had Mr. Nerieri, the inventor of the

22 patents, testify this is -- that was our documentation on the

23 battery life improvement.

24      THE COURT:  Well, let's -- let's put it this way,

25 Mr. Stockwell.  Once you put on your evidence that the battery

1  improvements are attributable to the efforts and the hard work

2  of Google, if in response to that the Plaintiff does anything

3  that I believe opens the door to you presenting further

4  evidence, including the patents, you just simply have to

5  approach and obtain leave.  Is that clear?

6          MR. STOCKWELL:  It -- it's -- it's clear, Your Honor,

7  although I -- I don't understand why this is not any different

8  than the first trial when you -- you did not require us to

9  approach and seek leave to put the patents in in the first

10 trial and -- you know, as I said, they are the documentation.

11 The way we structured the direct examination was around using

12 the patents to explain why and how we came up with the battery

13 improvement, because it was the documents we had on our exhibit

14 list for doing that.

15         THE COURT:  Well, let me ask for a further response

16 from the Plaintiff.  Taking the opposite side of the coin for

17 argument purpose -- for argument purposes, counsel, why is

18 going beyond saying the battery life improvements are our own

19 doing and here are the patents we've got related to it?

20         MR. FRANZINI:  Your Honor --

21         THE COURT:  Where's the harm in that?

22         MR. FRANZINI:  Your Honor, Mr. Stockwell just made a

23 relevance argument, but this isn't a relevance issue.  The --

24 there's no evidence in the record that Google actually

25 practices any of the claims of the patents that Google wants to

1   put up in front of the jury.  So there's no -- Google can

2   testify we came -- Mr. Nerieri is a qualified witness to

3   testify that he came up with battery life improvements, but

4   he's not a qualified witness to testify that, hey, Google

5   practices the claims of this patent, and I'm putting him in

6   front of you.  And so for that reason, there's no need for

7   Google to go beyond saying, we have battery life improvements,

8   and actually show the patents to the jury.

9        THE COURT:  Well, I granted this same motion in limine

10  in the prior trial, and Google was given leave to go into what

11  they went into.  I think we're going to follow the same

12  procedure.  I'm going to grant the motion in limine, but upon a

13  reasonable request, if I don't find there's any prejudice or

14  harm into doing it, I'm probably going to grant the same leave

15  I did before.  But at least it's going to come before me, and

16  I'll make a conscious decision during the course of the trial,

17  rather than leaving it wide open.  So the ruling is that the

18  motion in limine is granted.

19        MR. FRANZINI:  Thank you, Your Honor.

20        THE COURT:  All right.  Next is Plaintiff's Motion

21  in Limine 9, argument or evidence about whether Payne or

22  von Kaenel was offered a stake in SimpleAir.

23        MR. STOCKWELL:  Your Honor already ruled on this.  We

24  just incorporated our -- our prior papers on this, Your Honor.

25  I don't -- I don't anticipate a different result.

1          THE COURT:  Yeah, same ruling as before, that's

2     granted.

3          MR. STOCKWELL:  Sorry.

4          THE COURT:  Next is 10, evidence or argument about

5     valuations of the patent during AirMedia's bankruptcies or

6     other numbers disclosed in any of the other bankruptcies.

7          MR. STOCKWELL:  So, Your Honor, at the -- in the first

8     trial, Your Honor had excluded a set of bankruptcy documents.

9     They were voluminous.  They went into great detail on the

10    liabilities and assets of the company as irrelevant and overly

11    prejudicial.

12          There was another set of bankruptcy documents that

13    just showed the valuation of the patents in the bankruptcy that

14    we put on in examining Mr. Payne.  There was an objection

15    during trial to us actually tendering that exhibit which had

16    not been objected to.  It was actually pre-admitted.  We -- we

17    worked out a deal with the Plaintiff where we said, well, we

18    don't need to tender the exhibit because we have the valuation

19    in.  We'll withdraw that as an -- as an exhibit.  You guys

20    withdraw -- we -- we had some expert reports that had gotten in

21    under the pre-admitted exhibit ruling from the Court.  So we

22    withdrew that.  They withdrew the expert reports.

23          So Plaintiff has suggested the Court's already ruled

24    on this issue.  You haven't.  You -- you ruled on a narrow set

25    of documents at the first pre-trial conference that was the

voluminous set of bankruptcy documents.  It wasn't the

valuation issue.  We pointed out -- you know, we cited Judge

Clark's decision in Personal Audio that the jury should have

given substantial weight to an offer to sell the patent -- that

patent in a pending application.  We pointed to other

authority, the Houser case, where the patent owner purchased

the patent and the value of the consideration for -- that's

given in exchange for purchasing the patent is a highly

relevant consideration under Georgia-Pacific.  It's a valuation

of the patent-in-suit.  That's the same for the bankruptcy.

The valuation is a relevant factor.  I understand the

Court doesn't want us wading through a bunch of bankruptcy

documents, but simply eliciting the fact that the patent was

valued in bankruptcy is highly relevant under Georgia-Pacific

and we should be allowed to get into that.

THE COURT:  All right.  What's the Plaintiff's

position?

MR. EICHMANN:  Your Honor, to the extent that the

scope of the motion brought or addressed last time was narrower

than our current motion in limine, that was unintentional.  We

had this argument in the context of the exhibit conference, and

we said, here's the exhibits that relate to the bankruptcy --

two bankruptcies, one in '98, another one in 2001, both before

this patent even issued in 2006.  They have some numbers thrown

out.  One says, hey, the -- the bankrupt company has intangible

1 assets of zero dollars. Another one says something like

2 $220,000.00. There's these references here to valuations.

3 There was no valuation made of this patent. It hadn't even

4 been filed yet in the first one and hadn't been issued until

5 much later.

6 These are exactly the types of documents that we

7 intended to exclude the last time. We had a big dispute, live

8 in front of the jury -- at the bench last time because they

9 brought one up that we apparently let slip through on the

10 exhibit list last time. So we're bringing it up right now.

11 Same reason the Court excluded those other exhibits

12 before, did not pre-admit them, same reason now. They are

13 highly prejudicial and confusing to argue that bankruptcy

14 documents in '98 and 2001 in some way are indicative of the

15 reasonable royalty negotiation or value that would result from

16 that in 2010 in this case. And I -- I don't have handy Judge's

17 Clark's opinion on that, but I can tell the Court that this

18 issue came up and was resolved in our favor in the prior case

19 we had with Judge Schneider. Apple was trying to get it in.

20 We tried to get it out. Judge Schneider appointed Judge Folsom

21 as a special master. He ruled in our favor on this, said that

22 at a minimum it's prejudicial to have these numbers just thrown

23 out there suggesting to the jury that anybody did a valuation

24 saying that this patent was zero dollars or 220 or something

25 less than that.

1           THE COURT:  All right.  Anything further from the

2    Defendant?

3           MR. STOCKWELL:  No, Your Honor.  Other than the fact

4    that there's -- there's two numbers being bandied about here.

5    There's valuations, which is all their motion is addressed to.

6    There's what was actually paid in the bankruptcy, which was the

7    credit bid that Verus made.  So those are two separate

8    concepts.

9           There was the -- the -- the -- when they filed the

10   bankruptcy, they valued all the intangible property, the

11   $200,000.00.  There was also the credit bid that Verus made.

12   All I hear is the valuation.

13          There was another valuation in another bankruptcy that

14   we don't intend to get into.  It had to do with an opinion

15   letter from PricewaterhouseCoopers and the valuation of the

16   patents in that.  But the fact that when they filed the

17   bankruptcy, they valued the intangible property at $200,000.00

18   and that there was a credit bid for that after a full

19   publicized auction of the patent assets is relevant to

20   valuation.

21          THE COURT:  Well, perhaps being one of the few lawyers

22   in the courtroom that's had any real experience in bankruptcy

23   court, I will tell you that the numbers that are typically put

24   on those schedules are numbers that the debtor and the debtor's

25   counsel readily come to without spending a lot of time and

1  resources on independent appraisals.

2        And I think that the -- those numbers on the schedules

3  as to value are highly suspect in relation to the market value

4  of the assets.  But by the same token, a sale, whether it's a

5  commercial sale outside of the bankruptcy context or whether

6  it's a sale of assets through publication and bidding under the

7  bankruptcy context is a different matter.

8        I'm going to grant the motion as to the values and the

9  schedules filed in any prior bankruptcies or other related

10  bankruptcy filings, but if there's evidence properly disclosed

11  that as a part of a bankruptcy proceeding, intellectual

12  property was put up for sale, notice was given, bids were

13  taken, and somebody paid X dollars for it, that's admissible

14  and that's not covered by this motion in limine.

15        All right.  Last is No. 11 about no evidence or

16  argument about the founding or other irrelevant achievements of

17  Google.  I don't need any argument on this.  You're entitled to

18  introduce your client, but you're not entitled to put on a

19  documentary about the wonders of Google.

20        And there's a judgment element in here, Mr. Stockwell,

21  and I will hold you to a reasonable application of that.  If it

22  goes too far, you'll hear from me.

23        MR. STOCKWELL:  I don't think I'm doing anything

24  different than we did in the first trial, Your Honor.

25        THE COURT:  Well, I will tell you, I think you went a

1  little far in the first trial.

2          MR. STOCKWELL:  I have --

3          THE COURT:  I'm going to allow you to make an

4  introduction of your client, as I will the other side, but

5  beyond an introductory overview, I think it's irrelevant and an

6  attempt to ingratiate your client with the jury on -- on the

7  basis other than what's relevant before -- before the jury in

8  the trial.

9          MR. STOCKWELL:  I understand the Court's ruling.  I

10  will say that you've also given us a lot less time, Your Honor,

11  so that's the best governor.

12          THE COURT:  That may help solve the problem.

13          Okay.  Well, I don't think anybody would argue they

14  need as much time on a damages case as they do on an

15  infringement, invalidity, and damages case.  Nonetheless, the

16  ruling on No. 11 stands.

17          All right.  Next we'll take up the Defendants' motions

18  in limine, but before we do, we'll take a 10-minute recess.

19          COURT SECURITY OFFICER:  All rise.

20          (Recess.)

21          THE COURT:  All right.  I understand that there's one

22  additional motion in limine that the Plaintiffs have filed that

23  we did not take up.  And before we go into the motions in

24  limine offered by the Defendant, let's go back and pick up that

25  last motion in limine from the Plaintiff.

1          And I'll hear from the Plaintiff on this motion on why

2     it should be granted.

3          MR. EICHMANN:  Your Honor, this is a straight-up

4     violation of their discovery and disclosure obligations, and

5     the evidence they seek to introduce should be barred under Rule

6     37.  What they intend to do now is present testimony through

7     their own experts and apparently through this substitute

8     witness and their cross-examination of our experts, argument

9     that the GCM servers now send the data on a foreign detour

10    through Buzz routers that are located outside the U.S., and

11    then they have the data come back in the U.S. before going to

12    the Android phones.

13         Their argument that they did this as of January 24th

14    and that they are no longer infringing.  They told us this on

15    February 26th for the first time.  No explanation for why they

16    waited a month to tell us, no backup data, no corroboration,

17    not a single piece of paper, not a single supplemental

18    production or interrogatory response, just a letter from

19    counsel saying, hey, by the way, we don't infringe anymore.

