```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                         MARSHALL DIVISION

 3   SIMPLEAIR, INC.              *    Civil Docket No.
                                  *    2:13-CV-587
 4   VS.                          *    Marshall, Texas
                                  *
 5                                *    March 19, 2014
                                  *
 6   GOOGLE                       *    8:45 A.M.

 7                      TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
 8                    UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:       MR. GREGORY DOVEL
                               MR. JEFFREY EICHMANN
11                             Dovel & Luner
                               201 Santa Monica Blvd.
12                             Suite 600
                               Santa Monica, CA   90401
13
                               MS. ELIZABETH DERIEUX
14                             Capshaw DeRieux
                               114 East Commerce Avenue
15                             Gladewater, TX   75647

16   FOR THE DEFENDANTS:       MR. MITCHELL STOCKWELL
                               MR. RUSSELL KORN
17                             Kilpatrick Townsend & Stockton
                               1100 Peachtree Street, Suite 2800
18                             Atlanta, GA   30309

19
     APPEARANCES CONTINUED ON NEXT PAGE:
20

21
     COURT REPORTERS:          MS. SHELLY HOLMES, CSR
22                             MS. SUSAN SIMMONS, CSR
                               Official Court Reporters
23                             100 East Houston, Suite 125
                               Marshall, TX   75670
24                             903/935-3868

25   (Proceedings recorded by mechanical stenography, transcript
     produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:       MS. DANIELLE WILLIAMS
                          Kilpatrick Townsend & Stockton
                          1001 West Fourth Street
                          Winston-Salem, NC   27101

                          MS. JENNIFER PARKER AINSWORTH
                          Wilson Robertson & Cornelius
                          909 ESE Loop 323, Suite 400
                          Tyler, TX   75701


              ****************************************


                  P R O C E E D I N G S


              (Jury out.)

              COURT SECURITY OFFICER:  All rise.

              THE COURT:  Be seated, please.

              All right.  Is someone from the Plaintiff's trial

team prepared to go to the podium and read into the record

those exhibits from the list of preadmitted exhibits that

were used during yesterday's portion of the trial?

              MR. EICHMANN:  Yes, Your Honor.

              THE COURT:  If you'll proceed, Mr. Eichmann.

              MR. EICHMANN:  Plaintiff's Exhibit 33, 54, 139,

and 295.

              THE COURT:  Any objection to that rendition from

the Defendant?

              MS. AINSWORTH:  No, Your Honor.

1          THE COURT:  Does the Defendant likewise have a

2     list of preadmitted exhibits used before the jury to read

3     into the record?

4          MS. AINSWORTH:  Yes, Your Honor.

5          THE COURT:  If you'll proceed, Ms. Ainsworth.

6          MS. AINSWORTH:  Your Honor, the Defendant used

7     Defendant's Exhibits 29, 192, 214, 215, 221, 341, 342, 343,

8     345, 346, 347, 349, 351, 355, 356, 357, 432, 433, 441, 442,

9     443, 484, 485, and Plaintiff's Exhibits PX 26, 54, 266, and

10    295.

11         THE COURT:  All right.  Is there objection from

12    the Plaintiff to that rendition, from the Defendant?

13         MR. EICHMANN:  No, Your Honor.

14         THE COURT:  Okay.  Then having completed that,

15    we'll next go to the formal charge conference.  Yesterday,

16    after the close of evidence, the Court met with counsel in

17    chambers for a lengthy period of time and reviewed a working

18    draft of the final jury instructions and the verdict form.

19    The parties discussed with the Court the parties' joint

20    submission in that regard as well as tentative adjustments

21    and changes that the Court had proposed.  That discussion

22    was open and far-ranging, and after hearing fully from both

23    parties with regard to the various aspects each cared to

24    raise and a complete and thorough review of the charge and

25    verdict, the Court delivered electronically yesterday

1   evening a version of those final instructions and verdict

2   form that the Court believes should be given to the jury in

3   this case.

4           We're now going to open and conduct a final -- a

5   formal charge conference in which I'll hear from both

6   parties as to any remaining objections both as to what is

7   included in this version of the final instructions and --

8   and verdict or anything that's been omitted.

9           My practice, Counsel, is to do this on a

10  page-by-page basis.  We'll start with the current version of

11  the final jury instructions, and if someone who's going to

12  comment for both sides, if both of you will go to the podium

13  and be there together, it will be more efficient and save us

14  some time.  And I'll go through these, as I say, on a

15  page-by-page basis.

16          If you have an objection to make, as we get to

17  that page where either the basis for your objection is

18  included or what you want to object about having been

19  excluded should have been placed in your view, then that's

20  the time you should make your objection on the record.

21          So with that, we'll start with the final jury

22  instructions.

23          Turning to Page 1 of that document, are there

24  objections from either Plaintiff or Defendant?

25          MS. WILLIAMS:  Yes, Your Honor.

1          THE COURT:  Any objection on Page 1 from the

2     Plaintiff?

3          MR. EICHMANN:  No, Your Honor.

4          THE COURT:  All right.  Ms. Williams, what's your

5     objection on Page 1?

6          MS. WILLIAMS:  Your Honor, we object to the

7     instruction on Page 1 that states that -- in the last

8     paragraph where it states:  A verdict form has been prepared

9     for you.  It has one question.

10          We object to the presentation of one question to

11     the jury.  We propose that the instruction be:  It has two

12     questions asking you to write in the amount of damages you

13     have unanimously reached based on the evidence in the

14     case -- in the form of the royalty you have unanimously

15     reached based on the evidence in the case.

16          And then, Your Honor, that instruction from Page

17     1 -- or that paragraph continues on to Page 2, and we would

18     propose adding at the end of that:  That means that each of

19     you must agree on the amount of damages that should be

20     awarded for Google's infringement of the SimpleAir patent

21     and the form of royalty on which the amount of damages is

22     based.

23          THE COURT:  Well, certainly we discussed this at

24     length yesterday evening in the informal charge conference,

25     and it is the Court's view that the Plaintiff may seek and

1    has in this case sought a lump-sum royalty.

2           That's the evidence they presented.  That's the

3    only request they've made during this trial, and

4    consequently, the Court believes it's proper to submit one

5    question for one lump-sum amount, and, therefore, your

6    objection is overruled.

7           MR. EICHMANN:  Your Honor, may I move one more

8    thing for the record?

9           THE COURT:  Yes.

10          MR. EICHMANN:  The pretrial order, which also

11   governs this trial, and we did not plead in there for an

12   ongoing royalty as of the date of the last trial.  And

13   Google did not seek an ongoing royalty or determination

14   of damages occurring in the future for the full length

15   of the trial.

16          THE COURT:  All right.  Are there any other

17   objections on Page 1?

18          MS. WILLIAMS:  No, Your Honor.

19          THE COURT:  Turning to Page 2 of the final jury

20   instructions, are there any objections other than what's

21   already been noted?

22          MS. WILLIAMS:  No, Your Honor.

23          MR. EICHMANN:  No, Your Honor.

24          THE COURT:  Then we'll go to Page 3.  Are there

25   objections from either party on this page?

1          MS. WILLIAMS:  No, Your Honor.

2          MR. EICHMANN:  No, Your Honor.

3          THE COURT:  Page 4, any objections?

4          MS. WILLIAMS:  No, Your Honor.

5          MR. EICHMANN:  No, Your Honor.

6          THE COURT:  Page 5, are there objections?

7          MS. WILLIAMS:  Yes, Your Honor.

8          MR. EICHMANN:  Nothing from the Plaintiff.

9          THE COURT:  All right.  Then I'll hear from the

10   Defendant.

11          MS. WILLIAMS:  Your Honor, two just quick type --

12   what appear to be typographical errors.  If we look in the

13   paragraph that begins, as I explained, the sixth line down,

14   it starts the a patent.

15          THE COURT:  Yes.

16          MS. WILLIAMS:  And so I think that we should pick

17   either "the" or the "a," and "a" is probably the best way to

18   go.

19          Right here (indicating).

20          THE COURT:  All right.  I think that's correct.

21   I'll either -- I'll keep one of those articles and delete

22   one of those articles.

23          MS. WILLIAMS:  Yes, Your Honor.

24          THE COURT:  What else, Ms. Williams?

25          MS. WILLIAMS:  In the paragraph that begins

1    "however," the second sentence "as a result this trial will

2    not be concerned," I think the "will not be" should be

3    changed to "was not."

4              MR. EICHMANN:  Your Honor, I would just suggest

5    saying "this trial does not concern."

6              THE COURT:  Well, those are both good suggestions.

7    I think I'll take a third one and say "this trial has not

8    been concerned."

9              MS. WILLIAMS:  Our English professors that we

10   found have so many ways to --

11             THE COURT:  But it's a valid observations.  I'll

12   make -- I'll make the change there.

13             MS. WILLIAMS:  Thank you, Your Honor.

14             And then we also object to the language in the

15   last paragraph, the fourth line down that begins:  That is

16   infringement occurring prior to January 2014, you are not to

17   award damages for any infringement occurring after that

18   point.

19             Your Honor, the parties have disputed what the

20   royalty is in this case and whether it should be for a lump

21   sum or a running royalty and whether it is for the full life

22   of the patent or -- or -- or just for a certain period of

23   months.  There has been a significant amount of evidence

24   presented on that.

25             The way that this instruction is presented, it is

1   confusing or could be confusing to the jury, because it

2   suggests that they're not empowered to award damages for the

3   full life of the patent, and it is -- it seems to be

4   inconsistent with the other instructions that the Court is

5   giving about -- about the damages.  So we request that it be

6   deleted.

7          We also have some concerns that the way that this

8   instruction is presented that it takes the issue away from

9   the jury.

10          THE COURT:  Plaintiff have a response to that

11   objection?

12          MR. EICHMANN:  Yes, Your Honor.  This is the same

13   response articulated on -- with respect to Page 1, the

14   pretrial order does not define this case as including

15   damages occurring in the future nor does it define damages

16   occurring after the date of the last trial.  In fact, there

17   is a different damages standard that occurs for post-verdict

18   infringement.

19          In addition, the patent law only allows a

20   reasonable royalty for use made of the invention.  They

21   cannot -- they do not have authority to award damages for

22   use that has not been established.