20         This week we responded and said, well, if you're doing

21    this for willfulness, we don't think that you're getting around

22    post-verdict willful infringement.  We think you still infringe

23    under this.  But also tell us if you think you're bringing this

24    to the new trial because if so, we've got an issue.  And they

25    said, yes -- told us this two days ago, we are going to raise

1  this at the new trial, this one coming up in 10 days from now.

2  We're going to raise it through our witnesses, through your

3  witnesses.  We might even serve some supplemental expert

4  reports which we got late last night after we made the filing

5  and then another one this morning for the first time.

6       So what has happened here, Your Honor, is that during

7  discovery, they never disclosed this non-infringing

8  alternative.  They had another non-infringing alternative where

9  they said, we're going to take all the GCM software and just

10  install that on foreign servers and run all the data processing

11  through those foreign servers.  But now they've got this new

12  variation on it where they say, well, actually, let's leave

13  everything exactly where it is and just use the GCM servers in

14  the U.S., but we'll send the data out to these buzz routers

15  outside the U.S. and then have it come back into the U.S., and

16  that will do the trick, too.

17       That was never disclosed in discovery.  We never took

18  any discovery on that particular alternative, not addressed in

19  their expert reports, and we are completely being ambushed by

20  this at this point.

21       In addition, Your Honor, again, there is a second

22  violation which is why as of January 24th, when they implanted

23  this change, didn't they immediately begin producing

24  information about it.  There is not a single piece of document

25  they've produced talking about their plans to do this, their

1  actual implementation of it, how this has, in fact, affected

2  the operation of this service.  There's not a single e-mail

3  they've produced, a single document, metrics, nothing of any

4  sort on this.  And then they waited a month to even tell us and

5  then another week and a half, two weeks to serve these new

6  supplemental reports.

7        So, Your Honor, there's been two violations --

8  disclosure obligations here.  One that lasted the entire

9  duration of the case when they didn't disclose the alternative

10 and another one that's taken place in the last six weeks when

11 they're still withholding all of this evidence from us in a

12 very critical time as we're preparing for this trial.  There's

13 no justification for this, and we are very much prejudiced by

14 it.

15        THE COURT:  All right.  Response by the Defendant?

16        MR. STOCKWELL:  So, Your Honor, I want to take these

17 in two parts.  First off, we received this paper yesterday.

18 The allegation that this non-infringing alternative was never

19 disclosed is false.  If you think back to the trial, what

20 Mr. Nerieri testified to was that we could move the servers to

21 any of multiple data centers outside the United States.  We --

22 we asked him how he would do that.  He said, well, I -- I can

23 do it from my computer.  I can move the servers from my

24 computer.

25        We told the jury and this Court that the reason we

1    hadn't done that already is there -- is that we believe we

2    didn't infringe and that we were there to defend the work of

3    Google employees.  I wasn't lying when I said that, Your Honor.

4    We turned out to be wrong.  And the client immediately

5    implemented -- took steps to implement the alternative that

6    they had testified to under oath in front of this Court that

7    had been the full product of discovery in the prior case.  It's

8    very easy to come in and say, oh, well, that's not the right

9    version or flavor.  That's nonsense.

10          We -- we cross examined Dr. Knox on this, moving any

11   of the servers.  I went through each of the servers.  Did you

12   move any of these servers that's non-infringing?  We put in

13   Dr. Williams' report.  We had Mr. Nerieri testify about this.

14   We -- we did what we said we could do in the first trial and

15   before that.

16          Now, counsel says, well, okay, but you didn't disclose

17   it soon enough.  Your Honor, it was implemented January 24th.

18   The Google engineers let it run to make sure -- I mean, they

19   had -- they had alleged, well, there's going to be all these

20   delay problems.  We let it run to make sure it was going to --

21   it was going to implement correctly.  We disclosed it.  There

22   are no documents.  As Mr. Nerieri testified to at trial, he

23   goes to his computer and he moves one server to another.  I --

24   I don't know what else to disclose on this.

25          We got the information from the client.  We looked

1  into the interrogatory responses.  There wasn't an

2  interrogatory asking us about this.  So we sent them a letter

3  saying here's -- here's what we've done.  There was no

4  disclosure violation here, Your Honor.  The -- you've already

5  allowed the substitute witness, Mr. Costin.  He can testify

6  about this.  He can answer any questions they have about it.

7        It's the same issue as in the first trial.  The only

8  evidence that this rebuts is their whole argument, well, you

9  couldn't have actually moved this because of the '279 patent.

10  Well, of course, we could.  We did.  So it's highly relevant to

11  us.  They're not prejudiced.  It's the same issue that's been

12  debated in this case from the beginning.

13        THE COURT:  All right.  Well, the Court's conclusion

14  is that at the earlier trial, the testimony was we could move

15  the servers offshore and create a non-infringing means of doing

16  what we're doing.  This, in my view, is not the same thing.

17  It's not moving the servers.  It's routing information

18  electronically, as opposed to what was represented at the prior

19  trial, which is physically moving the servers to Canada or some

20  other foreign country.

21        Nonetheless, I think it's a substantive departure from

22  the prior evidence, and notwithstanding its recent

23  implementation, there's been no motion by the Defendant for

24  leave to supplement its reports.  There's nothing about this

25  particular process in its reports.  And I believe that the

1   motion in limine is well founded.  I'm going to grant it.

2          But I want the Plaintiff to understand this doesn't

3   preclude the Defendants from offering the same testimony they

4   offered in the earlier trial.  But to go beyond it and offer

5   this variation, which I view as a substantive variation,

6   without it being disclosed in the reports, I think is improper.

7   So what is, in effect, Plaintiff's Motion in Limine 12 is

8   granted.

9          MR. STOCKWELL:  Your Honor, may I -- may I be heard

10  briefly?  I understand your ruling.  I don't want to challenge

11  your ruling, except in one factual aspect.  And I would like to

12  file a paper and a proffer since we haven't had a chance to do

13  it.  And partly, Your Honor, this -- I feel like this is my

14  credibility with the Court.

15         This is not a substantive change from what we talked

16  about in the trial.  We talked in the trial about redirecting

17  traffic and moving servers, and servers are software.

18  Mr. Nerieri said he could do that from his computer.  That's

19  what we did, Your Honor.  And I -- I just -- I want the record

20  to reflect that.  I'd like -- I'd like to be able to make a

21  proffer on that, Your Honor, just so that the Court is clear on

22  that and the record is clear on that issue, because this is not

23  anything new from what our alternative non-infringing

24  substitute argument has been all along.

25         THE COURT:  I'll grant you leave to submit a written

1   representation to the Court on this issue of not more than

2   three pages in length before Friday of next week.  And

3   particularly, Mr. Stockwell, if you have testimony from the

4   prior trial, not something that might have been in a report

5   that was never mentioned, but if you can show me from the prior

6   trial that what you're talking about now was presented to the

7   earlier jury, I -- certainly I'll consider it and as with all

8   of these other motions in limine, a ruling by the Court is not

9   an absolute bar.  It's a requirement that you obtain leave.

10  And if you can convince me that you're entitled to leave, I'll

11  grant it.  But I'm going to grant the motion in limine at this

12  point.

13          MR. STOCKWELL:  Yeah, so just so Your Honor is clear,

14  I'm looking at Page 63 of the transcript.  Logistically, what

15  would be required to redirect traffic at Google's messaging

16  service --

17          THE COURT:  If you're going to read it to me now,

18  you're not going to get to file a paper.  If you're going to

19  file a paper, don't read it to me now.

20          MR. STOCKWELL:  Thank you, Your Honor.  Appreciate

21  that.

22          One other -- one other point on that, Your Honor,

23  which is part of their argument about the non-infringing

24  alternative was also a suggestion by counsel through

25  examination and cross-examination that we could not do such a

1 change because of data privacy concerns.  So I -- I just want

2 to note for the Court that even beyond the proffer and -- and

3 hopefully my effort to persuade the Court to change its ruling

4 on this, there are some door opening issues here, given what

5 happened at the prior trial.

6　　　　　　THE COURT:  Well, put those in your submission.

7　　　　　　MR. STOCKWELL:  Thank you, Your Honor.

8　　　　　　THE COURT:  And I don't view this as an attempt for

9 you to get me to change my ruling.  The motion in limine is

10 going to be granted.  But I view this as an attempt for you to

11 persuade me that leave is authorized, and I'll look for your

12 submission before Friday.

13　　　　　　MR. STOCKWELL:  Thank you, Your Honor.

14　　　　　　THE COURT:  And I'll also grant the Plaintiff an

15 opportunity by 5:00 o'clock on Friday to respond, not more than

16 three pages.

17　　　　　　Okay.  Let's go on to Defendants' motions in limine.

18 Are there any late-breaking agreements on these, counsel, or we

19 just need to go through them all?

20　　　　　　MR. STOCKWELL:  So, Your Honor, I -- I spoke with

21 Plaintiff's counsel.  Just so our first -- we tried to group

22 these motions in limine, Your Honor.  There were some that we

23 renewed that the Court has already ruled on.  Some of the

24 rulings were favorable for us, some were not.  I mean, I think

25 the parties expect the Court to apply the same rulings on

1    those, and that's the motion -- Defendants' Motion in Limine 1,

2    4 --

3              THE COURT:  We've basically been through this already?

4              MR. STOCKWELL:  Yes.  7, 11, and 12.  So I -- I think

5    the record already reflects from the first pre-trial what the

6    Court's rulings are on there.  We're perfectly prepared to live

7    with that, and I would understand Plaintiff to be in the

8    same -- same situation.

9              THE COURT:  All right.  Well, Motion in Limine 1 is

10   granted, but for the prior exception.  If the Defendant opens

11   the door, then the Plaintiff can refer to the existence of the

12   '279 lawsuit.  I think the Court's been very clear on that.

13             Motion in Limine 2 --

14             MR. STOCKWELL:  It's actually 4 in our joint notice,

15   Your Honor.

16             THE COURT:  All right.  It's 2 on my list, but it is

17   4.

18             MR. STOCKWELL:  Oh, sorry.

19             THE COURT:  This is Plaintiff to be precluded from

20   offering testimony regarding Plaintiff's settlement

21   negotiations with Apple and RIM.  That's granted to the extent

22   the motion -- the information or documentation wasn't produced

23   in the Court's discovery.  Otherwise, it's grant -- otherwise,

24   it's denied.

25             Okay.  Renewed Motion in Limine 7, Plaintiff to be

precluded from offering testimony regarding Google's total

sales, total revenues, size, or financial worth.

MR. EICHMANN:  Your Honor, may we be heard on that

one?

THE COURT:  All right.  This -- does this have to do

with the 10-K form?

MR. EICHMANN:  Sort of, but this --

THE COURT:  Well, let me just hear from you on it,

Mr. Eichmann.  This is the Defendants' motion, so what's your

objection?

MR. EICHMANN:  This is a little bit different than the

response we provided last time in light of the arguments that

we saw at trial.