23          THE COURT:  Well, despite the disagreement of the

24   parties, it's the Plaintiff's purview to seek relief when

25   coming to court and to define the parameters of the relief

1    they seek.  It's clear to the Court that the Plaintiff has

2    sought a lump sum and a lump sum up to but not beyond

3    January of this year.  Therefore, the -- the Defendant's

4    objection is denied.

5           MS. WILLIAMS:  Your Honor, and if I may note for

6    the record, our proposed instruction would be --

7           THE COURT:  I assume your proposed instruction is

8    included in the joint submission that's already on file.

9           MS. WILLIAMS:  Yes, Your Honor.

10          THE COURT:  I think the record's perfected,

11   Counsel.

12          MS. WILLIAMS:  Okay.  Thank you, Your Honor.

13          THE COURT:  All right.  Anything else on Page 5?

14          MS. WILLIAMS:  No, Your Honor.

15          MR. EICHMANN:  No, Your Honor.

16          THE COURT:  Then let's turn to Page 6.  Any

17   objection from either parties on Page 6?

18          MS. WILLIAMS:  Yes, Your Honor.

19          MR. EICHMANN:  Nothing from the Plaintiff.

20          THE COURT:  All right.  What's your objection, Ms.

21   Williams?

22          MS. WILLIAMS:  Your Honor, in the second

23   paragraph, fourth line down, the first full -- the first

24   sentence there begins:  The damages award ought to be

25   correlated in some respect to the extent the infringing

1   method is used by consumers.  The damages in this case are

2   based on Google's use of the '914 patent.  The instruction

3   is confusing, because it addresses use by customers when the

4   case is about Google's use.

5          We're not in -- in an inducement-type case, and so

6   where this instruction might be more appropriate, and so we

7   request that the instruction -- this instruction be deleted.

8          THE COURT:  Plaintiff have a response to that

9   objection?

10         MR. EICHMANN:  Your Honor, we would not object to

11   deleting the last two words of that sentence, "by

12   consumers," and just leaving it "to the extent the

13   infringing method is used."

14         THE COURT:  Well, this is language that was

15   obtained by the Court from the Lucent decision.  It -- it is

16   almost verbatim out of that case.  The Court believes it's

17   an accurate statement of the law, and the objection is

18   overruled.

19         Are there other objections from either party on

20   Page 6?

21         MS. WILLIAMS:  Yes, Your Honor.

22         We propose the addition of -- of language

23   regarding apportionment to follow the paragraph that we were

24   just looking at.  And the language is:  It is SimpleAir --

25   excuse me -- it is SimpleAir's burden to apportion and

1    establish the messages that are actually infringing from

2    those that take place outside the United States and thus do

3    not infringe.

4         And we would request that that be included based

5    on the Lucent versus Gateway decision, 580 F3d Fed Circuit

6    2009, and also the Cardiac Pacemakers versus St. Jude, 576

7    Fed 3d 1348, 1358 from the Federal Circuit 2009.

8         THE COURT:  Response by the Plaintiff?

9         MR. EICHMANN:  Your Honor, those cases do not

10   require or suggest that that instruction is appropriate

11   here.  The instructions already clearly advise the jury that

12   it is our burden on damages.  They do that multiple times.

13   The instruction is already stated in multiple occasions that

14   infringement only occurs in the United States, and they are

15   not to award damages for infringement occurring outside the

16   United States.

17        To then go further and drill down and say that we

18   need to apportion the messages based on U.S. or further,

19   provides undue emphasis on their argument that some of the

20   messages go outside and some come in.  And it furthermore

21   may suggest incorrectly to the jury that our damages award

22   needs to be based on a per-message model, which it is not,

23   and they don't argue that it is either.  So we oppose their

24   proposed addition.

25        THE COURT:  Well, in looking at that suggested

1   inclusion from the Defendant, the Court believes that it's

2   not completely accurate based on the authorities they've

3   cited; that it purports to hold the Plaintiff to an

4   absolutely allocation standard.  And the inclusion of the

5   statement from the Lucent case directing that the damages

6   ought to be correlated in some respects is the Court's

7   attempt to give guidance but not at a higher standard as the

8   Defendant would suggest, than the Court believes the

9   authorities and case law warrants.  So the objection is

10  overruled.

11        What's the Defendant's remaining objections on

12  Page 6, if any?

13        MS. WILLIAMS:  None, Your Honor.

14        THE COURT:  Okay.  We'll turn to Page 7.

15        MS. WILLIAMS:  Yes, Your Honor.

16        MR. EICHMANN:  No, Your Honor.

17        THE COURT:  All right.  Proceed, Ms. Williams?

18        MS. WILLIAMS:  Your Honor, consistent with our --

19  with our request that the jury be instructed on two

20  questions instead of just one, we request that the Court

21  add -- add the instruction that the jury must make two

22  determinations regarding the reasonable royalty.

23        Our proposed instructions are -- is on Page 21 and

24  22 of the joint submission.  It is three par -- three

25  paragraphs, Your Honor.  I'm happy to read it into the

1    record.

2            THE COURT:  As long as you can identify it by

3    certainty by reference, which in my view, you've done, I

4    don't think we need to take the time for you to read it

5    verbatim.

6            MS. WILLIAMS:  Yes, Your Honor.  It's the

7    Defendant's proposed instruction on Page 21 and 22 of the

8    joint submission.

9            THE COURT:  Well, consistent with my prior ruling,

10   that objection is overruled.

11           Are there other objections on Page 7?

12           MS. WILLIAMS:  No, Your Honor.

13           THE COURT:  Are there objections from either party

14   on Page 8?

15           MS. WILLIAMS:  No, Your Honor.

16           MR. EICHMANN:  No, Your Honor.

17           THE COURT:  Are there objections from either

18   party on Page 9?

19           MR. EICHMANN:  Yes, Your Honor.

20           THE COURT:  All right.  I'll hear from the

21   Plaintiff.

22           MR. EICHMANN:  The first -- excuse me, the third

23   full paragraph beginning patented inventions are sometimes

24   used or sold collectively, and including to the end, this is

25   different from the initial draft last night and adds in

1   their attempt to instruct on the entire market value rule.

2        We believe that this is not applicable to this

3   case.

4        We did not present a theory that is invoking or

5   based on the entire market value rule.  It is not relevant

6   to instruct the jury on a theory that neither side

7   presented.

8        In addition, with respect to the language of this,

9   the very last sentence should be at least modified, and we

10  believe deleted.  This is the sentence that says, in other

11  words, the patented invention must be the basis for customer

12  demand of the service as a whole, if you are to award

13  damages based on the value of the service as a whole.

14       Both times this sentence uses the term service,

15  whereas the prior parts of the paragraph focus on

16  components, and that's -- if there's any argument that's

17  relevant here, Your Honor, it's their argument that the

18  smartphone has all of these different components.  There's

19  never been any argument that the GCM service that was found

20  to infringe needs to then be split up into different parts.

21  They do -- they are liable for infringement of that service,

22  and there's been no testimony or argument to the contrary.

23  So we don't believe that this instruction is -- is proper at

24  all.  And we object to the last sentence for the reasons

25  just stated.

1          THE COURT:  What's the response from the

2    Defendant?

3          MS. WILLIAMS:   Your Honor, this -- this

4    instruction is appropriate, given the evidence that's been

5    presented in this case.  The Plaintiff has put forward all

6    of the Android business and has talked about the -- the

7    dollars and -- and the revenue associated with that

8    business.

9          We know -- there's also evidence that the

10   infringing feature of Google's messaging service is not the

11   driver of Android sales, and so the jury needs to have this

12   instruction to understand how they're supposed to weigh the

13   evidence of the Android business, as well as Google's

14   messaging service.  Without this instruction, they won't

15   know how to understand it.

16         Your Honor, the -- the other part of this

17   instruction, the -- the Court's final instructions delete

18   the word paramount between such and accordance in the fourth

19   line down, and we request that that word be added back.

20         THE COURT:  Well, given that the Court seems to

21   have offended both of you in regard to this paragraph, I

22   will equally deny both of your objections, but we'll keep it

23   as it is and we will not return the word paramount.

24         MR. EICHMANN:   Your Honor, may I -- just another

25   moment on this?  I -- my notes in the instructions, I've got

1   three exclamation points in this whole document.  Two of

2   them are right next to that last sentence.  This is not a

3   frivolous objection.  This is not just something we'd like

4   to have.

5            THE COURT:  Counsel, I didn't say that it was

6   frivolous, and I've ruled on it.  We need to move on.

7            MR. EICHMANN:  Okay.

8            THE COURT:  Are there any other objections on Page

9   9 from either party?

10           MS. WILLIAMS:  No, Your Honor.

11           MR. EICHMANN:  No, Your Honor.

12           THE COURT:  Any objections on Page 10?

13           MS. WILLIAMS:  Yes, Your Honor.

14           MR. EICHMANN:  Yes, Your Honor.

15           THE COURT:  All right.  I'll hear from the

16  Plaintiff first.

17           MR. EICHMANN:  Your Honor, this -- in the first

18  paragraph, the Court has added in the concept that we

19  proposed from the Mars case on the capping of damages to the

20  cost of implementing a non-infringing alternative.  The

21  language that the Court took here is admittedly from one of

22  the cases that we cited, Judge -- Judge Folsom's jury

23  instructions in Data Treasury, but now looking at it in

24  context here, we believe that the Federal Circuit language

25  is more accurate and it's the actual holding and makes more

1   sense.

2          So here's the issue.  The sentence reads a

3   reasonable royalty is not limited to the amount that the

4   infringer could have paid to avoid infringement, and then

5   just stops there.  It should continue to avoid infringement

6   by implementing an alternative or non-infringing

7   alternative.  The way it reads right now is actually a

8   little bit confusing because a reasonable royalty may, in

9   fact, be a fee that they agreed to at the hypothetical

10  negotiation which would, in fact, avoid infringement.  So

11  this needs, Your Honor, to be linked to the -- specifically

12  to the issue of a non-infringing alternative.

13          THE COURT:  All right.  What's the Defendant's

14  response to that objection by the Plaintiff?