Last time, the Court ruled that we are not precluded

from introducing evidence as to the Android line of business

because that's what's relevant in the damages case, so unit

sales and then their revenues, profits, and costs relating to

the Android line of business.  That is already something that

the Court let in last time, and we believe should be let in

this time and is not properly grouped as being total wealth,

revenue, et cetera.

In addition, last time we agreed that we weren't --

would not raise any sort of issue about how much money Google

as a company has or what its total revenues are or anything of

that nature.  We don't affirmatively plan to raise that in this

1  case, but last time they made arguments that we believe very

2  squarely open the door.

3      Throughout the trial, they tried to characterize our

4  damages claim as simply being so large -- so facially

5  unreasonable, that it was astounding.  This is something that

6  we provided in our papers here.  This argument was not tethered

7  to any Georgia-Pacific or actual expert evidence.  There's no

8  standard on the law that says, well, if damages get to a

9  certain point, they're just too big, you have to reject it.

10  But that's the argument that they were trying to make to the

11  jury.

12      And we believe that opens the door to us coming back

13  and saying, you know what, this number, it is big, but this is

14  not astounding to Google.  It's not astounding to Google to be

15  sitting down in a negotiation arguing for -- about money that's

16  in sums of greater than a hundred million dollars.  We believe

17  it's fair for us to say, look, if you're coming in here and

18  saying we're completely unreasonable and astounding, well,

19  that's just false.  You're not astounded by this.  You deal

20  with these kind of sums all the time.  This is really within

21  the scope of what you're transacting business on all the time.

22  So that's the difference between our response this time and

23  last time.

24      THE COURT:  All right.  Well, I don't need to hear

25  anything more on this.

1            The ruling is going to be substantially the same.  If
2    it's sales or revenue or profit data regarding the Android
3    systems or systems related to the GCM or C2DM systems, then
4    it's not excluded.  But if it's not related to those sources,
5    then it is excluded.

6            And for your benefit, Mr. Eichmann, I've never heard a
7    Defendant yet who didn't believe the Plaintiff's request for
8    damages was astounding.  And to say that that opens the door
9    for you to then come in and offer all the information you want
10   to about the company's total size and wealth is not persuasive
11   at all.  So to the extent you're offering that as a new
12   wrinkle, that's denied.

13           MR. EICHMANN:  Yes, Your Honor.  Going back a moment
14   to the -- what's -- the Roman numerals on their Table of
15   Contents has me off -- but the -- the one about the '279
16   patent, just a clarification for the record.  I believe they've
17   already confirmed today that they do intend to open that door,
18   so rather than making a -- a conditional ruling like last time,
19   I'd like to just maybe address that now.

20           THE COURT:  It's -- it's not a conditional ruling.
21   It's a ruling that when that happens, then this is the result.
22   So it's not conditional.

23           MR. EICHMANN:  I see.  I see.

24           THE COURT:  If -- if they don't open the door, then
25   the other doesn't apply.  If they do, I've already told you

1   what does apply.

2           MR. EICHMANN:  All right.

3           THE COURT:  All right.  Next is what appears to be

4   renewed Defendants' Motion in Limine 11.  This has to do with

5   precluding evidence -- any Defendant not present in trial,

6   including publishing the case caption to the jury.

7           What's the -- what's the issue here, counsel?

8           MR. STOCKWELL:  Oh, sorry.

9           THE COURT:  I mean, I'm going to grant it as to former

10  Defendants in this case.  I think that's irrelevant and

11  prejudicial.  And that's substantially the same ruling I gave

12  before.  If this -- if there's a variation on that, let me

13  know.

14          MR. FRANZINI:  Your Honor, with respect to the OEMs

15  who were previous Defendants in this case, we don't intend to

16  introduce evidence about that.  But with respect to Apple, RIM,

17  and Microsoft, the fact that they were Defendants is going to

18  come out based on the license agreements that came out in the

19  last case.  And we don't -- we don't understand this motion in

20  limine to -- to capture that, I guess.

21          THE COURT:  Well, let me -- let me explain it this

22  way.  We had a prior motion in limine about saying that Verus

23  was a Bermuda company.  There's an exhibit that may have that

24  in it, but it's buried in a lot of other verbiage.  And I told

25  the Defendants not to highlight or reference that.

1       If there are license agreements from these other

2  Defendants, the fact that the license agreements exist and the

3  fact that they were purchased and paid for is one thing, but

4  then to dig out of that verbiage the reference to this

5  particular lawsuit to establish not anything about the

6  transaction itself but that they were a former Defendant is

7  improper.  So we'll treat it the same way.

8       MR. FRANZINI:  Understood, Your Honor.  And there's

9  one last thing which is the caption issue.  I believe the

10  Defendant -- or Google would like us to redact all the

11  captions.  And this is something that came up in the last --

12  originally was raised in the last case, but then fell to the

13  wayside, didn't end up being an issue at trial.  And so we

14  don't see the need to create a lot of additional work to redact

15  a caption from all of the documents that happen to say

16  Microsoft on them, so we just need some clarification from the

17  Court on that issue.

18       THE COURT:  Well, I called the case this morning under

19  the 587 case number, and that's the SimpleAir versus Google

20  case number.  And this case will be presented to the jury as

21  SimpleAir versus Google.  And unless you can persuade me that

22  it's overly burdensome and unreasonable, I don't see any reason

23  to create confusion by permitting captions that reference

24  Microsoft or other Defendants that aren't before the jury in

25  this trial.

1        So it's my intention that this be presented to the

2    jury as SimpleAir versus Google, plain and simple.  And given

3    that that's -- that Google is the only Defendant, attempt to do

4    otherwise seems to me as an attempt to create confusion, and I

5    want to avoid confusion.  So I think we use the caption for

6    Case No. 2:13-CV-587, SimpleAir versus Google.

7        Does that answer your question?

8        MR. FRANZINI:  Yes, it does.  Thank you, Your Honor.

9        THE COURT:  All right.  Next is Renewed Motion in

10   Limine 12, Plaintiff to be precluded from offering testimony

11   regarding the issue of an injunction.  That was previously

12   agreed to.  Is it not agreed to here?  I don't know why in the

13   world evidence of an injunction would be relevant in a damages

14   case.

15       MR. EICHMANN:  I was going to give this to

16   Mr. Franzini, but I don't want him to incur the same reaction

17   as my last argument.

18       The difference here, Your Honor, is we don't -- we're

19   not arguing for an injunction.  We stipulated we're not seeking

20   one at the conclusion of this case.  It might be something we

21   have to do at some later point, but we do think that when they

22   argue about how unreasonable we are in seeking these damages,

23   that it's relevant to be able to show that, hey, we don't even

24   have the ability to do anything else but seek damages.  We

25   can't get an injunction as a matter of course.  And so this is

1  the only remedy we have for their infringement is to come here

2  to this Court and ask for damages that we think are

3  appropriate.

4  We think that that -- providing that in context is --

5  is reasonable here, Your Honor, and that that's an appropriate

6  use of reference to this and that it's not confusing.

7  THE COURT:  Well, I'm going to grant the motion in

8  limine, but I'm going to make it clear that there's nothing in

9  the granting of this motion in limine that precludes the

10  Plaintiff from making it clear to the jury that money damages

11  is their only available remedy under the law.

12  MR. EICHMANN:  Thank you.

13  THE COURT:  All right.  Let's then go to some motions

14  in limine that were not renewals of prior ones.  The next one I

15  have is Defendants' motion in limine that Plaintiff be

16  precluded from offering testimony that Google does not respect

17  patents.  Is there a dispute on this?

18  MR. EICHMANN:  Yes.

19  THE COURT:  Let me hear from you, then.

20  MR. EICHMANN:  This is one -- this is an open the door

21  issue, Your Honor.  We don't plan to come in in our opening or

22  affirmative evidence and argue that Google does not respect

23  patents, but if they make the same type of arguments that they

24  made last time and elicit the same testimony from their

25  witnesses, we believe it opens the door.  The type of

1  testimony --

2  THE COURT:  Then very simply I'll grant the motion in

3  limine, and if you believe they open the door, approach and ask

4  for leave.

5  MR. EICHMANN:  Got it.  Thank you.

6  THE COURT:  All right.  Next is Plaintiff to be

7  precluded from offering testimony regarding infringement by

8  foreign servers and foreign use.  We've already addressed that,

9  have we not, counsel?

10  MR. STOCKWELL:  Not quite, Your Honor.  So the

11  Court -- I think the Court said earlier today, and perhaps

12  clarification is in order, that you -- you do intend to

13  instruct the jury that there's been a finding of infringement

14  and validity.

15  THE COURT:  That's my intention.

16  MR. STOCKWELL:  Okay.  And obviously the parties are

17  going to make that clear, as well.

18  What we think needs to happen here is the Court needs

19  to instruct the jury that that finding does not extend to any

20  foreign messages or uses that was -- that is the law for a

21  method patent, and we've -- we tendered charges on that in the

22  prior case.  That is something that Dr. Knox admitted,

23  Dr. Williams admitted.  You know, there's -- there's agreement

24  all around that the finding of infringement cannot apply to

25  messages that are sent through servers located outside the

1   United States or to, you know, individual Android users who are

2   located outside the United States so that the -- the -- the

3   scope of damages here has to be measured in terms of the U.S.

4   activity, okay?  That's just sort of a fundamental of what the

5   finding in the first trial is and what the law is.

6          THE COURT:  So what are you asking for -- the Court

7   with regard to this motion in limine?

8          MR. STOCKWELL:  Okay.  So there is evidence that the

9   Plaintiff wishes to present about Google's use of the accused

10  services outside the United States in the context of arguing

11  for damages.  And we believe that evidence is entirely

12  improper.  I mean, it's not -- by definition under the law

13  under -- as I explained under the admissions in -- in the first

14  trial, any uses of the service outside the United States is not

15  an infringement.  It cannot count for damages purposes.  There

16  should be no reference to that.

17         Now, their response is, well, we had to use worldwide

18  message counts that Google gave us because they didn't have

19  just U.S. numbers.  To the contrary, Your Honor, Dr. Knox

20  testified as to how many messages he believed were sent in

21  the U.S.  He said, at least several hundred million.  And

22  Mr. Nerieri testified in the first trial as to how many

23  messages were sent in the U.S.

24         So that evidence is available.  They've -- their --

25  their damages expert ignores that and just focuses on the

1  worldwide messages count which is going to include both

2  infringing use within the U.S. and legally non-infringing U.S.

3  outside the U.S.  That's impermissible.  This is a damages

4  trial to establish the value of the usage Google made of this

5  patent in the United States, not elsewhere.

6          THE COURT:  All right.  What's the Plaintiff's

7  response?

8          MR. EICHMANN:  Your Honor, this is a back door attempt

9  to strike or exclude under Daubert the opinions of our experts.

10 They've already brought that separately, and the Court has

11 rejected that.  If they think that our experts are improperly

12 relying upon the transmission of notifications to foreign

13 devices or through foreign servers in their reports, then

14 that's something that should be raised as a motion to strike or

15 as a Daubert and they've already attempted to do that and have

16 failed.