15          MS. WILLIAMS:   Your Honor, the -- the proposed

16  language that the Court has in here sufficiently

17  addresses -- addresses the -- the issue.  The additional

18  language that Plaintiff is proposing would place undue

19  weight on it, so we propose following -- agreeing to what

20  the Court has proposed here.

21          THE COURT:  All right.  Well, the Court is going

22  to deny the Plaintiff's objection as stated in this first

23  paragraph on the top of page 10.

24          Does the Plaintiff have other objections on Page

25  10?

1          MR. EICHMANN:  No, Your Honor.

2          THE COURT:  What are the Defendant's objections on

3    Page 10?

4          MS. WILLIAMS:  Your Honor, with regard to the

5    second paragraph on Page 10 that begins though the '279

6    patent, we -- we object to -- we object to the general legal

7    notion that the '279 patent is relevant to this case.  We

8    object to having any instruction that specifically calls out

9    the '279 -- calls out the '279 patent, and we propose

10   adding -- and if the -- if the Court is intent on including

11   an instruction related to the '279 patent, we propose

12   including the instruction that we have on Page 27 of our --

13   of the joint proposed instructions.

14         THE COURT:  All right.  Response by the Plaintiff?

15         MR. EICHMANN:  Your Honor, for the same reasons

16   that the Court has in both first and this trial allowed in

17   evidence of the '279 patent, this instruction is proper.

18   Both parties have spent a lot of time addressing the patent

19   and its relevance to this case.  It is relevant.  And in

20   order to avoid any confusion by the Court -- excuse me, by

21   the jury on this issue, this instruction is -- is proper.

22         And furthermore, it should be viewed as favorable

23   to them because it says though the '279 patent is not at

24   issue in this case.  So it makes very clear to the jury that

25   they're not to award separate damages for that patent.

1          THE COURT:  Well, as the parties know, the Court

2    made it clear before the trial started that I would keep out

3    evidence as to the '279 patent unless the Defendant opened

4    the door.  And the Defendant in pre-trial indicated it

5    intended to open the door and did, in fact, open the door

6    and there's been considerable evidence through this trial

7    relating to the '279 patent.

8          And in response to that, the Court feels compelled

9    to avoid confusion on the part of the jury to give

10   instruction that gives them some guidance in regard to this.

11   And the Court believes that the guidance included in this

12   provision is accurate and reasonable, therefore, the

13   objection is overruled.

14         Are there other objections from either party on

15   Page 10?

16         MR. EICHMANN:  None from the Plaintiff.

17         THE COURT:  Anything further --

18         MS. WILLIAMS:  Yes, Your Honor.  Oh, I'm sorry.

19   Yes, Your Honor.  Sorry for my delay.

20         THE COURT:  What else?

21         MS. WILLIAMS:  With regard to the -- to the last

22   paragraph, the -- the first sentence of that is -- is -- is

23   acceptable.  We would propose replacing the remainder of it

24   with the language that we have proposed on Page 28 of the

25   joint submission, that SimpleAir must prove the amount by

1   which it was damaged with reasonable certainty, but need not

2   prove the amount of damages with mathematical precision.

3   SimpleAir is not entitled to damages that are remote or

4   speculative.

5           THE COURT:  Well, the language here on the last

6   paragraph at the bottom of Page 10, after the first

7   sentence, was not offered by either party, but is language

8   the Court has used in many other final jury charges.  The

9   Court believes it's an accurate statement of the law and is

10  instructive for the jury's benefit.  Therefore, the Court

11  intends to leave it as it currently states -- or as it

12  currently stands, and the objection is overruled.

13          All right.  Going on to Page 11, are there

14  objections from either party on Page 11 of the final jury

15  instructions?

16          MS. WILLIAMS:  No, Your Honor.

17          MR. EICHMANN:  No, Your Honor.

18          THE COURT:  Are there any objections on the final

19  page, being Page 12?

20          MS. WILLIAMS:  No, Your Honor.

21          MR. EICHMANN:  No, Your Honor.

22          THE COURT:  All right.  Turning to the proposed

23  verdict form, are there objections from either party on the

24  single page verdict form?

25          MR. EICHMANN:  Not from the Plaintiff, Your Honor.

1          MS. WILLIAMS:  Yes, Your Honor.  Consistent with

2     our earlier objections, we object to the submission of one

3     question to the jury and believe that it's more appropriate

4     to submit two questions to the jury, in particular, asking

5     the jury what the form of the damages award is.  Based on

6     the Plaintiff's requirement to apportion damages and based

7     on the Cardiac Pacemakers case that the damages be awarded

8     only on infringing use in the United States, it's

9     appropriate to ask this question.

10          Your Honor, we have concerns that without this

11     additional question being presented to the jury, that we may

12     find ourselves back before another jury trying to resolve

13     issues because if the Federal Circuit were to find any of

14     the grounds for damages infirm, we wouldn't know what it was

15     based on -- we wouldn't know how that -- how the jury's --

16     how the jury viewed the evidence and what the result was to

17     be able to understand how we're supposed to deal with the

18     rejection of one theory by the Federal Circuit but the

19     acceptance of another theory.

20          THE COURT:  Well, consistent with my earlier

21     rulings and having considered those arguments fully, the

22     Court overrules your objection, and the verdict form will

23     stand in its present form.

24          Are there any other objections from either party

25     regarding either the final jury instructions or the verdict

1    form that we haven't covered?

2             MR. EICHMANN:  No, Your Honor.

3             MS. WILLIAMS:   Your Honor, may I just state for

4    the record that Google requests that the Court use the

5    verdict form that it proposed in the joint submission of the

6    verdict form to the Court?

7             THE COURT:  That was clear when I reviewed your

8    joint submission, Counsel.

9             MS. WILLIAMS:  Yes, Your Honor.

10            THE COURT:  And I didn't use it for the reasons

11   that I've given you.

12            MS. WILLIAMS:  Thank you, Your Honor.

13            THE COURT:  I think -- I think you have made your

14   position very clear in the record.

15            MS. WILLIAMS:  Thank you, Your Honor.

16            THE COURT:  All right.  That completes the formal

17   charge conference.  I will make minor adjustments, as

18   indicated.

19            It is 20 minutes until 10:00.  I expect the Court

20   will be ready to start at 10:00 promptly when the jury will

21   be here, and we'll stand in recess between now and then.

22            COURT SECURITY OFFICER:  All rise.

23            (Recess.)

24            COURT SECURITY OFFICER:  All rise.

25            (Jury out.)

1          THE COURT:  Be seated, please.

2          All right.  Before we bring in the jury and

3    proceed with final instructions and closing arguments, the

4    Court's been notified that there's a dispute about the use

5    of two slides or demonstratives by the Plaintiff in closing

6    argument.

7          These appear to be numbered Slide 7 and 26.  I

8    think I understand the dispute between the parties.  I don't

9    intend to take a lengthy period of time and hear argument on

10   this.  I simply will say that these are intended as I

11   understand it as demonstratives only.  And while there may

12   be a dispute about where all of the evidence is, I think

13   there's clearly enough on both sides of these issues to

14   permit these to be used for purposes of argument.

15         And the Court, philosophically, is not inclined to

16   micromanage the argument of counsel in closing.  This does

17   not appear to me to be a clear and absolute departure from

18   the entire body of the evidence.  And so, therefore, I'm

19   going to overrule the objection and permit the use of these

20   as demonstratives during closing by Plaintiff.

21         All right.

22         MR. STOCKWELL:  Your Honor, may I just articulate

23   the objection briefly for the record?

24         THE COURT:  Very briefly, Mr. Stockwell.

25         MR. STOCKWELL:  Your Honor, we object to any

1   argument, evidence, or suggestion in closing that Facebook

2   does not use the '914 patent in light of Mr. Payne's

3   testimony at Page 57 of the relevant transcript.

4           Thank you, Your Honor.

5           THE COURT:  All right.  Is there anything further,

6   Counsel, before we bring in the jury?

7           MR. DOVEL:  Nothing from Plaintiff, Your Honor.

8           MR. STOCKWELL:  Nothing from Defendant, Your

9   Honor.

10          THE COURT:  All right.  And let me ask this

11  question before we bring in the jury.  With regard to

12  closing arguments, each side has 20 minutes.  Plaintiffs are

13  going to split their time; is that correct?  Mr. Dovel is

14  going to go first and Mr. Eichmann second?

15          MR. DOVEL:  Yes, Your Honor.

16          THE COURT:  All right.  And then you're going to

17  present the closing argument for the Defendant, Mr.

18  Stockwell?

19          MR. STOCKWELL:  Yes, Your Honor.

20          THE COURT:  Okay.  If you want a warning on your

21  time, either tell me now or tell me when you go to the

22  podium.

23          MR. DOVEL:  Your Honor, I plan to go 10 to 15

24  minutes.  I'm not sure how long it will take me to deliver

25  it.  I would like a warning at 10 minutes.

1          THE COURT:  Okay.  Mr. Stockwell, what about you?

2          MR. STOCKWELL:  Five minutes.

3          THE COURT:  And, Mr. Eichmann, for your final --

4    for the Plaintiff's final closing, do you have a request

5    with regard to a warning?

6          MR. EICHMANN:  Two minutes, please.

7          THE COURT:  Okay.  All right.  Let's bring in the

8    jury, Mr. McAteer.

9          COURT SECURITY OFFICER:  All rise for the jury.

10          (Jury in.)

11          THE COURT:  Be seated, please.

12          Good morning, ladies and gentlemen.

13          You've now heard the evidence in this case.  I

14    will now instruct you on the law that you must apply to that

15    evidence.  Each of you will have a copy of these

16    instructions to review while you deliberate in a few

17    minutes.  So accordingly, there's no need for you to take

18    written notes on these instructions unless you just want to.

19          It's your duty to follow the law as I give it to

20    you.  However, as I've said previously, you, the jury, are

21    the judges of the facts.  Do not consider any statement that

22    I have made during the trial or make during these

23    instructions as an indication that I have an opinion about

24    the facts in this case.

25          After I give you these instructions, the attorneys

1    will make their closing arguments.  Statements and arguments

2    of the attorneys are not evidence and are not instructions

3    on the law.  They are intended only to assist you in

4    recalling and understanding the evidence and the parties'

5    contentions.