17         We intend to present the same expert testimony from

18 Dr. Knox on the extent of use and the same expert testimony

19 from Robert Mills on the extent of use that we did the last

20 time.  There is no reason, or justification rather, for them

21 cutting off some portion of our testimony from last trial that

22 was pop -- properly admitted over their objections.

23         And now, with respect to -- and so with respect to any

24 instruction that they want to propose that the Court give the

25 jury, we'll look at what they propose.  We haven't seen

1   anything that they've provided.  It's possible there's

2   something in the realm of reason that we would consider, but

3   that's not something I can address on the fly.

4         But for the Court's context here, both Defendants in

5   the case, Microsoft before it left and Google did produce

6   worldwide numbers and that is something that our experts look

7   at and identify.  But they also made clear that those are

8   worldwide numbers, and here are the U.S. numbers.  They

9   provided in context.  Nobody's arguing for damages that are

10   based on foreign uses or foreign infringement.  We're doing the

11   same thing we presented last time in this regard.  It was

12   properly admitted that time; it should be here.

13         THE COURT:  All right.  Well, the Court sees nothing

14   wrong with the Plaintiff putting on evidence of worldwide use

15   as long as it can then take the additional step of apportioning

16   that total worldwide use to domestic use within the United

17   States.  And that burden of apportionment is the Plaintiff's

18   burden.  But to say how you're going to get to your number for

19   domestic use prohibits you from making any reference to

20   anything but domestic use, I think is -- I think is unfair, and

21   I think what was done last time is a reasonable approach.

22         That said, the jury's got to have a basis upon which

23   to then move from worldwide use to the appropriate apportioned

24   domestic use.  So to exclude all reference to foreign use or

25   foreign servers, I think is improper, and I'm going to deny the

motion in limine.  But if the Plaintiff doesn't move from

worldwide use to a clearly apportioned domestic use, then the

Plaintiff's going to have a problem getting a verdict from this

jury.

As far as instructions go, it probably is a matter

that's appropriate for inclusion in the final instructions to

the jury before they retire to deliberate, and I would welcome

suggestions from both sides in that regard.  But for the

record, I'll deny the motion in limine.

MR. EICHMANN:  One point of clarification, Your Honor.

They've also, as part of this, challenged Mr. Mills' damages

theory that is based on scaling, comparing the Microsoft

agreement to what Google would pay in settlement.  And in

making that comparison, Mr. Mills does compare the respective

worldwide numbers from both.  He says that Google produced data

showing 11 billion notifications a day worldwide.  Microsoft

produced data showing whatever it was, something like 140th of

that, right?  So that is a comparison that he's using as a

reasonable proxy for their relative extent of use.  And he

doesn't have all the U.S. numbers from Microsoft, so that's the

best he could do there.

They served a supplemental response from Dr. Ugone in

reply to that report back in December.  He doesn't take issue

with that comparison.  The use of that as a proxy is one of the

ways for scaling that agreement.  They also did not bring a

1    Daubert before the last trial seeking to exclude that, and

2    saying that's really just a misleading or improper use of

3    worldwide data.  They're -- they have tried, and it's hidden

4    between the lines and sometimes not that hidden.

5          In the most recent papers, they're trying to go back

6    and now say that that was improper.  We don't think there's

7    anything improper about it, and we also think it's untimely for

8    them to try to raise this as some sort of late Daubert

9    challenge to a report that Mr. Mills issued back in November --

10   November 27th of last year.

11         THE COURT:  Well, I've denied the motion in limine.

12   The evidence is what the evidence is.  I'm not sure what you're

13   asking for.  Whether you're trying to tell me to be on the

14   lookout for something during the trial.  I don't know where

15   you're coming from, Mr. Eichmann.

16         MR. EICHMANN:  I'm trying just, Your Honor, to make

17   sure the record is clear so that when they later on try to

18   knock out what Mr. Mills says on that, based on your reasoning

19   that, it's clear that we've made our explanation of what's

20   going on here.

21         THE COURT:  Well, if and when things happen, we'll

22   deal with them if and when they happen.

23         MR. EICHMANN:  Yes, sir.

24         THE COURT:  Okay.  All right.  Next is motion in

25   limine that the parties should be precluded from asking

1    questions during the voir dire seeking to commit jurors to any

2    particular range or amount of damages.  I'd be interested to

3    hear the parties' positions on this.

4          MR. STOCKWELL:  Your Honor, I -- I think this is an

5    area where inquiring into the panel's willingness to give what

6    Defense will characterize as a large number and the Plaintiff

7    would characterize as a reasonable number, or vice versa,

8    creates an undue prejudice right from the start in terms of

9    trying to find and get jurors to commit to such numbers,

10   whether it be small in the eyes of one party or large in the

11   eyes of that party.

12         I certainly -- I certainly understand we can get to a

13   fair and impartial jury by asking jurors questions about their

14   view of the parties, their view of the case, but throwing out

15   particular ranges of numbers that they might be willing to

16   commit to before they've heard the case seems to me to be

17   overly prejudicial.  There was some of that going on in the

18   first voir dire, and I -- I don't think it's appropriate here.

19         THE COURT:  Well, what's the Plaintiff's response?

20         MR. FRANZINI:  Your Honor, the -- Google's MIL is

21   phrased as preventing us from asking questions that would

22   commit the jury to a damages award before they've heard any

23   evidence.  We -- we don't really see how it's even possible to

24   get the jury to commit to a damages award before hearing the

25   evidence, and we certainly intend to try to get such a

1  commitment.

2       But this is a damages trial, and we need to be able to

3  ask questions to the jury to see if they have any

4  preconceptions, biases, or experiences that influence how they

5  do lawsuits.  And in particular, we need to be able to ask

6  questions to get information about whether, if presented with

7  persuasive evidence that a large damages award is warranted, a

8  particular juror would be able to award it or whether it would

9  be too difficult for them to be able to award such a sum.  And

10  we don't see that as prejudicial, and we think that's an

11  appropriate use of the voir dire process.

12       THE COURT:  Well, let me say this.  It's been my

13  experience that in most civil trials, the panel during voir

14  dire is asked something along the lines of even if the

15  evidence supported a finding of liability, is there anybody

16  that just could not award what the Plaintiff is going to ask

17  the jury to award, it's just too much money no matter what.  I

18  think that's a fair question.  And I assume that's what this is

19  getting to.  And I'm going to deny the motion in limine as to

20  that regard.

21       That said, if there's something else on the parties'

22  minds, make the Court aware of it.  I do not expect us to get

23  into a bidding war where how many could do this, how many could

24  do this, how many could do this, and we've got hands popping up

25  and trying to pin people down to numbers.  I mean, I'm not

1    expecting that.

2          But to the extent this is intended to cover the type

3    of general question inquiring of the panel if the amount the

4    Plaintiff intends to ask for is just a number so large that any

5    member of the panel could not feel comfortable awarding it,

6    notwithstanding what the evidence may show and if the evidence

7    would otherwise justify an award, I think that's a proper

8    question.  I think that goes to the issue of impartiality and

9    an open mindedness until they've heard all the evidence that we

10   need to secure in the jury.

11          So with that -- with that explanation, for the record,

12   I'll deny 3.  But, again, counsel, if there's something else

13   out there in the bushes that this is covering that I'm not

14   talking about, you need to let me know and I'll address it.

15   But I'm assuming I'm addressing what your concern is.

16          MR. STOCKWELL:  I think you nailed it with your

17   example of asking questions, getting the panel -- you know, how

18   many people are going to commit to this.  That -- that's

19   exactly the concern that we have, Your Honor.

20          THE COURT:  Well, asking people on the panel to commit

21   to a firm number before they've heard any evidence probably is

22   improper.  I don't anticipate that's going to happen.

23          To the extent somebody intends to do that, I'll grant

24   the motion in that limited application.  But I'm not going to

25   preclude the parties from asking the panel, if the evidence

1    supports an award, is there anybody that just couldn't give as

2    much as the Plaintiffs are going to ask for because it's too

3    big a number, and -- and they're not under any circumstances

4    comfortable with awarding a number of that size or scope.  I

5    think that goes to open mindedness and impartiality, and that's

6    proper.

7              All right.  Is anybody unclear about the Court's

8    ruling?

9              All right.  Let's move on then.

10             Next is motion in limine that Plaintiff should be

11   precluded from offering testimony of the absence of any Google

12   witness at trial.  What's the --

13             MR. STOCKWELL:  Your -- Your Honor --

14             THE COURT:  This is something that typically is

15   granted when it's asked for.

16             MR. STOCKWELL:  Yeah.  I mean, and really -- I mean, I

17   understand the Court denied our continuance, but honestly, Your

18   Honor, we would much prefer to have Mr. Nerieri and Ms. Ghosh

19   here.  I mean, we're going to have to prepare a new witness.

20   It's --

21             THE COURT:  I'll --

22             MR. STOCKWELL:  We -- we shouldn't be penalized

23   because of their scheduling conflicts and have that argument

24   which from Plaintiff's papers, they want to argue that, well,

25   they're -- you know, these witnesses aren't.  That shows Google

1   doesn't really care about the case.  I mean, we have a

2   scheduling conflict issue that we shouldn't be penalized at

3   with arguments against us on that.

4         THE COURT:  All right.  Plaintiff have anything to

5   add?

6         MR. EICHMANN:  Well, Your Honor, we didn't argue the

7   motion for continuance because you granted it beforehand.

8   We -- just for the record, we dispute that they've shown those

9   conflicts are genuine.  But I can just say this.  This is one

10  where I think they may open a door, not just with respect to

11  Mr. Nerieri and Ms. Ghosh on the presence or absence of

12  witnesses, but I think for that purpose, it would be fine if

13  the Court granted this and we would at that point notify the

14  Court if we think the door's been opened in some respect.

15        THE COURT:  Well, that's exactly what the Court's

16  going to do.  It's granted.

17        All right.  Last is the Defendants' motion in limine

18  that Plaintiff should be precluded from offering testimony

19  regarding the impact of a partial jury verdict for validity and

20  infringement on its damages claim.

21        As I've indicated, the Court intends to instruct the

22  jury that the issues of validity and infringement have

23  previously been settled in the earlier trial, and the only live

24  issue before this jury is the proper and appropriate amount of

25  damages.  And I've made my feelings very clear about not trying

1   to reopen the invalidity and infringement issues during this

2   trial.

3           That being said, what is the parties' dispute on this

4   motion in limine?

5           MR. STOCKWELL:  I don't think we have a dispute.  I

6   think Plaintiff agreed that they're not going to say, well, now

7   that Google has been found to infringe a valid patent, the

8   number ought to be higher, so I -- I think we don't have a

9   dispute on this, Your Honor.

10          THE COURT:  All right.  Well, I'm going to grant the

11  motion in limine, and I'm also going to caution Plaintiff, the

12  proper reference, to the extent there is one about what

13  happened in the prior trial, is that the Defendant has been

14  found liable, not that they have found guilty.  Guilty implies

15  criminality and is prejudicial, and I'm going to instruct you

16  not to use the word "guilty," use the word "liable."

17          MR. EICHMANN:  Okay.

18          THE COURT:  Okay.  All right.  As -- as I see it,

19  those are all the Defendants' motion in limine.  Have I missed

20  anything?