6            A verdict form has been prepared for you.  It has

7    one question asking you to write in the amount of damages

8    that you have unanimously reached based on the evidence in

9    this case.  You will take this form to the jury room, and

10   when you've reached a unanimous agreement, you will have

11   your foreperson fill in the blank in that form, date it, and

12   sign it.

13           Your answer must be unanimous, which means each of

14   you must agree on the amount of damages that should be

15   awarded for Google's infringement of SimpleAir's patent.

16           In determining whether any fact has been proven in

17   this case, you may, unless otherwise instructed, consider

18   the testimony of all the witnesses, regardless of who may

19   have called them, and all the exhibits received into

20   evidence, regardless of who may have introduced them.  And

21   you may also consider any stipulations and agreements of the

22   parties in this case.

23           By allowing the testimony or other evidence to be

24   introduced over the objection of an attorney, the Court did

25   not indicate any opinion as to the weight or effect of such

1    evidence.  As I've stated before, you are the sole judges of

2    the credibility of all of the witnesses and what weight and

3    effect to give to all of the evidence in this case.

4          When the Court sustained an objection to a

5    question addressed to a witness, you must disregard that

6    question entirely, and you may draw no inference from its

7    wording or speculate about what the witness would have said

8    if he or she had been permitted to answer the question.

9          At times during the trial, it was necessary for

10   the Court to talk to the lawyers either here at the bench

11   out of your hearing or by calling a recess and talking to

12   them while you were outside the courtroom.  This happened

13   because often during a trial, things come up that do not

14   involve the jury.  You should not speculate on what was said

15   during such discussions that took place outside of your

16   presence.

17         Certain testimony in this case has been

18   presented to you through depositions.  A deposition is

19   the sworn, recorded answers to questions asked to a

20   witness in advance of the trial.  If a witness cannot be

21   present to testify in person from the witness stand,

22   then the witness's testimony may be presented under oath

23   in the form of a deposition.

24         Before this trial, attorneys representing the

25   parties in this case questioned these deposition witnesses

1    under oath.  A court reporter was present and recorded the

2    testimony.  Deposition testimony is entitled to the same

3    consideration as testimony given by a witness in person from

4    the witness stand in the courtroom.

5         Accordingly, you should judge the credibility of

6    and weigh the importance of deposition testimony to the best

7    of your ability, just as if the witness had appeared and

8    testified before you in open Court.

9         While you should consider only the evidence in

10   this case, you are permitted to draw such reasonable

11   inferences from the testimony and exhibits as you feel are

12   justified in the light of common experience.  In other

13   words, ladies and gentlemen, you may make deductions and

14   reach conclusions that reason and common sense lead you to

15   draw from the facts that have been established by the

16   testimony and evidence in the case.

17        Unless I instruct you otherwise, you may properly

18   determine that the testimony of a single witness may be

19   sufficient to prove any fact, even if a greater number of

20   witnesses may have testified to the contrary, if after

21   considering all of the other evidence you believe that

22   single witness.

23        There are two types of evidence that you may

24   consider in properly finding the truth as to the facts in

25   this case.  One is direct evidence, such as the testimony of

1    an eyewitness.  The other is indirect or circumstantial

2    evidence.  That is the proof of a chain of circumstances

3    that indicates the existence or non-existence of certain

4    other facts.

5          As a general rule, the law makes no distinction

6    between direct or circumstantial evidence, but simply

7    requires that you find the facts, based on the evidence

8    presented, both direct and circumstantial.

9          Certain documents that were shown to you are

10   demonstratives.  Demonstratives are a party's depiction,

11   picture, or model to describe something involved in the

12   trial.  If your recollection of the evidence differs from

13   the demonstrative, rely on your recollection.

14         Demonstratives are not evidence, although a

15   witness's testimony that references the demonstrative is

16   evidence.

17         When knowledge of a technical or financial subject

18   may be helpful to the jury, a person who has special

19   training or experience in that field, called an expert

20   witness, is permitted to state his or her opinion on those

21   matters.  However, you are not required to accept that

22   opinion.  As with any other witness, it is solely up to you

23   to decide whether or not to rely upon it or not.

24         In deciding the facts, you may have to decide

25   which testimony to believe and which not to believe.  You

1   are the sole judges of the credibility or believability of

2   each witness and the weight to be given to his or her

3   testimony.

4          In considering the testimony of any witness, you

5   may take into account many factors, including the witness's

6   relationship to the parties, the witness's interest, if any,

7   in the outcome of the case, the witness's manner of

8   testifying, the witness's opportunity to observe or acquire

9   knowledge concerning the facts about which he or she has

10  testified, any bias or prejudice the witness may have, the

11  witness's candor, fairness, and intelligence, and the extent

12  to which the witness's testimony has been supported or

13  contradicted by other credible evidence.  You may, in short,

14  ladies and gentlemen, accept or reject the testimony of any

15  witness in whole or in part.

16         In determining the weight to be given to the

17  testimony of a witness, you should ask yourself whether

18  there was evidence tending to prove that the witness

19  testified falsely about some important fact or whether there

20  was evidence that at some other time the witness said or did

21  something or failed to say or do something that was

22  different from the testimony he or she gave at trial.

23         You should keep in mind, of course, that a simple

24  mistake by a witness does not necessarily mean that the

25  witness was not telling the truth as he or she remembers it

1    because people do from time to time forget some things or

2    remember other things inaccurately.  So if a witness has

3    made a misstatement, you need to consider whether the --

4    that misstatement was an intentional falsehood or simply an

5    innocent lapse of memory.  And the significance of that may

6    depend on whether it has to do with an important fact or

7    only an unimportant detail.

8            As I explained to you at the start of the case, a

9    jury in a prior trial has already determined that Google's

10   use of the Google Cloud Messaging -- Message -- Messaging,

11   GM -- GCM, and the Android Cloud to Device Messaging, C2DM,

12   services infringe Claims 1, 2, 3, 7, and 22 of SimpleAir's

13   '914 patent and that those claims are not invalid in light

14   of prior art.

15           A patent can be infringed if the alleged infringer

16   did not have knowledge of the patent and did not know that

17   what it was doing is infringement of a patent.  Infringement

18   does not require proof that a party copied the patent.

19           In the prior trial, there was no allegation that

20   Google knew of the '914 patent before the lawsuit or that

21   Google copied the patent.  That was not a relevant issue in

22   the last trial, and it is not a relevant issue for you to

23   consider in this trial.

24           However, the jury in the prior trial was unable to

25   reach an agreement on the amount of damages that would

1  fairly and reasonably compensate SimpleAir for Google's

2  infringement or infringing use of the '914 patent.  As a

3  result, this trial has not been concerned with the issues of

4  infringement or validity.  This trial has been focused

5  solely on the issues of money damages for Google's use of

6  Claims 1, 2, 3, 7, and 22 of SimpleAir's '914 patent.

7          Your job in this case is solely to determine the

8  amount of money damages to be awarded to SimpleAir as

9  compensation for Google's infringement.  The damages you

10  award must be adequate to compensate SimpleAir for the

11  infringement that was found by the prior jury -- that is,

12  infringement occurring prior to January of 2014.  You are

13  not to award damages for any infringement occurring after

14  that point.

15          In addition, damages are not meant to punish an

16  infringer.  Your damage award should put SimpleAir in

17  approximately the same financial position that it would have

18  been in had the infringement not occurred.

19          SimpleAir has the burden to establish the amount

20  of its damages by a preponderance of the evidence.  In other

21  words, you should award only those damages that SimpleAir

22  establishes that is more likely than not -- that it has more

23  likely than not suffered.

24          In this case, damages should be assessed beginning

25  in May of 2010.  Damages for infringement of a claimed

1   method, like the asserted '914 patent, must be based on the

2   actual amount of infringing use of the claimed method.  It

3   is SimpleAir's burden to establish the amount or extent of

4   infringing use.  The damages award ought to be correlated in

5   some respects to the extent the infringing method is used by

6   consumers.

7          In addition, because United States patent laws do

8   not apply to activity performed outside of the United

9   States, you may not award damages based on any use of the

10  accused services in other countries.

11         There are different types of damages that

12  SimpleAir may be entitled to recover.  In this case,

13  SimpleAir seeks a reasonable royalty.

14         A reasonable royalty is defined as the money

15  amount SimpleAir and Google would have agreed upon as a fee

16  for the use of the invention at the -- at the time prior to

17  when the infringement began.  The determination of a damage

18  award is not an exact science, and the amount need not be

19  proven with unerring precision.  You may approximate, if

20  necessary, the amount to which the patent owner is entitled.

21         In such a case, while the damages may not be

22  determined by mere speculation or guess, it is proper to

23  award a damages amount if the evidence shows the extent of

24  the damages as a matter of just and reasonable inference.

25         A royalty is a payment made to a patentholder in

exchange for the right to make, use, or sell the claimed invention within the United States.  A reasonable royalty is the amount of royalty payment that a patentholder and an infringer would have agreed to in a hypothetical negotiation taking place at a time prior -- just prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patentholder and infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patent was valid and infringed and the patentholder and infringer were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your -- your determination are as follows:

(1) The royalties received by the patentee for the licensing of the patent-in-suit proving or tending to prove

1    an established royalty.

2            (2) The rates paid by the licensee for such use of

3    other patents comparable to the patent-in-suit.

4            (3) The nature and scope of the license as

5    exclusive or non-exclusive or as restricted or

6    non-restricted in terms of territory or with respect to whom

7    the manufactured product may be sold.

8            (4) The licensor's established policy and

9    marketing program to maintain his or her patent monopoly by

10   not licensing others to use the invention or by granting

11   licenses under special conditions designed to preserve that

12   monopoly.

13           (5) The commercial relationship between the

14   licensor and the licensee, such as whether they are

15   competitors in the same territory, in the same line of

16   business, or whether they are inventor and promoter.

17           (6) The effect of selling the patented specialty

18   in promoting sales of other products of the licensee, the

19   existing value of the invention to the licensor as a

20   generator of sales of his non-patented items, and the extent

21   of such derivative or convoyed sales.

22           (7) The duration of the patent and the term of the

23   license.

24           (8) The established profitability of the product

25   made under the patent, its commercial success, and its

1    current popularity.