21          MR. STOCKWELL:  No, Your Honor, but there was one

22  corollary to the -- to the last motion.  We should perhaps have

23  put this in the papers, but I did want to raise it.

24          The -- the jury -- the first jury hung on damages.

25  You're going to instruct that we were found liable.  I am

1  assuming the parties are not to discuss the fact that the first

2  jury hung on damages.  I mean, that seems like it could be

3  prejudicial to one side or the other, but I want to make sure

4  that that is consistent with the Court's understanding.

5        THE COURT:  My intention, Mr. Stockwell, was to be

6  very factual about it and say, we had a trial, the jury

7  deliberated, the jury found that the patent-in-suit was valid.

8  The jury found that the Defendant infringed the patent-in-suit.

9  The jury was not able to agree on the amount of damages, and

10  thus I've ordered this new trial, and that is why the only

11  issue before you is damages.  I don't see that that's

12  prejudicial at all.  I think it's purely factual.  That's the

13  intended approach I am going to take with instructing the jury.

14        So I don't see how the issue of the jury being hung is

15  appreciably prejudicial, but I don't see how it has any real

16  relevance once the jury has been instructed how we got to where

17  we got to.

18        MR. STOCKWELL:  Thank you for that clarification, Your

19  Honor.

20        THE COURT:  All right.  It next appears that we have

21  as our last remaining pre-trial issue the disputed exhibits.

22  And it's my hope that we can group these as best as possible so

23  that we can achieve some efficiencies in going through them.

24        Let's take up, first, the Plaintiff's disputed

25  exhibits, and I'll hear the Defendants' objections on those.

1    And it looks like we start with PX 7, but if there's -- if

2    there's another order, Mr. Korn, I'm just as happy to take it

3    in your order as mine.

4          MR. KORN:  Your Honor, I think the order is fine.  We

5    can march through the -- the joint notice that way.

6          On the first one, which is PX 7 of the '279 patent, I

7    think that's been dealt with sufficiently thus far.  We

8    obviously renew our objection to the relevance of that document

9    but understand the Court's rulings today on that issue.

10          THE COURT:  All right.  Well, it's pre-admitted,

11    but -- consistent with the Court's prior ruling on the motion

12    in limine and is not to be presented to the jury unless the

13    door is opened.

14          MR. KORN:  Yes, Your Honor.

15          On Topic 2, which is -- there -- there's a slight

16    issue in the joint notice that there are two Topic 2s, so on

17    the one that starts on Page 6 of the joint notice, starts with

18    PX 258.  I think we can group these to -- to help the Court

19    through it.

20          PX 258, 284 through 287, 305 and 308 were pre-admitted

21    in the prior litigation.  These documents refer to third-party

22    sales revenue and information.  Exhibit 258 and 308 --

23          THE COURT:  This is the Android smartphones?

24          MR. KORN:  Yes, Your Honor.  258 and 305 are the IDC

25    reports, and we maintain our objection that those do not relate

1    to Google.  There's no mention of Google in any of those

2    reports or Google smartphones.  Those are Android devices

3    manufactured and sold by third parties and therefore are not

4    relevant to this litigation and also include inadmissible

5    hearsay.

6         On 284 through 287, those are documents that were

7    produced by other Android manufacturers who were Defendants in

8    the prior litigation.  They include Samsung, HTC, Motorola, and

9    LG.  And those are revenue -- those documents include revenue

10   information from those Defendants that have no association with

11   Google.  Their sales data and revenue data are not at issue and

12   should not be at issue in this case.  And Plaintiff has done

13   nothing to authenticate those documents, nor have they done

14   anything to show that there's an exception to hearsay on 284

15   through 287.  And although those were pre-admitted in the prior

16   trial, I think that that should be reconsidered, based on their

17   lack of authentication, foundation, and not showing a proper

18   exception to hearsay.

19         THE COURT:  What's your position on 305 and 308?

20         MR. KORN:  I'm sorry, 30 -- 308 is also -- 308 is an

21   LG document.  258 and -- and 305 are the IDC documents.  My

22   position on those two are that we're renewing our objection,

23   but understand that 258 and 305 have been pre-admitted in the

24   prior trial.

25         THE COURT:  All right.  Well, to save time, unless

1    something new has intervened between the prior trial and this

2    and given the Court's extensive use of time and resources to

3    review these exhibits prior to the former trial and the close

4    proximity in time of that trial to this trial, my intention is

5    to pre-admit what I've pre-admitted earlier.  And I'll

6    pre-admit 258, 284 through 87, 305, and 308.

7              I do want to hear argument on 550, 551, and 553.

8              MR. KORN:  Yes, Your Honor.  I'm prepared -- prepared

9    to do that now.  So as -- as you recognize, those were not

10   pre-admitted or raised in the -- in the -- there's -- those

11   documents were not raised or pre-admitted in the -- in the

12   prior case.  Those documents -- and I can -- I can show you

13   those on the screen if can have access, please.  I can -- I can

14   talk through the documents.  I have --

15             THE COURT:  That's fine.

16             MR. KORN:  -- hard copies if we need --

17             THE COURT:  Don't ask me.  It's first time I've ever

18   sat in this courtroom.

19             MR. KORN:  Okay.

20             THE COURT:  I don't know where the buttons even are.

21             MR. KORN:  Okay.

22             THE COURT:  All right.  Although we did have a

23   Markman hearing yesterday afternoon, and it seemed to work fine

24   then.

25             MR. KORN:  Your Honor has made it very clear today

1    that the damages trial is supposed to be about the issues

2    related to Google's finding of liability and the damages are

3    supposed to be related to Google.

4            This set of documents, which are 550, 553, and 551,

5    are focused on Apple.  PX 550, for example, is entitled Apple

6    Push Notification Service Program Guide.  It's a technical

7    document from Apple that describes the -- how to use Apple's

8    push notification service.

9            At the -- at the highest level, the operation of

10   Apple's push notification service is not at issue in this

11   litigation, and it's only going to confuse the jury if we start

12   talking about the operation of a service that is not even at

13   issue.

14           Secondly, these documents are really being put forth,

15   we think, as -- as a way to back door in a willfulness argument

16   that is not at issue in this case.  There's no allegation of

17   willfulness, therefore, Google's recognition, knowledge, or

18   understanding of Apple's push notification service is frankly

19   irrelevant to this litigation.  Therefore, allowing documents

20   that relate to Apple's system that show the operation of

21   Apple's system and e-mails that might show Google's

22   understanding of the existence of an Apple system are frankly

23   irrelevant to this case and prejudicial to Google.

24           THE COURT:  All right.  What's the Plaintiff's

25   position?

1          MR. EICHMANN:  Your Honor, these are relevant to the

2     issue of damages because as we explained in the last trial

3     and -- and to this time, Apple and Google and Microsoft, these

4     are all competitors in the smartphone market.  And the way they

5     compete is by offering their operating systems and their

6     various push notification services.  We have agreements with

7     each of these other competitors, and it is relevant to show

8     that they're all competing with each other, and they are all

9     implementing the technology that is patented by the '914

10    patent.

11         The specific documents at issue here show that Google,

12    while it was developing and making changes to its notification

13    service, was aware of the Apple push notification service and

14    was viewing them as a competitor service.  That is directly

15    relevant to our affirmative damages case, and it is also

16    relevant to rebut their arguments -- their contentions that

17    we're not like Apple.  We're Google.  We're not like Apple.  We

18    don't sell phones.  We don't make all this money from the

19    phones.  We should be considered one of these other companies

20    that provides or gives software for free, not one of these

21    companies that makes the phones ourselves, like Apple or like

22    Blackberry.

23         So one of these exhibits is Mr. Nerieri himself

24    saying, hey, I wonder what's going on currently with the APNS,

25    I'd really like to see what's going on there, get their

1    program, the developer documents, and other documents -- that's

2    Exhibit 551.

3            550 is the developer document that he apparently

4    obtained.  It's not attached to the e-mail, but it seems pretty

5    clear that he got ahold of it, and that's why it was produced

6    from him as a custodian.

7            And then similarly, Exhibit 553 is an e-mail among a

8    number of internal employees where they're talking about the

9    APNS -- that's the Apple push notification service -- and about

10   how -- generally just sort of how it works.  So it's relevant

11   to establish that they were aware of this service, that Google

12   considers Apple a competitor, and that they consider the APNS,

13   which is a license service, to be a competitor service to the

14   Google messaging services which are the infringing services

15   here.

16           THE COURT:  Mr. Eichmann, does your expert opine about

17   these Apple services in his opinion?

18           MR. EICHMANN:  Yes, they do, Your Honor.  Both

19   Dr. Knox and Mr. Mills were our experts in the prior case, and

20   in their existing reports for this case, they both point to the

21   fact that Apple and Blackberry have competitor services and --

22   that were also very successful, and they use that as evidence

23   to point to the reason that this shall be considered on equal

24   footing in the same market.

25           They do not cite to these specific documents, Your

Honor.  That's not what we're offering these for.  But these documents were ones that we came across in the course of looking back through the documents after seeing the arguments that Google made at trial about how we shouldn't consider what Apple is doing, they have nothing to do with this case, they're not like us, nobody over here in this trial knows anything about how the Apple system works.  That, Your Honor, just simply was not true.  Their own witnesses, including their primary trial witness, Mr. Nerieri, very clearly was following what was going on with Apple and considered it a competitor service.

THE COURT:  Do you have something further, Mr. Korn?

MR. KORN:  Yes, Your Honor.

Your Honor, since I'm having some technical difficulties, may I approach with the documents that are in --

THE COURT:  You may.

MR. KORN:  Your Honor, in -- in addressing Mr. Eichmann's point, I'm going to be clear -- make sure we're clear about a couple of issues.  One, he mentioned that his experts addressed Apple's system.  To be clear, there -- there was never any expert testimony that -- any detailed analysis about the way the Apple system works or any comparison between Apple's system and Google's messaging service.  That is -- that is just absent from any of these expert reports or the testimony.

1          At most, there was an acknowledgement that there were

2    these other systems that they state to be competitor systems.

3    But these documents are going further than that, Your Honor.

4    These are documents that are focused on the operation of the

5    system, and they're being used as a way to back door in a

6    willfulness argument that is not at issue in this case.  And

7    they're trying to tie Google to the Apple settlement agreement

8    and the Apple system, and there's no basis for that.

9          THE COURT:  All right.  I've heard enough.

10         MR. KORN:  Okay.

11         THE COURT:  I don't find that these are inherently

12   relevant enough on their face to pre-admit them, and I do not

13   want this damages trial with regard to Google to turn into a

14   trial between Apple and Google.  However, if the Defendants do

15   what the Plaintiffs have represented they expect they're going

16   to do and say we give this away, we're not like Apple, we're

17   this, this, this, this, then I will leave the door open for the

18   Plaintiff to potentially impeach the witness with the use of

19   these, but I'm going to require the Plaintiff to approach and

20   obtain leave before you do that.  But I'm not going to

21   pre-admit them, and I'll exclude them for exhibit purposes.