2            (9) The utility and advantages of the patented

3    property over the old modes or devices, if any, that had

4    been used for working out similar results.

5            (10) The nature of the patented invention, the

6    character of the commercial embodiment of it as owned and

7    produced by the licensor, and the benefits to those who have

8    used the invention.

9            (11) The extent to which the infringer has made

10   use of the invention and any evidence probative of the value

11   of that use.

12           (12) The portion of the profit of the selling

13   price that may be customary in the particular business or in

14   comparable business to allow for the use of the invention or

15   analogous inventions.

16           (13) The portion of the realizable profits that

17   should be credited to the invention as distinguished from

18   non-patented elements, the manufacturing process, business

19   risks, or significant features or improvements added by the

20   infringer.

21           (14) The opinion and testimony of qualified

22   experts.

23           (15) The amount that a licensor, such as the

24   patentee, and a licensee, such as the infringer, would have

25   agreed upon at the time the infringement began, if both had

1  been reasonably and voluntarily trying to reach an

2  agreement; that is, the amount which a prudent licensee who

3  desired as a business proposition to obtain a license to

4  manufacture and sell a particular article embodying the

5  patented invention would have been willing to pay as a

6  royalty and yet be able to make a reasonable profit and

7  which amount would have been acceptable by a prudent

8  patentee who was willing to grant a license.

9       No one factor is dispositive, and you can and

10  should consider evidence that has been presented to you in

11  this case on each of these factors.

12       When evaluating evidence about amounts paid under

13  other licenses or sales, you should consider whether and to

14  what extent such licenses or sales were comparable from both

15  a technical and an economic perspective.  In other words,

16  you should consider whether the technology exchanged and the

17  terms of the license or sale were similar in terms and scope

18  to the technology of the patent-in-suit and the license for

19  the patent in the hypothetical negotiation.

20       Patented inventions are sometimes used or sold

21  collectively with other components and features that are not

22  covered by the patent.  In that circumstance, you may not

23  award damages based on the value of the non-patented

24  features and components, unless Plaintiff proves that the

25  patented invention is of such importance that it

1    substantially created the value of those other features.

2         In other words, the patented invention must be the

3    basis for customer demand of the service as a whole, if you

4    are to award damages based on the value of the service as a

5    whole.

6         You may also consider other factors which in your

7    mind would have increased or decreased the royalty Google

8    would have been willing to pay and SimpleAir would -- would

9    have been willing to accept acting as normally prudent

10   business people.

11        The final factor establishes the framework which

12   you should use in determining a reasonable royalty; that is,

13   the payment that would have resulted from a negotiation

14   between the patent holder and the infringer taking place at

15   a time prior to when the infringement began.

16        In determining a reasonable royalty, you may

17   consider whether or not Google had commercially acceptable

18   non-infringing alternatives to taking a license from

19   SimpleAir that were available at the time of the

20   hypothetical negotiation and whether that would have

21   affected the reasonable royalty the parties would have

22   agreed upon.

23        A reasonable royalty is not limited to the amount

24   that the infringer could have paid to avoid infringement.  A

25   non-infringing alternative need not have been used to be

1    acceptable.  You may also consider the utility and

2    advantages of the patented invention over any acceptable

3    non-infringing alternatives that could be used for working

4    out similar results.

5         Though the '279 patent is not at issue in this

6    case, the existence of a pending separate suit where the

7    '279 patent has been asserted but not finally resolved may

8    be considered by you in this case in deciding if Google's

9    proposed non-infringing alternative is, in fact, an

10   accepted -- acceptable alternative or not.

11        In determining what royalty agreement the parties

12   would have agreed to at the time of the hypothetical

13   negotiation, the parties' experts and you, the jury, may

14   properly consider information and -- and events that

15   occurred or came into existence after the date of the

16   hypothetical negotiation.

17        Where the parties dispute a matter concerning

18   damages, it is SimpleAir's burden to prove that it is more

19   probable than not that its version is correct.  However, the

20   determination of a damage award is not an exact science, and

21   the amount need not be proven with unerring precision.  You

22   may approximate, if necessary, the amount to which the

23   patentholder is entitled.

24        In such case, while the damages may not be

25   determined by mere speculation or guess, it is proper to

1    award a damages amount, if the evidence shows the extent of

2    the damages as a matter of just and reasonable inference.

3           At this time, ladies and gentlemen, we will hear

4    closing arguments for the attorneys for both of the parties.

5           We'll begin with the first closing argument from

6    the Plaintiff.

7           Mr. Dovel, you may address the jury.

8           MR. DOVEL:  Thank you, Your Honor.

9           Good morning, ladies and gentlemen.

10          I'm going to speak with you about 10 minutes or

11   so, and then we'll hear from Google's lawyer, and then my

12   colleague, Mr. Eichmann, will give our final argument.

13          The first thing I want to talk to you about is

14   that SimpleAir's patent increased Google's profits.  What

15   the evidence showed is that notifications started out slow

16   but became a very popular feature, something that for many

17   people was important to their use of smartphones.  It wasn't

18   important for everybody, but for many people, it was very

19   important.

20          Why does that matter?  It matters because

21   Google makes money when it sells or when -- when

22   Android's phones are put into use.  Makes money from

23   advertising, from selling apps from other sources.

24          And what we know is that as a result of adding the

25   notification feature, more phones were put in use.  More

1    phones were sold.  More Androids were put in use as compared

2    to iPhones or Windows phones.

3          This that I put on the board here is --

4    illustrates the testimony that I got from cross-examination

5    of Google's expert, Dr. Ugone.  He tested this himself.  He

6    wanted to find out, well, what happened when the

7    notification feature was put in place?  What happened to

8    Google's Android use?  Did -- did Android go up in the

9    market or did it go down?  Did it stay the same?

10         According to his calculations in the one-year

11   period before the infringing feature was put into place,

12   Android had a market share of just about 16 percent.  And in

13   the one-year period after, it jumped dramatically to 51

14   percent.

15         Now, we don't claim that our feature was

16   responsible for every bit of this increase, but it was

17   responsible for a substantial portion of it.  And when Dr.

18   Ugone tested it, he established with his own statistics, his

19   own data that Android sales went up dramatically after the

20   notification feature was introduced.  It was introduced in

21   May of 2010, and it jumped dramatically thereafter.

22         And that makes a difference why?  Because every

23   time an Android is put in use, there's another potential

24   person to sell an ad to.  There's another potential person

25   that's going to buy apps, another potential person that's

1    going to buy an Android phone.  And the more Android phones

2    that are put in use, the more money Google makes.  That

3    proposition was admitted by every witness that was asked

4    about this.

5         Now, the next point I want to talk to you about is

6    how much money did Google make for this?  And I want to

7    address this for a specific reason, pointing out to you that

8    Google has been trying to understate all through this trial

9    how much money they've earned from Android.

10         Their witness came on the stand.  He told you --

11    put up some numbers that totaled about $1.1 billion.  This

12    was Jon Gold.  But then I cross examined him, and he

13    admitted the following:  Well, this is really just numbers

14    for three months in 2013, just three months.  And if we

15    consider the rest of 2013, we've already got another $3.3

16    billion in revenues.  And then there are these additional

17    phone sales, these additional sales of phones that Google

18    makes that don't show up on his accounting because there's

19    another person at Google that accounts for those.  He didn't

20    know the exact number, but he -- he admitted that it was at

21    least as much as show up on his books in a year which is at

22    least a billion dollars a year, and that means for 2013

23    alone, there were Android revenues of at least $5.4 billion.

24         We know it's more than that because we don't have

25    all the phone sales in there.  And this doesn't account for

1    all the years before 2013.  This is just for 2013 alone.

2    They came in and tried to tell you that this was about a

3    billion dollars.  No, in 2013, alone, it was more than 5.4

4    billion.

5         The next point is this.  When Dr. Ugone went to

6    calculate, well, gee, let's figure out how much revenue

7    Google earns per Android device.  And he says it's about

8    $20.  When he did his calculation, he based it on the phony

9    data, the data we just looked at a minute ago, the one that

10   was just about $1.1 billion.  And when I cross examined Dr.

11   Ugone, he admitted that when we add in those additional

12   revenues, what happens?  If we just fix 2013, that's the

13   only year we fix, we get up to $60 per phone -- $60 per

14   phone.  And it's more if we include the other missing

15   revenues.

16        And, in fact, as -- as Mr. Gold testified, their

17   revenues are doubling or tripling every year.  We're not

18   comparing this to $20 a phone.  It's at least 60 and more.

19        The next point is this.  Estimating the infringing

20   profits.  What do we mean by that?  We're not here to say

21   that all those Android profits are attributable to our

22   invention.  That's not it at all.  But a big chunk of them

23   are.  Not half, not a quarter, but a big chunk of it.  And

24   we want to find out how much it is.

25        Well, as every witness that was asked admitted, we

1   know that Google is making more money by giving the

2   notification feature away than if they charge for it -- that

3   is, if they charge for it, they make this amount.  In fact,

4   we know they're making more.  We don't know how much more,

5   but we know they're making more.  So if we can figure out

6   how much they would have made if they charged separately for

7   it, we would know for sure they're making actually more

8   money.

9           So we went out to calculate how much could they

10  have earned if they charged separately for it?  If we could

11  find that out, we know the answer.  We know how much money

12  Google is making for using our infringing product.  That is

13  profits that are attributable solely to the notification

14  feature, not all of those other features in the phone.

15          Now, how'd we do that?  There's a way that big

16  companies use to find this answer to these sorts of

17  questions in the real world.  It's called conjoint analysis.

18          Dr. Seenu Srinivasan is one of the world's

19  foremost experts.  This is what their expert, Dr. Dhar, said

20  about him, he is one of the world's foremost experts.  As

21  Dr. Srinivasan testified and it's unrebutted, if you're a

22  big company, if you're Johnson & Johnson, you're Colgate

23  Palmolive, you're eBay, you're -- you're Wells Fargo, you're

24  Marriott Hotels, you're Pfizer, and you want to know how

25  much money can we expect to earn if we add this feature,

1   this tiny feature to this product.  If we add this thing to

2   our laptop, if we add this thing to our digital cameras, how

3   much money are we going to make?  What do they do?  They

4   call Dr. Srinivasan, and they hire him.  And he's been at

5   this a long time.  He charges $900 an hour.  And those

6   companies keep coming back, and they keep paying him that

7   money.  It's a lot of money.