22         MR. KORN:  Thank you, Your Honor.

23         THE COURT:  Let's go on to the next group.

24         MR. KORN:  All right.  Your Honor, the next group

25   is -- unfortunately, it's labeled 2, as well, but it starts on

1   Page 10 of the joint notice.  And to simplify things, 49, 244,

2   and 273 were pre-admitted.

3          49 and 270 -- 73 are the same document, and they deal

4   with total Android sales, P&L statements related to Android

5   sales.  I think Your Honor has been clear about his ruling on

6   that issue.  So for the record, we renew our objection but

7   understand the Court's ruling on those.

8          On 244, it is a document that relates to a product and

9   service referred to as AdSense.  And, Your Honor, AdSense --

10  the document is entitled The AdSense Revenue Share, and this

11  was pre-admitted in the first case, but I want to raise

12  relevance grounds again.

13         The -- the document is not related to -- specifically

14  to Android or any accused service.  The -- the AdSense service

15  applies to searching functionality and ad revenue, and it goes

16  beyond the issues that are -- are -- that were in the case --

17  in the case in the first trial and go beyond what should be at

18  issue in the damages trial.  Therefore, bringing in documents

19  related to services that aren't at issue we think is irrelevant

20  and highly prejudicial to Google.

21         THE COURT:  Go ahead and let me hear your position on

22  552, 554, and 555.

23         MR. KORN:  Yes, Your Honor.  So 552 and 554 can be

24  grouped slightly.  552 and 555 --

25         THE COURT:  Those are the internal e-mails.

1          MR. KORN:  Yes, Your Honor.  Those are e-mails where

2     Google -- Google employees forwarded some Internet

3     advertisements about the Android success.  They were not

4     comments by Google themselves about the success of Android or

5     any improvements or features of Android.  They were just

6     forwarding press releases, media statements from other

7     entities.

8          It's our opinion that those press releases are

9     hearsay, and because Google forwarded those without any real

10    substantive comment, that doesn't save the -- the underlying

11    media reports from being hearsay, and, therefore, these

12    documents should not be admitted.

13         554 is an -- is an internal document that -- that

14    relates to a -- it's really an internal media document focusing

15    on features of Android.  There's nothing in that document that

16    talks about Google's messaging service.  And, therefore, we

17    find that 554 is just not relevant to this case and it should

18    also be excluded.

19         THE COURT:  All right.  Let me hear from the Plaintiff

20    in response.

21         MR. EICHMANN:  Your Honor, regarding Exhibits 552 and

22    555, the only argument they made is a hearsay argument

23    regarding the hearsay within the document, the media

24    statements.  We're not offering the exhibits or those

25    statements for the truth.  The point of those exhibits is to

1   show that Google internally follows what's going on in the

2   market for the Android operating system and the market share is

3   simply -- its -- its -- its market share in the U.S. and -- and

4   worldwide, the success of the platform, and the reviews and

5   raves that it gets in the field from media and from reviewers.

6          That is relevant, Your Honor, to dispute their

7   argument, again, that they're just simply developing this stuff

8   for free and giving it away for free, and they don't really

9   care about the commercial success of it, and they're not really

10  making any money.  That's absolutely false.  And we believe

11  this -- these documents are among others -- excuse me, and

12  others dispute their assertions and their attempt to

13  characterize themselves as simply offering a free service they

14  don't benefit from whatsoever.

15         And so this is similar to the issue with the Apple

16  documents we just went over, but there should not be any need

17  for approaching the bench first here.  There's no potential

18  confusion about -- about, you know, the Apple system or

19  anything like that.  This is all about Android.  That's what

20  these documents are about.  They're internal e-mails, and it's

21  directly relevant and not offered for an improper hearsay

22  purpose.

23         THE COURT:  Do 252 and 255 (sic) being internal

24  e-mails with articles or notices from the marketplace, are

25  the -- are the third-party articles embedded in the e-mails, or

1  the e-mails simply refer to them without including the articles

2  themselves?

3        MR. EICHMANN:  It's a little bit of both, Your Honor.

4  First, this is -- you said 252 and 255.  It's 552 --

5        THE COURT:  I'm sorry.

6        MR. EICHMANN:  -- and 555.

7        THE COURT:  You're correct, 552 and 555.

8        MR. EICHMANN:  But I believe it's -- it's a chain and

9  it's a compilation of things.  I think in some cases, it's a

10  link to something and maybe just has a headline.  In other

11  cases, it's a little more extensive, has, you know, a blurb or

12  a paragraph or something of that nature.

13        THE COURT:  All right.

14        MR. EICHMANN:  And then with respect to 554, Your

15  Honor, their only argument there is a relevance one.  They

16  admit this is something that Google created.  It's an internal

17  Android newsletter.  It was created right around the time of

18  the hypothetical negotiation, April 2010.  That's the date of

19  this document.  The hypothetical was a month later.  And this

20  specifically talks about the introduction of the Android

21  operating system Version 2.2, which is what they call Froyo.

22  It's the nickname for frozen yogurt.

23        So here's them internally saying, hey, this is how

24  we're going to promote it to the media outlets.  These are the

25  things that are relevant.  This is what's going on at the time

in the Android and smartphone marketplace.  There's no --
there's no objection other than relevance, and it's clearly
relevant, Your Honor, to something the parties would be
considering at the time of the hypothetical.  What's their
market share?  What's going on with this new version of the
system?  How are they competing?

THE COURT:  All right.  With regard to these exhibits,
as before, I'm going to pre-admit 49, 244, and 273.

With regard to the newly offered exhibit, 552, 554,
and 555, I do find that they're not offered for the truth of
the matter asserted but to show the conduct of Google in
following the market, and there -- the Court finds there is
some relevance here.  I'm going to pre-admit those three, as
well.

Next is PX 115.  What's the Defendants' position on
it?

MR. KORN:  Your Honor, PX 115 is Google's source code.
We -- we can't imagine how their source code would be relevant
to a damages only trial.  There's nothing -- Plaintiff makes
the statement that it relates to an argument that our
non-infringing alternative somehow is infringing or somehow is
not acceptable.

But Dr. Knox never looked at the source code in
assessing whether our non-infringing alternative, in fact,
infringes or is unacceptable from his opinion.  There is

1    nothing in his report or from his testimony in the prior trial

2    that relates the source code to a non-infringing alternative

3    argument.

4          THE COURT:  What's SimpleAir's position?

5          MR. EICHMANN:  Your Honor, there's two potential

6    purposes for this.  One is really more of a demonstrative use

7    of it to show the jury that Dr. Knox considered all this

8    information about Google in forming his opinions.  For that

9    purpose, it doesn't need to be pre-admitted, as I understand

10   the Court's practices, and certainly doesn't need to be sent

11   back to the jury.

12         The second purpose is, you know, when we're opposing

13   these papers, it was a little unclear what's coming in now with

14   their new non-infringing alternative and what they're going to

15   be able to offer with respect to the older version of the

16   foreign server alternative.  I do believe it does have

17   relevance to cross examining Dr. Williams and showing that this

18   is a complicated set of code.  It's not so easy just to

19   conclusory -- to -- to summarily transfer over this software to

20   another machine located overseas, as they contend.  I believe

21   that that goes to that issue, but, again, if it's the Court's

22   practice that we can cross examine or impeach a witness with a

23   document without having it be pre-admitted, then perhaps

24   there's not a real dispute here any longer.

25         THE COURT:  Well, I'm going to exclude it as an

1    admitted exhibit and find that it's not pre-admitted.  How it

2    may or may not be used in some other fashion that doesn't

3    require pre-admission, we'll wait until we get to the trial.

4              MR. EICHMANN:  Okay.

5              THE COURT:  All right.  Next I have PX 50, the e-mail

6    thread from Mr. Nerieri.

7              MR. EICHMANN:  Your Honor, we've reached agreement to

8    treat this the same way we did last time, which is the -- to

9    redact the I hate patents part of it.

10             THE COURT:  Okay.

11             MR. EICHMANN:  And if for some reason if we believe

12   they've opened the door for us to unredact it, we will approach

13   the bench and address it that way.

14             THE COURT:  So with the agreed redactions, it will be

15   pre-admitted, correct, by agreement?

16             MR. EICHMANN:  Yes, Your Honor.

17             MR. KORN:  Yes, Your Honor.

18             THE COURT:  All right.  So ordered.

19             What's next, Mr. Korn?

20             MR. KORN:  All right.  Topic 5 on Page 16, Your Honor,

21   that relates to the RIM, Apple, and Microsoft agreements,

22   these were pre-admitted in the first trial, and we want to

23   renew our objections that these license agreements are not

24   relevant to this litigation, that they're hearsay, and that

25   based on the fact that they came through settlement of an

1    active patent litigation matter, that the -- the numbers

2    therein are overstated and, therefore, prejudicial to -- to

3    Google.

4           In addition, on the -- Your Honor, on the Microsoft

5    agreement, we want to state for the record that it's -- that

6    the Microsoft agreement came into existence just prior to the

7    trial in this case, so it was late fall which was three years

8    after the date of the hypothetical negotiation, and, therefore,

9    it is not relevant to the hypothetical negotiation in 2010.

10          THE COURT:  That's 295, the Microsoft agreement?

11          MR. KORN:  Yes, Your Honor, it's 295.

12          THE COURT:  I'm going to -- as in the prior trial, I'm

13    going to pre-admit 180 through 181 and 295.  And that should

14    take us to Plaintiff's objections to Defendants' exhibits.

15          MR. KORN:  Your Honor, one point, the -- since the

16    joint filing, the Plaintiff has identified two new exhibits

17    that we have objections to.

18          THE COURT:  All right.

19          MR. KORN:  PX 240 and 214.  I'm sorry, due to my

20    technical difficulties, I only have a hard copy of 240, but I

21    think I can talk about this for both.  May I approach?

22          THE COURT:  You may.  And I'll give you back the 550s

23    that you gave me earlier.

24          MR. KORN:  Thank you, Your Honor.

25          Your Honor, as you can see from Exhibit PX 240, it is

1    a -- a blog from a Google website that's announcing the

2    acquisition of Motorola Mobility back from May 22nd of 2012.

3          Our objection to this document and the -- just for the

4    record, PX 214 includes similar information.  Our objection to

5    both 240 and 214 is that the -- the -- the acquisition of

6    Motorola Mobility doesn't have any relevance to any claim or

7    defense in this litigation.  Motorola was a separate Defendant

8    in the original action.  Motorola has since been dismissed with

9    prejudice from this case.  There's been no evidence presented

10   about the relationship between Google and Motorola and whether

11   there's some sort of piercing the corporate veil argument that

12   they want to make or make some argument that Google has some

13   role in the smartphone market that it doesn't actually have but

14   used Motorola to -- to make that argument.

15         THE COURT:  Let me interrupt you, Mr. Korn.  You've

16   handed me two copies of 240.

17         MR. KORN:  I'm sorry, Your Honor.

18         THE COURT:  So if you want to bring me a copy of 214.

19         MR. KORN:  Your Honor, I apologize.  I don't have a --

20         THE COURT:  You don't have 214?

21         MR. KORN:  -- copy of 214.

22         THE COURT:  Okay.

23         MR. KORN:  So I apologize for giving you -- giving you

24   two.