8         And the reason they pay him that money is because

9   he gives them the right answer every time.  He has a

10  scientific technique that he's developed that others have

11  tested that's in use now, 18,000 times a year, that gives

12  the answer to this question.

13        He did a study and he then calculated something

14  called the correlation coefficient.  This is a scientific

15  statistical measure of is this data reliable.  After we get

16  all this data, is it good data or not?  Is this working or

17  not?  And it came out with something called the .88

18  correlation coefficient which he testifies is very reliable.

19        And that's undisputed, unrebutted testimony.

20  Their expert, Dr. Dhar, said nothing about this whatsoever.

21  This is the scientific fact.  This study is right.  This

22  study is right.

23        And it tells us that the market willingness to pay

24  is about $12, and Dr. Srinivasan even calculated for us his

25  statistically accurate confidence interval.  In other words,

1   he wants to tell you, I'm not here to tell you just by a

2   preponderance, 51 percent -- 95 percent confidence.  Here's

3   the confidence interval.  I can be 95 percent confident that

4   the answer is within this range -- 95 percent confidence.

5          When you do studies like this, they're not going

6   to be precise.  They're estimations.  As the Court says,

7   when we calculate damages like this, we can use estimations.

8   But it's not far off the mark.  It's about $12.  That's the

9   answer.

10         And he also calculated the percentage of Android

11  users that would have purchased this -- about 42 percent.

12  He gave his confidence interval.

13         Now, what did they present to try to rebut this?

14         Three important points.  They presented a critique

15  from Dr. Dhar.

16         Now, Dr. Dhar is not an expert in conjoint

17  analysis.  He didn't say he was an expert in conjoint

18  analysis.  He didn't say he'd ever actually done one.  He

19  said he'd been a litigation consultant on matters involving

20  conjoint analysis.  He had written a couple papers that

21  happened to mention conjoint analysis.  There's not a single

22  company that's ever hired him to do a conjoint analysis.  He

23  didn't mention the name of a single company that ever hired

24  him to do a consumer survey of any kind.  Why is that?

25  Because he's not the guy you go to.  He doesn't do this for

1  a living.  He's the academic.  He doesn't find answers in

2  the real world.

3        But he is an academic that's capable of doing

4  statistical tests and of also conducting surveys and testing

5  things.  But he didn't do any statistical test.  He didn't

6  do a survey or any testing with any real world customers.

7  What did he do?

8        THE COURT:  10 minute warning, Counsel.

9        MR. DOVEL:  Thank you.

10        He did something that did not require his Ph.D.

11  He went on the Internet and read some reviews and said let's

12  see how often notifications are mentioned.  That's not a

13  scientific test for how important notifications are to real

14  world consumers.  It's not a test of how much money people

15  would actually pay for it.

16        He said -- his final criticism was, well, if

17  we did this for all these things, we're going to have a

18  phone that's worth $2,000.  That's what it's going to

19  tell us, but that's not what this is about.

20        We're not taking twenty features and adding them

21  to a phone.  We're adding one, and when you add one to a --

22  one feature to a phone, it tells you what the market

23  willingness to pay is for that feature, assuming all the

24  other features are there.  That is, all the other phones

25  already have WiFi; they have phone-making capability; they

1    have access to the Internet.

2           The question is:  If we add this feature, what

3    does that do?

4           It increases the market willingness to pay by

5    $12.23.  This is undisputed, unrefuted testimony.

6           And the rest from there is basic math.  $12.23

7    times 42 percent, $5.16.  We subtract the costs, which are

8    undisputed.  Again, Mr. Mills calculated those using

9    Google's actual data.  They're undisputed.  Undisputed.

10          Then infringing profits of $3.10, extra profits

11   that they got on average per phone.  On some phones, they

12   got no extra profits; on others, they got $20 or more in

13   extra profits.  On average, $3.10 per phone, undisputed.

14          When we divide that fairly, at least 30 percent

15   goes to SimpleAir, because they have no alternative.

16   There's no other way for them to earn that money.  Without

17   our patent, that $3 does not exist in their bank account.

18   At least 30 percent goes to SimpleAir.  That means 93 cents

19   a phone.

20          The final topic I want to address with you is

21   these settlements.  There are seven patents that were

22   licensed by all these different companies, and what the

23   evidence shows is the '914 patent is about a central

24   broadcast server.

25          The evidence shows that four of those companies

1    used a central broadcast server, used the patent, used the

2    '914 patent for an app notification service.

3            What about the others?

4            The evidence showed that none of them were using

5    the '914 patent.  There's not a single scrap of evidence

6    that any of them had a central broadcast server.  In fact,

7    we know that for Facebook and Yahoo!, for example, they made

8    use of Google's.  They had to send their -- their

9    notifications to Google to send on to their customers or

10   send it to Apple to send on to their customers.

11           What were they doing when they licensed the

12   patents?

13           Well, we don't know exactly what other patent they

14   were concerned about.  They paid smaller amounts, but likely

15   it was for one of those other patents, one of those other

16   seven.

17           Those agreements, Facebook and Yahoo! and so on,

18   they tell you nothing about the value of the '914 patent to

19   a company that's actually using it.  We have to compare

20   Google to companies that are using the '914 in the same

21   manner, apples to apples.  We compare it to Google, Apple,

22   Microsoft, and BlackBerry.  And when we do, what did we find

23   out?

24           Here's our property, the '914 patent.  BlackBerry,

25   Microsoft, and Apple, they each used our property.  They

 1  built a structure on it, different sizes.  Whoever built the

 2  biggest, paid the most.  Before Google, that was Apple.  But

 3  Google then built the biggest structure of all, used the

 4  patent the most, five times more than Apple, the next

 5  biggest.

 6          They should do what everybody else did and pay

 7  according to how much they've used our patent.

 8          And if they do that, they owe between 127

 9  million -- that's the settlement analysis -- and $146

10  million.

11          Thank you.

12          THE COURT:  All right.  Mr. Stockwell, you may

13  address the jury on behalf of the Defendant.

14          MR. STOCKWELL:  Thank you, Your Honor.

15          THE COURT:   All right.  You may proceed.

16          MR. STOCKWELL:  Thank you, Your Honor.

17          Good morning.

18          I want to -- I want to just say I know it's a

19  sacrifice for you to be here.  I've actually served on a

20  jury myself.  I want to thank you so much for paying so much

21  attention through the course of the case.  And I want to

22  thank you in advance for being able to give the parties a

23  fair and just verdict.

24          Now, one of the things that you're able to do as

25  the jury is you're able to ask to look at any of the

1    evidence.  And I've written down on this summary some

2    exhibit numbers of the evidence that we think supports the

3    fact that the damages here are no more than $6 million.

4         If you want to see any of this and look at any of

5    this evidence, write down the numbers and you can ask the

6    Court for it when you're deliberating.

7         So the question in this case, did we use the '914

8    patent, that's not the question.  That's been settled.

9    The other question in this case -- the other question in

10   this case, did we copy them?

11        No.  You just heard the Judge say there's no

12   allegation of copying, and, in fact, Google's service was

13   independently developed.

14        Now, you heard SimpleAir's lawyers say at the

15   beginning of the case this is like property, and you know

16   that if somebody throws a baseball through your window,

17   you're going to have to pay for that damage, right?

18        The question in this case is, did we really damage

19   SimpleAir's patent?

20        No.  We didn't take product sales from them.  Mr.

21   Payne admitted that.  So that's why the law says, if you

22   don't really damage, you're limited to a reasonable royalty.

23   It's got to be fair to both sides, because there can be

24   accidental, unknowing infringement.  That's why you've got

25   to consider both sides of the story.

1          We put $6 million on the table.  That's a lot of

2     money.  It's a lot of money for one patent, not seven.  It's

3     a lot of money other than all the other agreements.  The

4     only one that's bigger is the Apple agreement.  It's more

5     money than anyone else has paid them for one patent.

6          They said no.  And we think that's because they

7     want something that's not fair and not reasonable.

8          Now, to demand that much money, we think that one

9     of the things they needed to do, and the Judge just told you

10    this, and he told you at the beginning of the case, it's

11    their burden to tilt those scales with the greater weight of

12    the evidence.  They had to do that with real-world evidence.

13    They didn't have that.

14         They promised repeatedly they'd give you

15    real-world data.  The real world shows they never got a

16    payment per phone.  They never got a payment per message.

17    Just like you pay a lump sum for the very computer I'm using

18    and you send emails, you don't pay for the emails.  You just

19    buy the computer.

20         The central broadcast server that infringes, you

21    don't pay for that message-by-message.  You buy the

22    computer.  When you're paying for a license to use that

23    computer, you pay for just that computer, like every single

24    license in this case.

25         The license they propose is for one patent.  It's

1    for half the time of their other licenses.  The money they

2    seek is more than the four times as much as the money

3    they've gotten from thirteen licensees.

4              This doesn't pass the reasonableness and real

5    evidence test.

6              Now, what did they say about this?

7              Well, they -- they just tried to convince you

8    again that $12.23 -- notifications are worth $12.23.  Now,

9    I -- common sense.  The Judge instructed you to use that.

10             Everyone agrees that most apps are free, and

11   everyone agrees that when there is a charge, it's only a

12   buck or two.  Even Dr. Srinivasan agrees with that.

13             They're trying to say that $12.23 per phone for

14   notifications is the right number, even though apps are free

15   or just 1 to $2.  Common sense says that doesn't make sense.

16   They're also trying to say -- they tell you in their own

17   survey, the second worst feature they surveyed was

18   timeliness of notifications, and the only reason it was the

19   second worst is because counsel suggested that he add the

20   worst feature, FM tuner.

21             All these other features, you know they've got to

22   be worth more than $12.  This survey adds up to a -- a

23   smartphone that's worth thousands of dollars.  That makes no

24   sense.

25             This is not based on real-world evidence.  It's

1    based on a formula, and the formula is nothing but

2    speculation or guesswork.