25         THE COURT:  That's fine.  I just thought there was a

1   mistake with the copies that I had, but go ahead.

2           MR. KORN:  214 involves the similar statements about

3   the Motorola acquisition.  And, again, we maintain that those

4   aren't relevant and should be excluded from -- from

5   pre-admission.

6           THE COURT:  All right.  Let me hear from the Plaintiff

7   in response.

8           MR. EICHMANN:  Your Honor, these documents go -- go to

9   two issues.  First is, as the Court may recall last trial,

10  Google argued over and over again that they don't make phones,

11  they don't sell phones, it's these other companies out there

12  that do that.  That's not true.  Google's subsidiary, Motorola,

13  and now Google itself through the Google nexus and its Google

14  Play Store, they do sell phones, and they do make phones, and

15  it directly impeaches their assertion that they're this

16  tangential company in the smartphone market.  They develop the

17  operating system.  They develop phones and sell those phones,

18  and they obviously have now been found to offer an infringing

19  notification service.

20          It's directly relevant to that, and it's also

21  described in our expert's report.  Dr. -- excuse me, Mr. Mills

22  addresses Motorola, and I believe these specific documents

23  which are created by Google themselves in his report.

24          In addition, these documents go to cross examining and

25  impeaching Google and their experts on their comparable license

1  agreements.  What they've done is pointed to, as one of their

2  primary agreements, a 5. -- I don't guess I need to say the

3  number.  They've pointed to an agreement where in 2011 or -- or

4  '10, Google purchased some patents for a much smaller sum than

5  is at issue here from Motorola, and that's something that

6  Dr. Ugone points to and argues as -- as an indicator of value

7  and is very close to his damages number in this case of $6

8  million.

9          Well, what he very clearly fails to address is the

10  fact that Google paid over a billion dollars to acquire -- $2.2

11  billion to acquire Motorola, primarily as it's well known, to

12  acquire that company's patents.  This is something that

13  directly goes to his credibility and to show that he is cherry

14  picking agreements that Google has entered into with respect to

15  patents.  So on both of these grounds, this is clearly

16  relevant.  It's produced right off of Google's announcements

17  and is not challenged as hearsay, so we believe it should be

18  pre-admitted.

19          THE COURT:  All right.  Well, I'm going to treat this

20  much like the '279 patent.  I'm going to pre-admit it

21  conditioned upon Google opening the door by saying it doesn't

22  make smartphones or anything else that would fly in the face of

23  this Google-generated document, which has to be viewed as an

24  admission.

25          I am going to direct that the several pages of blog

1  posts attached to it be excluded.  Those are clearly hearsay

2  from people all over the planet, and I can't see any relevance

3  to including all these blog posts.  So, in effect, with regard

4  to PX 240, it would be all of the first page and the top

5  section of the second page through the actual article or

6  statement itself.

7         And if -- if Google opens the door, then SimpleAir may

8  use them both for impeachment or for other purposes.  But

9  you're going to have to obtain leave from me before you present

10 them to the jury.  But for that purpose and to make it such

11 that we don't have a problem if, in fact, the door is opened,

12 I'm not going to deny them.  I'm going to pre-admit them, but

13 I'm going to pre-admit them on that condition.

14        All right.  Then that's 214 and 240.

15        Now, that should bring us to Defendants' Exhibits and

16 Plaintiff's objections to the same.

17        MR. KORN:  Your Honor, I'm sorry --

18        THE COURT:  Did I miss something else?

19        MR. KORN:  No, there's nothing else on Plaintiff's

20 exhibits.  But there's a -- a Defendants' exhibit that's not on

21 the joint statement that is pertinent to the discussion we just

22 had.

23        THE COURT:  All right.  And it's objected to by the

24 Plaintiff?

25        MR. KORN:  It is, which is -- it's Defendants' Exhibit

1    494.  And, again, Your Honor -- Your Honor, I apologize, I have

2    a digital copy but not a hard copy.  It's a -- it's a similar

3    news release about the -- the sale of Motorola to Lenovo.  And

4    our position is to the extent that Your Honor finds that 240

5    and 214 should be pre-admitted, that the press release about

6    the sale of Motorola Mobility to Lenovo should also be

7    pre-admitted.

8          MR. EICHMANN:  Your Honor, we don't have an objection

9    to that.  They -- that was recently added to their exhibit

10   list, recently produced.  We've never asserted an objection.

11   We don't have one.

12         MR. KORN:  Okay.

13         THE COURT:  All right.  Does it contain similar

14   postings from people all over the world, or is it simply a

15   statement?

16         MR. KORN:  I believe it's a statement.  We will check

17   and redact accordingly.

18         THE COURT:  All right.  Well, let me back up a minute.

19   Given that we've now got this sale to Lenovo also documented,

20   I'm going to lift the prior condition on the pre-admission of

21   214 and 240, and both 240, 214 and DX -- what is it, 494?

22         MR. KORN:  Yes, Your Honor.

23         THE COURT:  Those are all pre-admitted.

24         MR. EICHMANN:  Just to be clear, Your Honor, those

25   blog comments, we've already taken those out.  They weren't

1 supposed to be there, so that's not an issue for us.

2 THE COURT: They're to be excluded as a part of any

3 pre-admitted document.

4 All right. Any other reason we shouldn't go on to

5 Defendants' exhibits?

6 MR. KORN: No, Your Honor.

7 THE COURT: Let me hear from the Plaintiff on the

8 first set of objections.

9 MR. EICHMANN: Our first group, Your Honor, Category

10 1, is prior art documents. For the same reason that we've

11 already addressed with respect to the in limine's and

12 Mr. Eastburn's deposition, we don't believe that any of these

13 documents are relevant or should be pre-admitted or used for

14 any purpose in this case.

15 THE COURT: All right. What's the Defendants'

16 position?

17 MR. KORN: Your Honor, we were seeking pre-admission

18 for use with Mr. Eastburn. If Mr. Eastburn is not permitted to

19 testify, we're not seeking pre-admission of these documents.

20 THE COURT: All right. Then for purposes of the

21 record, I'll treat it that in light of the Court's prior ruling

22 on Mr. Eastburn, the -- the Defendants' withdrawing these

23 exhibits.

24 MR. KORN: Thank you, Your Honor.

25 THE COURT: Let's go to Category 2, Plaintiff.

1          MR. EICHMANN:  Your Honor, there are three exhibits in

2    this category that relate to the chain of title.  Our position

3    is that they have already stipulated that they own the '914

4    patent and own the right to pursue and collect damages for

5    infringement, that these documents are not relevant.

6          With respect to Exhibit 347, this is the memorandum of

7    sale and deposit between Verus -- and, actually, it's not a

8    typo itself.  This has a -- this is the document by which Verus

9    obtained ownership of the patents during the bankruptcy

10   proceeding.

11         Google is arguing that this is relevant to the issue

12   of damages.  We group this, even though it is a sale and the

13   Court has expressed its comments in part on this, to fall in

14   the same category as the patent valuations.

15         What happened here is this is not really an arm's

16   length transaction for the patents.  Verus was the highest

17   secured creditor of AirMedia during these bankruptcies.  When

18   the patents went into bankruptcy, Verus then made a bid to

19   extinguish its credit of $10 million to obtain ownership of

20   the -- of the -- the intellectual property.  This wasn't

21   somebody looking around and saying, hey, these are what these

22   patents are about or should be valued at or should be worth in

23   the future or even now.  This is really just -- it's -- it's

24   bankruptcy math, Your Honor, and it's not indicative of what a

25   reasonable royalty would be for Google's infringement nearly 10

1    years later.  That's Exhibit 347.

2           I believe they've withdrawn Exhibit 348, just in -- in

3    sidebar.

4           And then with respect to Exhibit 354, that is not a

5    sale.  That is simply an assignment between Ex Machina and

6    AirMedia dated 1997.  That's a chain of title document.  We

7    don't think that's relevant for any purposes, whether damages

8    or otherwise, because the chain of title has been stipulated

9    to.

10          THE COURT:  All right.  What's the Defendants'

11   response?

12          MR. KORN:  Your Honor, as an initial matter, we will

13   withdraw from the request for pre-admission of 348 and 354, so

14   our focus is on Exhibit 347.

15          347, as Mr. Eichmann said, is, in fact, a document

16   that shows the purchase of the patents out of bankruptcy.

17   It -- it --

18          THE COURT:  Let me -- let me stop you, Mr. Korn.  I'm

19   going to pre-admit 347.

20          MR. KORN:  Thank you, Your Honor.

21          THE COURT:  Plaintiff can deal with it on

22   cross-examination.

23          MR. KORN:  Thank you, Your Honor.

24          THE COURT:  All right.  What's the next category,

25   Mr. Eichmann?  I show it as being other.

1           MR. EICHMANN:  This is our other category, and it's a

2    lot shorter than last time.

3           Exhibit 301 is from the Google website.  It's company

4    background.  Last time the Court ordered them to redact

5    portions of it.  We are fine with that same ruling, and I

6    believe they have agreed that they will proceed in that manner.

7           Exhibit 353 is --

8           THE COURT:  Just a minute.  Before you go on to 353.

9           MR. KORN:  Yes.

10          THE COURT:  Is that the Defendants' agreement on 301?

11          MR. KORN:  Yes, Your Honor.

12          THE COURT:  It will be pre-admitted with those agreed

13   redactions.

14          MR. EICHMANN:  Exhibit 353, Your Honor, is a 1997 --

15   1996 to '97 operating budget for Ex Machina.  That's the prior

16   name of AirMedia.  We don't believe that this document is

17   relevant to any issue in this case.

18          In the past case, it may have been relevant to arguing

19   issues of commercial success of the invention or lack of

20   commercial success.  The company didn't make a lot of money

21   from AirMedia Live.  That's not disputed.  That is not relevant

22   to the issue of damages in this case.  1996, '97, the patent

23   hadn't even issued.  How Google infringes and how they make

24   money is very different from how Ex Machina attempted to make

25   money.  At a minimum, this should be excluded under 403 because

1   it's confusing and prejudicial.

2          And with that, I'll stop.

3          THE COURT:  What's the -- what's the Defendants'

4   response?  What's the relevance here, Mr. Korn?

5          MR. KORN:  On -- on DX 353, there's -- there's a

6   couple of bases for the relevancy.  One is that this document

7   shows that the -- the Plaintiff's damage -- damages model is

8   focused on charging for notifications and how much would --

9   would someone pay for that.  This document is showing that

10  the -- that AirMedia themselves could not implement a model to

11  where they made money off of selling notifications.  So it's

12  relevant in us disputing the damages model that they're putting

13  forth at the trial.

14         Secondly, the operating budget and the success of

15  AirMedia Live is relevant to multiple Georgia-Pacific factors,

16  including Georgia-Pacific Factors 8 and 10.  Georgia-Pacific

17  Factor 8 reads:  The established profitability of the product

18  made under the patent, its commercial success, and its current

19  popularity.

20         Georgia-Pacific Factor 10 reads:  The nature of the

21  patented invention, the character of the commercial embodiment,

22  it's -- as owned and produced by the licensor and the benefits

23  to those who have used the invention.