3            How do we know that?

4            Well, let's look at what Dr. Srinivasan said.  He

5    said you can't use Formula 14 to determine the increase in

6    the price.  And yet, that's how they're trying to use it.

7    They're trying to say Google should have increased the price

8    of notifications from $12 to 0.  That doesn't make any

9    sense.

10           What else did he say?

11           He said Formula 14 is going to be unreliable for

12   large improvement features.  That means if it's an important

13   feature, you can't use it.  Counsel just said notifications

14   are important.  That's their view.  That's why they say, oh,

15   we can get a piece of all of your Android revenue, because

16   these things are so important.  Their own expert said I

17   can't use Formula 14 reliably for important improvements.

18           What else did he say?

19           Well, he said, well, I didn't consider

20   competition.  The smartphone market is one of the most

21   competitive markets in the world, and he doesn't consider

22   that, even though his papers says he has to.

23           He said, oh, well, you know what, I had to throw

24   out a third of the data.  What was left was 66 percent.

25           That's a D.  Why is that a D?

1          What else did he say about the survey?  Even

2    worse, he said -- he told these folks that were

3    surveyed, 186 folks that were using Androids -- 186, I

4    guess it's one million per person in their view.

5          Previous research has identified notifications

6    as important, and he admitted that he had no research to

7    support that.  He misled the survey respondents.

8          And then he omitted all of those features.  These

9    are features that were actually identified by real consumers

10   as important.  He only tests 16.  He doesn't test the

11   hundreds of features.

12         Even he admitted that the consumer report study

13   that he did to identify the features, that he left out a

14   bunch of features in the consumer support study and he

15   testified that if I leave out important features, the

16   results are unreliable.

17         Now, I don't know about you, but I'm pretty sure

18   that smartphones, one of the most valuable features is

19   phoning, which was left out of the survey.  And to say that

20   that survey is reliable under those circumstances is not

21   credible.

22         Now, what did they do with that number?  They came

23   up with exactly what I told you in opening and they deny it.

24   They said they were going to bring you real world numbers.

25   I said they're going to talk about hypothetical revenue.

1          Mr. Mills takes that number and he says, I'm going

2     to make a hypothetical charge.  And then he applies it not

3     to the phones Google sold.  He applies it to 193 million

4     phones that other people sold.  Google's not even on this

5     list.  They're not even selling those phones.  They're not

6     making that revenue.  They're not getting that profit.  You

7     heard him just talk -- talk about Mr. Gold and the numbers.

8          The reason -- the reason those numbers aren't on

9     there is they're not Google's.  They're Alcatel, AT&T,

10    Casio, Dell, HTC.  That's not Google.  You can't add those

11    numbers to Google.

12         The other thing is he did a study on smartphones,

13    not the apps.  The closest thing in this case that has

14    anything to do with the patent is apps, but he didn't even

15    study that.  He studied smartphones, and smartphones don't

16    infringe.

17         Now, at the end of the day we gave them the actual

18    real world evidence.  We gave them the financials on the

19    whole Android business.

20         It's true, I had Mr. Gold just look at one

21    quarter.  I could have dragged everybody through the whole

22    set.  We gave them all of the financials on Android.

23         Dr. Ugone calculated what our Android revenue was

24    on a per phone basis.  It's 20 bucks.  They're saying they

25    get $12 of that.  They get 60 percent of all of our Android

1    revenue.  That includes ads.  60 percent for notifications.

2    The real world suggests their theory doesn't make any sense.

3           Now, what about the Microsoft theory?  They're

4    asking you to accept unreliable data on this.  The first

5    point is, Mr. Mills says, oh, they paid $5 million for the

6    '914 patent.  Well, Mr. Payne says actually they paid $5

7    million for two patents because that's what they sued

8    Microsoft on.

9           We also know, because Mr. Mills admits it, that

10   the Microsoft agreement doesn't have a per message payment

11   in there.  And Mr. Payne, their lead negotiator, admitted

12   the same thing.

13          Now, in this case, you have to determine damages

14   based on the actual amount of infringing use.  Now, they try

15   to take the Microsoft agreement, and you heard them talk a

16   lot about 11 billion.  One of the things that Dr. Knox said

17   that in order to infringe, the message has to actually be

18   delivered.  This is his testimony in black and white.

19          What did Mr. Manolache -- Manolache say?  He

20   explained that of that 11 billion they took, those are send

21   requests.  That's Facebook.  That's everybody else sending

22   us a request, saying, hey, can you forward that?  50 percent

23   aren't delivered.  Maybe no one's home.  Maybe they got the

24   wrong address.  We don't deliver 50 percent.  Right away, 11

25   billion is cut in half.  Did they take that into account?

1    No.  They're just trying to pump the numbers up.

2         Then they said -- Dr. Knox said I had to estimate

3    this because they didn't give us the right data.  We did

4    give them the data.  We gave them a spreadsheet showing

5    where every single server was and where all these send

6    requests were coming.  We showed messages from non-U.S.

7    servers.  They included all that.

8         They also included messages from outside the

9    United States.  We gave them a specific number.  We gave

10   them the 193 million messages that went through our U.S.

11   servers and were delivered to U.S. Android subscribers.

12   Those are the actual messages, not the 11 billion.  193

13   million.

14        Mr. Mills ignored that number.  Should he have?

15   Absolutely not.  Because you know what Dr. Knox said?  In

16   the first trial -- you might remember I showed him this

17   slide.  This was his slide from the first trial.  How many

18   times has Google infringed?  Hundreds of millions of times,

19   exactly like the 193 million.  Now he says 11 billion.  14

20   billion.

21        Now, why is this important?  The Judge just read

22   you the law, the charge.  You may not award damages based on

23   any use of the accused services in other countries.

24        What did Mr. Mills do?  He's awarding damages

25   based on worldwide numbers for Google.  Google's

1   notification numbers were 193 million.  They weren't 11

2   billion.  This is just so he can pump the number up.

3           If you actually adjust it back to 193 million, you

4   might remember, as Ms. Williams did, you get the Microsoft

5   agreement between 3.171 million and 5.4 million.  That's the

6   fair comparison here.  Not 127 million.

7           Now, I want to talk a little bit about this other

8   theory they have that the -- we -- we need to compare Google

9   to Apple.

10          Now, who's theory is this?  It's the lawyer's

11  theory because you know what, Mr. Mills did not talk and

12  adjust the Apple agreement.  In fact, he said he didn't do a

13  comparison.  He presented a slide that said he didn't have

14  enough information for comparison of Apple to Google.

15          Apple's got the biggest number here, 30 million.

16  They keep trying to suggest we've got to pay more.  They

17  didn't even use the Apple agreement.  They used a different

18  agreement.  Their own expert concluded you can't use the

19  Apple agreement here.

20          Why is that?  Because Apple is 20 -- is -- is 40

21  times -- they've got 40 times the phone revenue that Google

22  has.  80 billion in 2012, compared to 2 billion Android

23  revenue across the whole United States and whole world for

24  Google.  40 times our size.

25          You also heard Mr. Gold explain the number of

1  phones Google has sold, the Nexus phones, about 2 million

2  worldwide over time.  Dr. Ugone pointed out in one year

3  Apple sold 49 million iPhones.  In one year, they've sold 25

4  times as many phones as Google's ever sold.  There's no

5  comparison between Apple and Google, in their view, and the

6  reason is Apple is so much bigger in the phone market.

7  Apple paid more money because they had tons of revenue.

8  Google doesn't have that.

9          THE COURT:  5 minute warning, Counsel.

10          MR. STOCKWELL:  Now, I want to talk a little bit

11  about what our theory is and what our evidence shows.  One

12  of the things that you have to remember is we actually gave

13  them the real numbers.  And Mr. Mills said I didn't use

14  those numbers.  We gave them real numbers that showed the

15  cumulative profits of Android are $150 million.  They want

16  all of the cumulative profits for Android.  That's not

17  reasonable.

18          What you've got to do in this case is you've got

19  to step back and figure out what Google did that infringes

20  and only award damages for that.  You have to exclude the

21  things that Google added.

22          Android's not infringing.  Only the central

23  broadcast server infringes.  And we know that Android added

24  lots of features.  There were hundreds of features.  One of

25  them is apps.  Apps have lots of features, and notifications

1  is just one feature of all of the features in Android and

2  only one feature of an app.

3       Now, Mr. -- Dr. Ugone talked to you about the

4  table and the reasonableness of having both sides at the

5  table and talking about what the evidence shows.  You've

6  got to envision yourself at that table, and as you do

7  that, you've got to realize Google's going to be talking

8  about all the benefits they had for Android that have

9  nothing to do with this patent.

10      They're the non-patented features, the ones that

11 you have to exclude from any calculation.  And you realize

12 they're going to be talking about the value of

13 notifications.  What are the value of notifications?

14      We know they're low.  57 percent of all apps are

15 free; 86 percent of notifications come from the top 10 free

16 apps.  AirMedia went bankrupt when they tried to charge for

17 it, and there's no evidence that anyone else has ever

18 charged for notifications.  That's going to be at the table.

19      And we know that Google's going to talk about

20 Facebook.  Facebook is going to be at the table, because

21 Facebook is the most relevant license agreement.  Google

22 delivers half the messages that -- half of its messages are

23 from Facebook.

24      Facebook is just like Google, as Mr. Payne

25 admitted, because Facebook and Google, they don't derive

1   direct revenue from notifications.  They had Facebook make

2   that representation.  It was important to them agreeing to a

3   900,000-dollar amount.  Facebook had half the messages that

4   we delivered.  They paid $900,000.  If you just double that,

5   that's a couple million dollars.

6          That's the relevant comparison.  That's what's

7   going to be talked about at the table.

8          You're also going to have Google talking about the

9   patents it paid for, the Aloft Media, the $5-1/2 million for

10  Motorola.  It was undisputed that these were technically

11  comparable.  Dr. Williams testified about that.  Dr. Knox

12  didn't.  He didn't challenge that.  He didn't challenge the

13  Aloft agreement as being technically comparable.

14         Google is sitting at the table knowing that it's

15  paid $5-1/2 million for comparable patents, similar patents.