24         The document relates to -- to just that, Your Honor,

25  the success of AirMedia Live based on the commercial

1　embodiment, and it's relevant to the Georgia-Pacific factors,

2　and it's relevant for those reasons.

3　　　　　THE COURT:  All right.  I'm going to pre-admit 353.

4　　　　　I understand 436 and 444A have been withdrawn; is that

5　correct?

6　　　　　MR. KORN:  That's correct, Your Honor.

7　　　　　THE COURT:  All right.  That leaves us 484 and 485.

8　What's the basis for pre-admission on these summaries?

9　　　　　MR. EICHMANN:  Maybe I can address it in reverse.

10　We'll withdraw our objection to 485.  That's the summary of

11　Dr. Ugone's opinions.

12　　　　　484, Your Honor, at the time we filed this notice was

13　not yet produced to us.  It has since been produced.  This is a

14　summary of the opinions of Dr. Ravi Dhar.  That's their survey

15　expert who didn't come last time.  We just simply haven't had

16　time to go back and -- and check whether what's in that summary

17　matches up with what's in his report.  I don't think there's

18　going to be a problem, but we just haven't had time yet to --

19　to review that document and determine whether we maintain that

20　objection.

21　　　　　THE COURT:  So you're asking me to leave the pre-trial

22　open so you'll have time to go back and review that document?

23　　　　　MR. EICHMANN:  Well, Your Honor, it was produced to us

24　two days ago, so among other things, they're filing motions for

25　final responses.  So, yes, Your Honor, I'm asking for

1    additional time to, you know, look it over and notify the Court

2    if there's an actual dispute on this particular document.  I

3    don't think there will be, but I haven't gone -- had a chance

4    to go back and vet what they've put in there and what Dr. Dhar

5    has opined on in his report.

6          THE COURT:  All right.  Well, I'll -- I'll afford the

7    Plaintiff 48 hours -- let's say Monday at noon give me a

8    response.  Communicate with my law clerk as to whether you

9    still maintain an objection.  And if you do, then give me one

10   page on why you do and I'll let the Defendant respond.  I'll

11   rule on the papers.

12         MR. EICHMANN:  I think that's all very generous and

13   won't be necessary, but thank you for the opportunity.

14         THE COURT:  All right.  Are there other disputed

15   exhibits the Court needs to take up the parties are aware of?

16         MR. EICHMANN:  No, Your Honor, not from the Plaintiff.

17         MR. KORN:  No, Your Honor, not from the Defendants.

18         THE COURT:  All right.  I want to make one thing

19   clear, counsel.  We're treating this and, in fact, it is a

20   separate trial, so as far as your exhibits for the Court and

21   the Courtroom Deputy, we're not going to pull from the prior

22   exhibits.  You need to regenerate new exhibits as if this were

23   the first time this were tried.  That way we have a complete

24   set for each trial, and we're not going to be sharing documents

25   between the two.  So if you have any questions, consult with

1   Ms. Lockhart before you leave today on that issue.

2          Are there any other matters of a pre-trial nature the

3   parties are aware of the Court should take up before the 17th?

4          MR. EICHMANN:  Yes, Your Honor.  Mr. Dovel would like

5   to address one issue.

6          MR. DOVEL:  Your Honor has given the parties -- each

7   side four hours for witness testimony.  In the first trial, we

8   presented just about five hours of witness testimony on

9   damages.  This time around, it's -- it's going to be tight to

10  do it with that, but we can live with the five.  Four is going

11  to make it so that we're going to have to cut out important

12  testimony.  We -- we were successful in getting a verdict.

13  We're going to have to defend it on appeal.  We need enough

14  time to present the testimony, Your Honor.

15         If -- if each side gets five hours or even four and a

16  half, we can still get the case to the jury on Wednesday at

17  noon.  The first trial we spent 9 hours and 17 minutes on the

18  record with witness time in the first two days, that is, Monday

19  and Tuesday.  So even at nine hours, Your Honor, that's four

20  and a half hours per side, we'd be on the same pace we were on

21  at the last trial.

22         We're suggesting just a little more time, an extra

23  hour in total, so we do an hour of witness testimony Wednesday

24  morning, that still lets us do everything we need to do and get

25  it to the jury on Wednesday at noon.  So we'd request five

1  hours per side for witness testimony.

2       THE COURT:  What's the Defendants' response?

3       MR. STOCKWELL:  Your Honor, we think that four hours

4  is more than sufficient, and I think after -- after looking at

5  the proffer they put in the joint notice, my concern is -- you

6  know, the Court started off the hear -- the hearing today just

7  reminding everybody, look, we're -- we're only trying damages,

8  it's not infringement, invalidity.  Frankly, there's a lot of

9  fat in their proposal that revolves around talking about the

10  infringement, having Dr. Knox go back through that.

11       I don't think any of that is necessary.  I think we

12  can get this done in four hours.  I -- I don't see a need for

13  five hours, and I fear that if we get that additional time,

14  we're going to -- we're going to bleed into some of those areas

15  that the Court doesn't want us to bleed into.

16       THE COURT:  All right.  Well, I'll split the baby,

17  four and a half hours.  I may get some of this time back, if

18  you go outside your reports and I take it away from you.  So

19  I'll make it four and a half hours.

20       Anything else of a pre-trial nature?

21       MR. STOCKWELL:  Yes.  Just two -- two points, Your

22  Honor.  First, just to make sure, I -- I take it that the Court

23  does want to try to give the case to the jury that Tuesday or

24  maybe Wednesday morning?  I mean, what --

25       THE COURT:  I'm not under any strict compulsion,

1   whether it's Tuesday or Wednesday.

2          MR. STOCKWELL:  Okay.

3          THE COURT:  I've got a little -- I've got more

4   flexibility that week than I -- than I have had in other weeks.

5   So it -- it will just be when it happens, counsel.

6          MR. STOCKWELL:  And what I was trying to get to is

7   things like you probably have the informal jury charge

8   conference sometime Tuesday or maybe Wednesday morning, like we

9   did before, just before closing, something like that?

10         THE COURT:  Once we finish the evidence, then we'll

11  see what's an appropriate time to set it.

12         MR. STOCKWELL:  And then the only other suggestion I

13  would have for the Court, to make sure we can kind of move

14  things along, I'm not sure, I went back and looked at the

15  patent video.  I'm not sure we need to play that to the panel

16  beforehand.  It's mostly about liability issues.  It really

17  doesn't talk about damages issues at all.  That could save some

18  time in selecting the panel early on in the morning, so --

19         THE COURT:  No, I think -- I think it's appropriate.

20  We're going to tell this jury of lay people that there's been a

21  finding of validity and infringement.  They need to have the

22  background of the patent video to understand the context of

23  that.  We'll play the patent video.

24         MR. STOCKWELL:  Thank you, Your Honor.

25         THE COURT:  Okay.  All right.  Counsel, if there's not

1   anything further.

2          Ms. Smith?

3          MS. SMITH:  Your Honor, I -- I apologize.  I don't

4   intend to be a slow learner, but on the -- the sealing of the

5   courtroom, I've just heard -- I've been listening carefully,

6   and I think what has happened is some confidential Microsoft

7   documents have been pre-admitted, which is a hugely efficient

8   way to -- to manage your Court, and I'm grateful for that

9   typically.

10          But if this case plays out like it did in the first --

11  the first part, what will happen in opening statement, we're

12  going to go beyond what I think you and I both see as attorney

13  argument, and we will see actual evidence because it's been

14  pre-admitted and the parties are -- you know, it's available to

15  parties, and they're able to use it.  We'll see actual

16  documents hit the ELMO or excerpts of confidential documents.

17  Do I have any remedy with the Court to avoid that situation in

18  open Court?

19          THE COURT:  Let me ask the parties, do either side

20  intend to use those type documents before the jury in opening

21  statement?

22          MR. EICHMANN:  Your Honor, no.  And Ms. Smith doesn't

23  have the benefit of our most recent exhibit list.  I believe

24  the only Microsoft document that's pre-admitted is the actual

25  settlement agreement.  The things like their operating system

1  sales, how many units they've sold, what they're getting for

2  that, the things that they're most concerned about, I'm pretty

3  certain that we didn't seek pre-admission of this round or last

4  round, rather, if they're not on there.  But the only thing I

5  can think of that is coming up in opening is going to be, you

6  know, the Microsoft settlement amount.

7        THE COURT:  Well, you know, opening statements are not

8  evidence.  I really would not expect pre-admitted exhibits to

9  be used during opening.  Unless somebody has an intention to do

10  that, I don't think your -- your anticipated problem is going

11  to play out the way you're concerned it might.  If anybody on

12  either side is planning do otherwise, now is the time to let

13  the Court know.  But unless you are, I think we leave opening

14  statement as an oral presentation to the jury.

15        MR. STOCKWELL:  Yeah, I mean, I -- I -- I don't think

16  we would be going through the documents in opening.  I mean,

17  we've got 15 minutes.  It's -- it's an overview.  We may have

18  some demonstratives and whatnot.

19        THE COURT:  Well, I'm going to assume, based on this

20  discussion, that neither side's going to expose or -- or

21  publish to the jury pre-admitted exhibits during opening

22  statement.

23        With regard to pre-admitted exhibits being used during

24  the trial and either party's request the courtroom be sealed,

25  I'll refer you to my earlier comments.  Let me know, and we'll

1   try to structure it so that it can be done in a way that

2   affords some protection for that proprietary information but

3   doesn't unduly disrupt the flow of the trial.

4        MR. STOCKWELL:  Just one modification on the

5   pre-admitted exhibits, can we limit that to the Microsoft

6   confidential material?  I mean, I haven't thought about whether

7   there's some other material we might want to use, Your Honor.

8        THE COURT:  I'm going to leave in place a prohibition

9   against using the pre-admitted exhibits during the opening and

10   if -- if on the morning of jury selection, you feel absolutely

11   compelled to reurge it, I'll take it up then.  But I don't want

12   to leave this door open.  If you find some compelling reason

13   you've got to do it, we'll talk about it on Monday morning, the

14   17th, well before opening statements.

15        MR. STOCKWELL:  Okay.  Understood.

16        THE COURT:  But I don't want to leave this loose end

17   untied.

18        MR. STOCKWELL:  Understood, Your Honor.

19        THE COURT:  All right.  The deposition that's going to

20   be taken, I'll refer to the parties' agreement on that as to

21   this new witness.  I assume it's going to be -- have you --

22   have you determined when and where?

23        MR. EICHMANN:  No.

24        MR. STOCKWELL:  No.

25        THE COURT:  All right.  I'm going to direct you to

1  meet and confer on that because if by chance there are some

2  problems, I need to know about it earlier rather than later.

3  But I'll assume unless Court hears otherwise, that will be

4  taken care of by agreement of the parties.

5          MR. STOCKWELL:  Yes, Your Honor.

6          THE COURT:  All right.  If there's not anything

7  further, counsel, that will complete this pre-trial hearing.  I

8  will see you on the 17th.

9          You're excused.

10         COURT SECURITY OFFICER:  All rise.

11         (Recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    _____          _____

     SHELLY HOLMES                        Date
10   Official Reporter
     State of Texas No.: 7804
11   Expiration Date: 12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25