16         We also have to consider the other thing that

17  Google knows.  We all have different ways we can spend our

18  money.  We can buy one product over the other.  Google had

19  another patent they could go to.  United States patent laws,

20  they don't apply to activity outside the country.  You have

21  to consider the non-infringing alternative.  We had other

22  data centers already.  All we had to do was move the GCM

23  server overseas.  It would cost about $4.8 million.  The

24  location of the servers wasn't relevant.

25         What does Dr. Knox say?

1            Well, you'll -- you'll infringe the '279 patent.

2    But even he admits you can't infringe a patent that hasn't

3    issued.  October 29th, 2013, it only issued a couple months

4    ago.  There's been no finding on that.  Plus, the service is

5    going to be overseas.  You can't infringe it over there.

6            That brings us back to the hypothetical

7    negotiation.  As you're sitting at the table, you're hearing

8    these points.  You're looking at the real-world evidence,

9    the evidence that we brought to you, the evidence of these

10   agreements, the Yahoo!, the Facebook, the Aloft, the

11   Motorola agreement.

12           We think all of that evidence points to a

13   reasonable royalty damage of $6 million.  It's a fair

14   number.  It's reasonable to both sides.  It's a lot of

15   money.  And when you fill out that jury verdict form, we

16   would ask you to put something down of no more than $6

17   million.  That's the just verdict in this case.

18           Thank you for your time.  Thank you for your

19   attention.

20           THE COURT:  All right.  Mr. Eichmann, you may

21   address the jury on behalf of the Plaintiff.

22           MR. EICHMANN:  Thank you, Your Honor.

23           THE COURT:  You have six minutes remaining.

24           MR. EICHMANN:  Good morning.

25           As you've heard, I only have a short amount of

1    time to talk to you, and I wanted to start with the very

2    beginning of this case when you were all asked various

3    questions about yourself and how you view lawsuits, all

4    these questions that were designed to figure out whether you

5    could be a fair and impartial jury.

6            You might have seen that we had all these charts

7    with your names on it.  People were taking these notes down.

8    We made you fill out those questionnaires before you came

9    in, had all this information.

10           At the end of the day, none of that actually even

11   matters.  We are presenting the exact same evidence and

12   arguments that we would present to any other member of this

13   community, any other group of eight people.

14           That other information is interesting, but what

15   we're really trying to figure out is, can you look at the

16   evidence and can you understand the difference between a

17   settlement agreement and this hypothetical negotiation that

18   both parties say has to happen?

19           Can you sit here and look at Mr. Payne and his

20   co-inventor, Mr. von Kaenel, who's also here, and understand

21   that a small company comprised of just two inventors, who

22   did all this work back many years ago, can actually be

23   entitled to so much money from a company like Google?

24   Can they convince you that they are not entitled to pay

25   damages, because it's Google and they don't really need

1    their patent and they don't compete in the marketplace?

2          These are all the questions and the concerns that

3    we have, and we think they're addressed by the jury

4    instructions that the Judge read, because none of those

5    concerns matter.  The law requires that you give the

6    inventors what they are entitled to under the law, which is

7    a reasonable royalty.

8          Now, we also discussed this concept in the

9    opening -- excuse me -- jury selection, about a broken

10   window.  And what you heard here is that they didn't send

11   the ball over accidentally.  They threw the ball; they broke

12   the window; and they came over and tried to pay for one

13   window, but they didn't break just one window.  They didn't

14   break just two.  They are breaking windows every single day.

15   And they haven't paid us for a single one of those.

16         They say, well, we're focusing on the worldwide

17   numbers, trying to get infringement that's outside the

18   United States.  Absolutely not.

19         How many times did you hear us distinguish between

20   worldwide and U.S. revenues during -- excuse me -- and

21   notifications during our testimony?

22         Because we know we are required to prove they're

23   doing this a lot in the U.S.  Even by their own admission,

24   192 million times a day, they're infringing our patent.  192

25   million times a day.  They haven't paid us a single penny

1    for that.  A single penny.  They say they brought $6 million

2    to the table.

3         Well, there was a briefcase that the Google

4    representative had at that table.  We haven't seen that

5    briefcase.  They say they owe us $6 million and they are

6    ready to pay that.  We haven't received a single dollar.

7         Did you hear any evidence about that?

8         And what did they do after this lawsuit was filed,

9    when they found out that they were innocently infringing

10   somebody else's patents?

11        They kept on doing it.  This lawsuit was filed in

12   2011.  And right after that, they kept running up all the

13   way to 14 billion.  And by the way, Dr. Knox didn't say 14

14   billion was in the U.S.  He said something along the order

15   of a billion, hundreds of millions.  We're in large -- very

16   large numbers.

17        If they want to go back to the way he phrased it

18   the first time, that's fine.  200 million times per day is a

19   lot of infringement.  And when we compare that infringement

20   to the other companies, like Apple and Microsoft, we took

21   apples to apples.

22        THE COURT:  Two minutes, Counsel.

23        MR. EICHMANN:  We said that they are both

24   worldwide companies.  They also have their servers all over

25   the place, but they came to the table and they brought real

1   money, not a fake briefcase.

2          They are sill here today arguing that they should

3   be considered different than these companies.  They didn't

4   only throw the ball over and break a couple of windows.

5   They went back over, saw that they were on our property, and

6   they stayed.  And they put up the biggest building on the

7   property, and they don't want to pay for being there.

8          Our representative has a face.  He's sitting right

9   here, and he knows what he invented before Google was even

10  founded, more than a decade before they even came up with

11  the Android operating system or this infringing notification

12  service.  He knows that.  They didn't even tell us who's on

13  the other side of the negotiation table.

14         They want you to consider us to be unreasonable.

15  Is it unreasonable to take the undisputed evidence of

16  infringing profits, $3.10 per phone, and to say that of the

17  infringing profits, SimpleAir gets 30 percent.  And they

18  still get to keep 70 percent of the infringing profits.

19  That is reasonable?

20         We did not come in here trying to trump up the

21  damages.  We came in here providing unbiased testimony from

22  Mr. Mills.  This is his analysis.  And they took down these

23  exhibits, but we'll have you look at any single one of

24  those, including the Microsoft agreement, which is our

25  Exhibit 295.  That's the one that's most relevant.

1          And we thank you for your time.

2          THE COURT:  All right.  Ladies and gentlemen, I'd

3     like to give you a few final instructions before you begin

4     your deliberations.

5          You must perform your duty as jurors without bias

6     or prejudice as to any party.

7          The law does not permit you to be controlled

8     by sympathy, prejudice, or public opinion.  All parties

9     expect that you will carefully and impartially consider

10    all of the evidence.  Follow the law as I have given it

11    to you and reach a just verdict, regardless of the

12    consequences.

13         Answer the question on the verdict form from the

14    facts as you find them to be.  Do not decide who you think

15    should win and then answer the question accordingly.  Your

16    answer and your verdict must be unanimous.

17         You should consider and decide this case as a

18    dispute between persons of equal standing in the community,

19    of equal worth and holding the same or similar stations in

20    life.  This is true in patent cases between corporations,

21    partnerships, or individuals.

22         A patent owner is entitled to protect his or her

23    patent rights under the United States Constitution.  This

24    includes bringing a suit in a United States District Court

25    for money damages for infringement.

1          The law recognizes no distinction among types of

2     parties.  All corporations, partnerships, and other

3     organizations stand equal before the law, regardless of size

4     or who owns them and are to be treated as equals.

5          When you retire to the jury room to deliberate on

6     your verdict, you will each have a copy of this charge or

7     these final instructions to take with you.

8          If you desire to review any of the exhibits which

9     the Court has admitted into evidence, you should advise me

10    by a written note delivered to Mr. McAteer, the Court

11    Security Officer, and I will then send the exhibit or

12    exhibits to you.

13         Once you retire, you should first select your

14    foreperson and then conduct your deliberations.  If you

15    recess during your deliberations, follow all of the

16    instructions that the Court has given you about your conduct

17    during the trial.

18         After you have reached your verdict, your

19    foreperson is to fill in the amount in the verdict form of

20    your -- of your unanimous answer to the damages question.

21         Do not reveal your answer until such time as you

22    are discharged, unless otherwise directed by me.  You must

23    never disclose to anyone, not even to me, your numerical

24    division on any question.

25         Any notes that you have taken during the trial are

1   only aids to your memories.  If your memory should differ

2   from your notes, then you should rely on your memory and not

3   your notes.  The notes are not evidence.  A juror who has

4   not taken notes should rely on his or her independent

5   recollection of the evidence and should not be unduly

6   influenced by the notes of other jurors.  Notes are not

7   entitled to any greater weight than the recollection or

8   impression of each juror about the testimony.

9         If you want to communicate with me at any time,

10  please give a written message or a question to the Court

11  Security Officer, who will bring it to me.  I will then

12  respond as promptly as possible, either in writing or by

13  having you brought back into the courtroom so that I can

14  address you orally.  I will always first disclose to the

15  attorneys in the case your question and my response before I

16  answer your question.

17        After you have reached a verdict and I have

18  discharged you, you are not required to talk with anyone

19  about the case unless the Court orders otherwise.

20        I will now hand to the Court Security Officer

21  eight copies of the final jury instructions and one copy of

22  the verdict form.  And I'll direct him to deliver these to

23  the jury once they retire to deliberate.

24        Ladies and gentlemen, you may now retire to the

25  jury room to deliberate upon your verdict.  We await your

1  verdict.

2          COURT SECURITY OFFICER:  All rise.

3          (Jury out.)

4          THE COURT:  We stand in recess either awaiting a

5  note or a verdict from the jury.

6          (Recess.)

7          ************************

8

9                        CERTIFICATION

10

11          I HEREBY CERTIFY that the foregoing is a true

12  and correct transcript from the stenographic notes of the

13  proceedings in the above-entitled matter to the best of my

14  ability.

15

16

17  /s/_Shelly Holmes____                    _____3/19/14_____
    SHELLY HOLMES, CSR                       Date
18  Official Court Reporter
    State of Texas No.:  7804
19  Expiration Date  12/31/14

20

21  /s/_Susan Simmons_____                  _____3/19/14_____
    SUSAN SIMMONS, CSR                       Date
22  Deputy Court Reporter
    State of Texas No.:  267
23  Expiration Date  12/31/14

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25